**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

GIDEON RAPAPORT,                                    Case No.: 24-cv-7439-JGLC

                        Plaintiff,

            v.

RICHARD ALLEN EPSTEIN, et al.,

                        Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT MITCHELL K. PALLAKI'S MOTION TO DISMISS**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND .................................................................................................... 3

    I.      The Parties and Claims ................................................................................ 3

    II.     Plaintiff's Allegations ................................................................................... 4

         A.     Plaintiff's Allegations Regarding Supreme Court Clerkships and Professor
               Epstein's Purported Influence and Power as a Supreme Court Recommender ...... 4

         B.     Plaintiff's Allegations Regarding the Purported Relationship Between and
               Among the Parties ................................................................................... 5

         C.     Plaintiff's Allegations Regarding Defendants' Purported Misconduct ................. 5

PLEADING STANDARD ........................................................................................ 8

ARGUMENT ......................................................................................................... 9

    I.      The Court Should Dismiss the RICO Claims ......................................................... 9

         A.     Plaintiff Failed to Allege a Cognizable RICO Injury ........................................ 10

         B.     Plaintiff Failed to Allege Causation............................................................... 13

         C.     Plaintiff Failed to Allege a Pattern of Racketeering Activity ............................. 15

    II.     The Court Should Dismiss the Antitrust Claims................................................... 22

         A.     Plaintiff Failed to Allege Any Plausible, Cognizable Market ............................. 22

          B.     Plaintiff Failed to Allege that Mr. Pallaki Committed Any Antitrust Violations. 23

         C.     Plaintiff Failed to Allege Antitrust Injury......................................................... 24

CONCLUSION....................................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Alix v. McKinsey & Co., Inc.*,
  2023 WL 5344892 (S.D.N.Y. Aug. 18, 2023) ........................................................ 20

*Alphas Co. of N.Y., Inc. v. Hunts Point Terminal Produce Coop., Inc.*,
  2017 WL 1929506 (S.D.N.Y. May 9, 2017) ............................................................ 12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .......................................................................................... 8, 14

*Bayshore Cap. Advisors, LLC v. Creative Wealth Media Fin. Corp.*,
  667 F. Supp. 3d 83 (S.D.N.Y. 2023) ................................................................. 15, 21

*Black v. Ganieva*,
  619 F. Supp. 3d 309 (S.D.N.Y. 2022) .................................................................... 17

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) .............................................................................................. 24

*D. Penguin Bros. Ltd. v. City Nat'l Bank*,
  587 F. App'x 663 (2d Cir. 2014) ............................................................................ 10

*Dangerfield v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  2003 WL 22227956 (S.D.N.Y. Sept. 26, 2003) ....................................................... 19

*Iowa Pub. Emps. Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
  340 F. Supp. 3d 285 (S.D.N.Y. 2018) .................................................................... 23

*Doe v. Trump Corp.*,
  385 F. Supp. 3d 265 (S.D.N.Y. 2019) .................................................................... 13

*Edmondson v. Raniere*,
  2024 WL 4334374 (E.D.N.Y. Sept. 27, 2024) ........................................................ 19

*First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*,
  385 F.3d 159 (2d Cir. 2004) .................................................................................. 10

*George Haug Co. v. Rolls Royce Motor Cars Inc.*,
  148 F.3d 136 (2d Cir. 1998) .................................................................................. 24

*GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*,
  67 F.3d 463 (2d Cir. 1995) ............................................................................... 21, 22

iii

*H.J. Inc. v. Nw. Bell Tel. Co.*,
  492 U.S. 229 (1989) ................................................................................ 15

*Hamza v. Yandik*,
  2020 WL 2092487 (N.D.N.Y. May 1, 2020) ............................................ 20

*Harbulak v. Suffolk Cnty.*,
  654 F.2d 194 (2d Cir. 1981) ..................................................................... 9

*Hassan v. FEC*,
  893 F. Supp. 2d 248 (D.D.C. 2012) .......................................................... 9

*Hemi Grp., LLC v. City of New York, N.Y.*,
  559 U.S. 1 (2010) .................................................................................... 13

*Hollander v. Pressreader, Inc.*,
  2020 WL 2836189 (S.D.N.Y. May 30, 2020) .......................................... 17

*In re Mexican Gov. Bonds Antitrust Litig.*,
  412 F. Supp. 3d 380 (S.D.N.Y. 2019) ..................................................... 23

*Jingle Kids USA, LLC v. In Colour Cap., Inc.*,
  2023 WL 5016496 (S.D.N.Y. June 6, 2023) ........................................... 11

*Kashelkar v. Rubin & Rothman*,
  97 F. Supp. 2d 383 (S.D.N.Y. 2000) ....................................................... 19

*Kennedy v. Vermont*,
  2018 WL 9815980 (D. Vt. Oct. 9, 2018) ................................................. 25

*Kerik v. Tacopina*,
  64 F. Supp. 3d 542 (S.D.N.Y. 2014) ....................................................... 10

*Kimm v. Chang Hoon Lee & Champ, Inc.*,
  196 F. App'x 14 (2d Cir. 2006) ............................................................... 12

*Lerner v. Fleet Bank, N.A.*,
  459 F.3d 273 (2d Cir. 2006) ................................................................... 10

*Long Island Anesthesiologists PLLC v. United Healthcare Ins. Co. of N.Y.*,
  2023 WL 8096909 (E.D.N.Y. Nov. 21, 2023) ......................................... 25

*Mack v. Parker Jewish Inst. for Health Care & Rehab.*,
  2014 WL 5529746 (E.D.N.Y. Oct. 30, 2014) ......................................... 12

*Miller v. Carpinello*,
  2007 WL 4207282 (S.D.N.Y. Nov. 20, 2007) ......................................... 19

*Miller v. Nicholas*,
　2021 WL 9037639 (E.D.N.Y. Nov. 3, 2021) ................................................................ 24, 25

*MinedMap, Inc. v. Northway Mining, LLC*,
　2022 WL 570082 (2d Cir. Feb. 25, 2022) .................................................................. 21, 22

*Moss v. Morgan Stanley Inc.*,
　719 F.2d 5 (2d Cir. 1983) ............................................................................................ 15

*Petroff Amshen LLP v. Alfa Rehab PT PC*,
　2021 WL 960394 (E.D.N.Y. Mar. 15, 2021) .................................................................. 12

*Regeneron Pharms., Inc. v. Novartis Pharma AG*,
　96 F.4th 327 (2d Cir. 2024) ........................................................................................ 22

*Scheidler v. Nat'l Org. for Women, Inc.*,
　537 U.S. 393 (2003) ................................................................................................... 18

*Sekhar v. United States*,
　570 U.S. 729 (2013) ................................................................................................... 25

*Shetiwy v. Midland Credit Mgmt.*,
　15 F. Supp. 3d 437 (S.D.N.Y. 2014) ............................................................................ 20

*United States ex rel. Camburn v. Novartis Pharms. Corp.*,
　124 F.4th 129 (2d Cir. 2024) ........................................................................................ 9

*United States v. Autuori*,
　212 F.3d 105 (2d Cir. 2000) ........................................................................................ 16

*United States v. Jabar*,
　19 F.4th 66 (2d Cir. 2021) .......................................................................................... 16

*United States v. Percoco*,
　317 F. Supp. 3d 822 (S.D.N.Y. 2018) .......................................................................... 18

*Westchester Cnty. Indep. Party v. Astorino*,
　137 F. Supp. 3d 586 (S.D.N.Y. 2015) ............................................................... 9, 10, 14

*Wilkie v. Robbins*,
　551 U.S. 537 (2007) ................................................................................................... 18

*Williams v. Affinion Grp., LLC*,
　889 F.3d 116 (2d Cir. 2018) .................................................................................... 9, 16

*World Wrestling Ent., Inc. v. Jakks Pac., Inc.*,
　530 F. Supp. 2d 486 (S.D.N.Y. 2007) .................................................................. 10, 11, 12

**<u>Statutes</u>**

18 U.S.C. § 1503 ........................................................................................................... 19

18 U.S.C. § 1511 ........................................................................................................... 20

18 U.S.C. § 1512 ....................................................................................................... 18, 19

18 U.S.C. § 1515 ........................................................................................................... 18

18 U.S.C. § 1951 ........................................................................................................... 17

18 U.S.C. § 1961 .................................................................................................... *Passim*

18 U.S.C. § 1962 .................................................................................................... *Passim*

18 U.S.C. § 1964 ....................................................................................................... 10, 12

**<u>Rules</u>**

Federal Rule of Civil Procedure 9 ........................................................................... 1, 9, 16

Federal Rule of Civil Procedure 12 ............................................................................... 1

Defendant Mitchell K. Pallaki[1] respectfully submits this memorandum of law in support of his motion to dismiss Plaintiff Gideon Rapaport's Complaint (ECF No. 1 ("Compl.")) pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) (the "Motion").

## PRELIMINARY STATEMENT

Plaintiff's Complaint is a meritless, incoherent, 256-paragraph diatribe premised on a purported vast conspiracy at New York University School of Law ("NYU Law") that allegedly had the ability—seemingly without any judicial input or oversight—to place students in one hundred federal district and appellate court clerkships, as well as up to four United States Supreme Court clerkships. It is full of vitriolic *ad hominem* attacks regarding Mr. Pallaki's personal life and religious beliefs that are irrelevant to Plaintiff's claims,[2] all of which are brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and the Sherman Antitrust Act of 1890 (the "Sherman Act"). Plaintiff's plainly meritless claims should never have been brought, and they should be dismissed with prejudice.

According to the Complaint, Plaintiff's once-mentor, Defendant Richard Allen Epstein ("Professor Epstein")—the accused head of the conspiracy—allegedly banded together with Plaintiff's former NYU Law classmates, including Mr. Pallaki, to prevent Plaintiff from obtaining a Supreme Court clerkship that he had purportedly been promised (but for which he never actually applied). To do so, Plaintiff avers, the defendants took control of the NYU Law chapter of the Federalist Society ("FedSoc," and the NYU Law chapter, "NYU FedSoc") and operated it as a racketeering enterprise to destroy Plaintiff's reputation and career prospects.

---

[1] The Complaint incorrectly identifies Mr. Pallaki's middle name as "Kevalla."

[2] Plaintiff has continued to level baseless accusations against Mr. Pallaki, including in his February 5, 2025 filing. (*See* ECF No. 38 at 8.) Mr. Pallaki denies the assertions contained therein.

Plaintiff's RICO claims are facially implausible, and they are legally deficient for multiple, specific independent reasons.  First, a civil RICO plaintiff must allege a concrete injury to property or business, and the loss of a tentative job opportunity, such as the clerkship to which Plaintiff boldly claims he was entitled, does not qualify.  Second, Plaintiff's allegations make clear that there were multiple intervening factors—including the fact that he did not actually apply for any clerkship or successfully clerk for a "feeder" judge—breaking the implausible causal connection that Plaintiff alleges exists between the purported RICO violations and his claimed injury.  Third, Plaintiff's RICO claims are meritless because he has failed to allege that Mr. Pallaki committed any RICO predicates.  While Plaintiff accuses Defendants, in conclusory and entirely implausible fashion, of committing the serious crimes of wire fraud, blackmail, extortion, witness tampering, obstruction of justice, obstruction of state law enforcement, and money laundering, the Complaint lacks factual allegations that would establish that Mr. Pallaki (or any of the other Defendants) committed any such predicate acts.  Nor has Plaintiff alleged that Mr. Pallaki engaged in a pattern of racketeering activity, as required to plead a RICO claim, because he has not alleged that Mr. Pallaki engaged in repeated racketeering activity extending over a substantial period of time or that projects into the future.

Plaintiff's antitrust claims are equally implausible and fare no better.  They fail at the threshold because Plaintiff has not alleged any plausible, cognizable market.  Even if he had, those claims would still fail because Plaintiff has engaged in impermissible group pleading by failing to specifically identify any allegedly anticompetitive conduct undertaken by Mr. Pallaki.  Further, Plaintiff's antitrust claims are deficient because Plaintiff has alleged only that he was personally injured, not that competition as a whole has been adversely impacted.

For these reasons, Plaintiff's claims should be dismissed with prejudice.

## BACKGROUND

The Complaint advances an implausible narrative and contains dozens of nonsensical allegations, and Mr. Pallaki disputes the facts alleged therein. Nevertheless, pursuant to the applicable standard of review, Mr. Pallaki accepts as true the Complaint's well-pleaded factual allegations for purposes of the Motion.

### I.     The Parties and Claims

Plaintiff was a summer associate at Kirkland & Ellis ("Kirkland") and is an NYU Law graduate. (Compl. ¶ 1.) Professor Epstein is a law professor at NYU Law and the faculty advisor for both NYU FedSoc and the NYU Law Journal of Law and Liberty ("JLL"). (*Id.* ¶ 2.) Mr. Pallaki is an NYU Law graduate who had a leadership role in NYU FedSoc when he was a law student. (*Id.* ¶ 4.) Defendants Ajay Srinivasan Iyer, Zachary George Garrett, William Stuart Lasseter Weinberg, and Andrew Nelms (with Mr. Pallaki and Professor Epstein, "Defendants") are all NYU Law graduates who also had various leadership roles in NYU FedSoc. (*Id.* ¶¶ 6, 8, 10, 12.)

The Complaint asserts the following eight claims: (1) a RICO claim under § 1962(b) (Count I); (2) a RICO claim under § 1962(c) (Count II); (3) a RICO conspiracy claim premised on § 1962(b) (Count III); (4) a RICO conspiracy claim premised on § 1962(c) (Count IV, and together with Counts I–III, the "RICO Claims"); (5) a claim for monopolization of the NYU clerkship market, presumably under § 2 of the Sherman Act (Count V); (6) a claim for attempted monopolization of the NYU Law clerkship market, presumably under § 2 of the Sherman Act (Count VI); (7) a claim for unreasonable restraints of trade concerning academic journal work, presumably under § 1 of the Sherman Act (Count VII); and (8) a claim for unreasonable restraints of trade concerning think tank work, presumably under § 1 of the Sherman Act (Count VIII, and, together with Counts V–VII, the "Antitrust Claims"). (*See* Compl. ¶¶ 201–20 (Count I), 221–25

3

(Count II), 226–31 (Count III), 232–36 (Count IV), 237–41 (Count V), 242–46 (Count VI), 247–50 (Count VII), 251–56 (Count VIII).)

## II.    <u>Plaintiff's Allegations</u>

The scattershot fifty-five page, 256-paragraph Complaint touches on a variety of topics. At its core, however, the Complaint can be boiled down to a single basic assertion: Defendants allegedly worked in concert to prevent Plaintiff from obtaining a Supreme Court clerkship.

### A.    <u>Plaintiff's Allegations Regarding Supreme Court Clerkships and Professor Epstein's Purported Influence and Power as a Supreme Court Recommender</u>

According to Plaintiff, young lawyers can obtain a Supreme Court clerkship in two ways: (1) clerk for a federal appellate court judge referred to as a "feeder" judge, perform well, and get recommended by the feeder judge to a Supreme Court Justice; or (2) arrange a feeder judge clerkship and a Supreme Court clerkship simultaneously.  (Compl. ¶¶ 190–92.)

Plaintiff alleges that Professor Epstein "has established an unprecedentedly powerful apparatus around himself and under his control" and "placed himself as a clearinghouse between significant amounts of 'dark money' keen to influence public policy and the administration of justice, the brand and credentialing power of elite institutions, exceptionally talented and sometimes idealistic students with lofty career ambitions . . . and the judicial branch . . . through his control over the staffing of an unrivaled number of federal clerkships." (Compl. ¶¶ 28–29.)

Plaintiff avers that Professor Epstein wields this influence in three ways.  First, he purportedly unilaterally controls "up to four" Supreme Court clerkships and "approximately one hundred [clerkship] slots in the federal trial and appellate courts."  (Compl. ¶¶ 31, 37.)  Second, he purportedly "sits as an intermediary between vast amounts of 'dark money' provided by large corporations and wealthy donors who seek to influence public policy and the administration of justice . . . in a manner consistent with their personal interest and beliefs" and "controls this money

with broad discretion." (*Id.* ¶ 33.)  Third, he purportedly "plays God over the lives of [] students"
and "young professionals" who "serve as the grist for [his] mill and the foot-soldiers that occupy
the positions he controls." (*Id.* ¶ 34.)  In short, according to Plaintiff, because of Professor
Epstein's "unrivaled combination of power, resources, and influence, and his monopoly as the only
NYU Law professor in this business on the right, every NYU Law student aspiring to any
ideologically-involved position right of center, must be blessed by [Professor] Epstein, and even a
slight disapproval is fatal." (*Id.* ¶ 35.)

      B.    <u>Plaintiff's Allegations Regarding the Purported Relationship Between and Among
the Parties</u>

According to Plaintiff, Messrs. Iyer, Garrett, Weinberg, Nelms, and Pallaki (whom Plaintiff
refers to collectively as the "NYU Crew") "serve as the foot-soldiers of [Professor] Epstein on
campus and seek to control and influence . . . to whom he doles out his favor, largesse and prized
clerkship spots." (Compl. ¶ 44.)  Whereas members of the NYU Crew purportedly served
Professor Epstein only "as a means to obtain what he controls, primarily clerkships," Plaintiff avers
that he "had a genuine long-term intellectual interest in the scholarship and ideas of [Professor]
Epstein," "enjoyed a sincere relationship with [Professor] Epstein that included . . . mentorship to
be his intellectual successor," and was Professor Epstein's "protégé." (*Id.* ¶ 48.)

      C.    <u>Plaintiff's Allegations Regarding Defendants' Purported Misconduct</u>

Plaintiff alleges that during the 2020-21 academic year, Messrs. Weinberg, Nelms, and
Pallaki unjustifiably removed Plaintiff from his leadership role with NYU FedSoc. (Compl.
¶¶ 56–58.)  Plaintiff contends that they did so by, among other things: filing a "false and meritless
[complaint] to the NYU Law Administration about [P]laintiff's leadership of the [NYU FedSoc]"
(*id.* ¶ 61); introducing typos into a document circulated by Plaintiff and telling Professor Epstein
about the joke that Plaintiff made following distribution of the typo-ridden document (*id.*

¶¶ 64–69); facilitating a clash between Plaintiff and another NYU FedSoc member concerning a documentary about Justice Thomas (*id.* ¶¶ 70–76); gathering votes to remove Plaintiff from his leadership position on the NYU FedSoc and, after a majority was gathered by agreement, allegedly "blackmail[ing] and extort[ing]" the other voters to ensure a unanimous vote (*id.* ¶¶ 78–80); and saying unkind things about Plaintiff during a meeting and preventing him from fully defending himself (*id.* ¶¶ 81–82). Purportedly upset by this series of events (and other factors), Plaintiff took a leave of absence from NYU Law for the remainder of the 2020-21 academic year. (*Id.* ¶ 91.)

While Plaintiff was on leave, members of the NYU crew allegedly lied to two individuals at the student division of FedSoc by telling them that Plaintiff was transferring to Northwestern University and was older than thirty. (Compl. ¶ 102.) Messrs. Weinberg, Nelms, and Pallaki are also alleged to have changed the NYU FedSoc constitution in a way that would purportedly affect only Plaintiff and would prevent him from holding any future leadership positions. (*Id.*)

According to Plaintiff, Defendants continued to wrong him when he returned to school the next year. Plaintiff avers that at a conference Mr. Pallaki allegedly attended, he "spread defamations" about Plaintiff. (Compl. ¶¶ 106–07.) Additionally, Plaintiff asserts that when he attempted to re-join the NYU FedSoc board, he was prevented from doing so. (*Id.* ¶¶ 115–16.)

Plaintiff next alleges that in early April 2022, he attended a party at a pub hosted by the NYU Student Bar Association. (Compl. ¶¶ 117–18.) While he was speaking with Mr. Garrett outside the pub, a female NYU Law student complained to the pub's doorman about Plaintiff. (*Id.* ¶ 118.) Citing a policy that applied to female patrons complaining about male ones (and not vice versa), the doorman purportedly refused Plaintiff reentry. (*Id.* ¶¶ 119–20.) Plaintiff avers that Mr. Garrett acknowledged that this was "primae [sic] facie discrimination." (*Id.* ¶ 121.) Plaintiff alleges that he filed a "human rights complaint" against the pub the next day, which led to an

investigation by the New York State Division of Human Rights ("NYSDHR").  (*Id.* ¶ 122.)  As part of the complaint, Plaintiff provided NYSDHR with Mr. Garrett's phone number.  (*Id.*)  According to Plaintiff, Messrs. Pallaki and Iyer allegedly told Mr. Garrett to lie about the incident to NYSDHR, which he purportedly did.  (*Id.* ¶¶ 123–24.)  Based on Mr. Garrett's purportedly perjured testimony, NYSDHR's investigation ended.  (*Id.* ¶ 124.)

On April 10, 2022, Plaintiff allegedly informed Professor Epstein that he was planning to spend his final year of law school away from NYU Law.  (Compl. ¶ 125.)  A few days later, Professor Epstein purportedly implored Plaintiff to stay and "offered the [sic] him a 'feeder' federal appellate clerkship from a list [] [P]laintiff would provide to be followed by a Supreme Court clerkship as available, a top position on [JLL,] and to teach" two classes instead of only one.  (*Id.* ¶ 126.)  Plaintiff allegedly accepted this offer and canceled his plans to leave NYU Law.  (*Id.*)  According to Plaintiff, Professor Epstein insisted that Mr. Iyer extend Plaintiff an offer to join the JLL board, which Plaintiff accepted.  (*Id.* ¶ 127.)

In mid-July 2022, Plaintiff attended a NYU FedSoc gathering and told Messrs. Iyer and Garrett that he would be attending the James Kent Academy—a prestigious FedSoc event frequently attended by former and future Supreme Court clerks—later that summer.  (Compl. ¶ 128.)  Purportedly envious that Professor Epstein was planning to recommend Plaintiff, and not them, for a Supreme Court clerkship, Messrs. Iyer, Garrett, and Pallaki allegedly resolved to "maintain their power and status, as well as increase their own chances [of obtaining Supreme Court clerkships]."  (*Id.* ¶¶ 129–31.)

In late July 2022, Mr. Iyer allegedly "surreptitiously photographed a guard desk" in Kirkland's lobby and "used digital image manipulation software to erase the actual contents of a page posted at the desk and replace them with a picture of [P]laintiff's face, and the text: DO NOT

ADMIT GIDEON RAPAPORT KIRKLAND AND ELLIS." (Compl. ¶ 132.) Plaintiff avers that Mr. Iyer then posted this image online, falsely stating that Plaintiff had been fired from his summer associate job for sexual harassment and that he had been banned from Kirkland's office building, and providing unflattering information regarding Plaintiff's "personality, habits, mannerisms, modes of dress and pastimes." (*Id.* ¶¶ 133–34.) According to Plaintiff, the "posts . . . mentioned [P]laintiff's political, ideological and jurisprudential beliefs" "in order to mask the attack as not coming from individuals with shared ideology and membership in [FedSoc]." (*Id.* ¶ 135.)

Plaintiff further alleges that during an August 2022 phone call, Professor Epstein—who had purportedly learned of the allegations against Plaintiff contained in the aforementioned postings—told Plaintiff that he "will not have a federal clerkship" and "will not serve as Senior Article Editor of the [JLL]." (Compl. ¶¶ 140, 142.) Notably, Plaintiff does not allege that Professor Epstein consulted with Mr. Pallaki regarding, or that Mr. Pallaki was otherwise directly involved in, this decision. Further, Plaintiff does not allege that he applied for any clerkship following this purported phone call with Professor Epstein (or at any other time), let alone that any such application was rejected. Indeed, Plaintiff does not allege that he took any concrete steps to obtain a clerkship with any judge, such as seeking another professor to act as a recommender or contacting any judge concerning a potential clerkship.

## **PLEADING STANDARD**

To survive a motion to dismiss, a complaint must contain sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). Although the Court must accept as true all factual allegations in the Complaint, that "tenet" is "inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Moreover, the only inferences to which Plaintiff is entitled are *reasonable* ones. *See United States ex rel. Camburn v. Novartis Pharms. Corp.*, 124 F.4th 129, 135 (2d Cir. 2024).

Importantly, insofar as Plaintiff's RICO claims are premised on purported instances of wire fraud, the elements "must be pled with particularity" pursuant to Federal Rule of Civil Procedure 9(b). *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018). Thus, "the [C]omplaint must detail the specific statements that are false or fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Id.*

Finally, while courts typically afford *pro se* litigants the benefit of the doubt, because Plaintiff is a law school graduate (and, according to his allegations, was qualified enough to merit a Supreme Court clerkship), the Court need not do so here. *See, e.g.*, *Harbulak v. Suffolk Cnty.*, 654 F.2d 194, 198 (2d Cir. 1981) ("Harbulak is a lawyer and, therefore, he cannot claim the special consideration which the courts customarily grant to pro se parties."); *Hassan v. FEC*, 893 F. Supp. 2d 248, 253 (D.D.C. 2012) (similar).

## **ARGUMENT**[3]

For the following reasons, each of Plaintiff's claims is implausible on its face and legally deficient for multiple, independent reasons. Accordingly, the Complaint should be dismissed.

## I.    **The Court Should Dismiss the RICO Claims**

While the RICO statute does have a broad remedial purpose, "courts have cautioned that, because the mere assertion of a RICO claim has an almost inevitable stigmatizing effect on those named as defendants, courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." *Westchester Cnty. Indep. Party v. Astorino*, 137 F. Supp. 3d 586, 599 (S.D.N.Y.

---

[3] To the extent applicable, Mr. Pallaki expressly adopts and incorporates by reference the arguments set forth in the memorandum of law in support of the motion to dismiss filed by Messrs. Iyer, Garrett, Weinberg, and Nelms.

9

2015) (citation and internal quotation marks omitted).  As set forth below, Counts I through IV are precisely the sort of "frivolous" RICO claims that this Court should "strive to flush out . . . at an early stage of the litigation."  *Id.*  Specifically, Plaintiff's substantive RICO claims fail because he has failed to allege: (1) a cognizable RICO injury; (2) causation; and (3) a pattern of racketeering activity.  Further, because Plaintiff's RICO conspiracy claims rise or fall with his substantive RICO claims, the deficiencies with Plaintiff's substantive RICO claims are equally fatal to Counts III and IV.  *See, e.g.*, *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir. 2004) (affirming dismissal of RICO conspiracy claims where plaintiffs "did not adequately allege a substantive violation of RICO"); *D. Penguin Bros. Ltd. v. City Nat'l Bank*, 587 F. App'x 663, 669 (2d Cir. 2014) ("The failure to state a claim for a substantive RICO violation, moreover, is fatal to plaintiffs' RICO conspiracy claim under § 1962(d).").

A.     Plaintiff Failed to Allege a Cognizable RICO Injury

Plaintiff's RICO claims should be dismissed because he has failed to allege a cognizable injury to his business or property.

To assert a civil RICO claim, a plaintiff must allege, among other things, an injury to his business or property.  18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue . . . ."); *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 283 (2d Cir. 2006) ("[A] plaintiff must plead . . . an injury to the plaintiff's business or property . . . ." (citation and internal quotation marks omitted)).  Importantly, courts require plaintiffs alleging RICO injuries to plead "actual, quantifiable injury," *Kerik v. Tacopina*, 64 F. Supp. 3d 542, 560 (S.D.N.Y. 2014) (citation and internal quotation marks omitted), and consistently hold that "a RICO plaintiff may not recover for speculative losses or where the amount of damages is unprovable," *World Wrestling Ent., Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 519 (S.D.N.Y. 2007) (citation and internal quotation marks omitted); *see also Westchester Cnty.*,

10

137 F. Supp. 3d at 613 (noting that "the loss alleged must be clear and definite, rather than speculative" (citation and internal quotation marks omitted)).  Put simply, "[i]f the damages cannot be ascertained, then there is no lawful way to compensate the plaintiff.  Thus, the courts regularly have held that a plaintiff who alleges injuries that are indefinite and unprovable does not have standing under, and cannot recover damages pursuant to, RICO." *World Wrestling*, 530 F. Supp. 2d at 521 (citation and internal quotation marks omitted).

The injury that Plaintiff alleges here—losing out on a potential Supreme Court clerkship to which he arrogantly and implausibly asserts he was *entitled*—is far too indefinite and unprovable to be cognizable under the RICO statute.  First, Plaintiff's own allegations make clear that this opportunity was far from certain and would require him to perform well enough as a feeder judge's clerk to merit a Supreme Court Justice's consideration.  (*See* Compl. ¶ 126 (averring that Professor Epstein offered him a "Supreme Court clerkship *as available*" (emphasis added)); *see also id.* ¶¶ 191–92 (asserting that individuals cannot clerk on the Supreme Court unless they perform well during their feeder judge clerkships).)  Tellingly, Plaintiff fails to allege which Supreme Court Justice he was to clerk for or when this clerkship would start (or even that he applied or otherwise contacted any Justice).  Moreover, Plaintiff does not even attempt to quantify his purported damages (let alone adequately do so).  *See Jingle Kids USA, LLC v. In Colour Cap., Inc.*, 2023 WL 5016496, at *9 (S.D.N.Y. June 6, 2023) ("[T]o plausibly allege a RICO injury, conclusory allegations of injury to pecuniary interest will not suffice; rather, a plaintiff must allege a *concrete financial loss*." (emphasis added) (citation and internal quotation marks omitted)).  Indeed, quantifying Plaintiff's purported injury would require consideration of multiple variables and would undoubtedly devolve into impermissible conjecture and speculation.  *See World*

*Wrestling*, 530 F. Supp. 2d at 522 (finding that the number of "variables" at issue in calculating injury "doom[ed] [p]laintiff's efforts to establish a cognizable RICO injury").

Additionally, insofar as Plaintiff is asserting a reputational injury generally affecting future employment and/or business prospects, that injury is likewise not cognizable under the RICO statute. *See, e.g.*, *Kimm v. Chang Hoon Lee & Champ, Inc.*, 196 F. App'x 14, 16 (2d Cir. 2006) ("As written, the generalized reputational harms alleged, including the risk of future lost business commissions, are too speculative to constitute an injury to business or property."); *Alphas Co. of N.Y., Inc. v. Hunts Point Terminal Produce Coop., Inc.*, 2017 WL 1929506, at *4 (S.D.N.Y. May 9, 2017) ("[Plaintiff] alleges damages in lost income and in losing his . . . license to conduct business and find further employment, but these injuries are too speculative to constitute an injury to business or property." (citation and internal quotation marks omitted)); *Mack v. Parker Jewish Inst. for Health Care & Rehab.*, 2014 WL 5529746, at *6 (E.D.N.Y. Oct. 30, 2014) ("Plaintiff has not quantified the loss she alleges to suffer, instead simply that she has not been able to find employment reflective of her level of education and experience. Such allegations are too speculative to constitute an injury to business or property."); *Petroff Amshen LLP v. Alfa Rehab PT PC*, 2021 WL 960394, at *12 (E.D.N.Y. Mar. 15, 2021) (similar).

Similarly, to the extent Plaintiff argues that Defendants' purported capture or operation of the NYU Law FedSoc was, itself, his injury, that position is untenable. The RICO statute makes clear that the plaintiff's injury and the RICO violation are distinct elements of a claim. *See* 18 U.S.C. § 1964(c) ("Any person injured in his business or property *by reason of a violation* of section 1962 of this chapter may sue . . . ." (emphasis added)).

Thus, Plaintiff has failed to allege an injury to his property or business, and the RICO claims should be dismissed.

B.     Plaintiff Failed to Allege Causation

Even if Plaintiff had alleged a cognizable RICO injury, the RICO Claims would still be deficient because Plaintiff has failed to allege that the purported RICO violations caused his claimed injury.

"[T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense not only was a but for cause of his injury, but was the proximate cause as well." *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010) (citation and internal quotation marks omitted). "Proximate cause for RICO purposes . . . should be evaluated in light of its common-law foundations; proximate cause thus requires some direct relation between the injury asserted and the injurious conduct alleged." *Id.* (citation and internal quotation marks omitted). "A link that is too remote, purely contingent, or indirec[t] is insufficient." *Id.* (alteration in original) (citation and internal quotation marks omitted). Accordingly, "even at the pleading stage, civil RICO's direct relation requirement is rigorous and requires dismissal where substantial intervening factors attenuate the causal connection between the defendant's conduct and the plaintiff's injury." *Doe v. Trump Corp.*, 385 F. Supp. 3d 265, 276–77 (S.D.N.Y. 2019).

As an initial matter, none of the purported predicate acts that occurred before Plaintiff's April 10, 2022, communication with Professor Epstein could have caused Plaintiff's alleged injury because, according to Plaintiff's allegations, Professor Epstein did not offer him the clerkship until *after* that communication. (*See* Compl. ¶¶ 125–26.) That is, if Plaintiff's purported injury is a revoked clerkship offer (for an unspecified judge or Justice) then nothing that pre-dated when that offer was extended in the first place could possibly be a cause of that injury.

Moreover, based on Plaintiff's own allegations, there were "substantial intervening factor[s] [which] attenuate[d] the causal connection between [Defendants'] conduct and [Plaintiff's claimed] injury." *Trump Corp.*, 385 F. Supp. 3d at 277. For one, that Plaintiff did not,

in fact, apply for any clerkship, much less apply and get rejected, breaks any conceivable causal chain. As noted above, the Complaint is devoid of any allegations that Plaintiff took concrete steps to pursue any clerkship. Therefore, to the extent he was injured (he was not), such an injury was due to Plaintiff's own inaction, not any alleged misconduct.

Additionally, as Plaintiff acknowledges, performing well in an initial clerkship is a prerequisite to clerking for a Supreme Court Justice, and Plaintiff's failure to allege that he did so is another rupture in any purported causal chain. Moreover, it merits mention that, although his allegations are not crystal clear, Plaintiff seems to acknowledge that he was fired from his summer associate position at Kirkland (or, at minimum, did not finish the summer program). Specifically, Plaintiff consistently uses the formulation, "fired for sexual harassment" when describing why statements were purportedly false (*see, e.g.*, Compl. ¶ 134 (averring that the online postings were false insofar as they stated that Plaintiff was "fired *for sexual harassment*" (emphasis added)); *id.* ¶ 26 (same)), and nowhere does he squarely allege that he completed the summer program. Assuming Plaintiff did not complete the program, the notion that Plaintiff could still have clerked is "[im]plausible on its face." *Iqbal*, 556 U.S. at 678. Indeed, there are myriad reasons why Plaintiff did not obtain a clerkship, and none of them are attributable to Defendants' actions.

Further, Counts I and III are also deficient for another reason: Plaintiff has failed to allege that he "suffered an injury as a result of the acquisition or control [of the purported enterprise], separate and apart from any injuries attributable to the individual predicate acts of racketeering." *Westchester Cnty.*, 137 F. Supp. 3d at 616. The injury that Plaintiff alleges has nothing to do with Defendants' purported acquisition or maintenance of control over the NYU FedSoc—and Plaintiff never alleges otherwise.

Accordingly, Plaintiff has failed to allege causation, and the RICO claims should be dismissed.

C.    Plaintiff Failed to Allege a Pattern of Racketeering Activity

The RICO Claims also fail because Plaintiff has not alleged a pattern of racketeering activity.

A pattern of racketeering activity is the heart of a RICO claim.  *See* 18 U.S.C. § 1962(b) ("It shall be unlawful for any person *through a pattern of racketeering activity* . . . to acquire or maintain . . . any interest in or control of any enterprise . . . ." (emphasis added)); 18 U.S.C. § 1962(c) ("It shall be unlawful for any person employed by or associated with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs *through a pattern of racketeering activity* . . . ." (emphasis added)); *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983) (setting forth the elements of a RICO claim, including a pattern of racketeering activity). The statute "defines a pattern of racketeering activity to require at least two acts of racketeering activity occurring within a ten-year period," but "the Supreme Court has imposed additional requirements that must be met for racketeering activity to constitute a 'pattern.'"  *Bayshore Cap. Advisors, LLC v. Creative Wealth Media Fin. Corp.*, 667 F. Supp. 3d 83, 134 (S.D.N.Y. 2023). Specifically, a plaintiff "must show that the racketeering predicates . . . amount to or pose a threat of continued criminal activity."  *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).

As discussed below, Plaintiff's allegations are deficient on both scores.  He has not alleged any RICO predicates.  And even if he had, he has not alleged that any such predicates amount to, or pose a threat of, continued criminal activity.

1.    *Plaintiff Has Not Alleged Any RICO Predicates*

Section 1961(1) enumerates an exhaustive list of predicates that can comprise a pattern of racketeering activity.  *See* 18 U.S.C. § 1961(1).  Here, Plaintiff identifies seven: wire fraud,

15

blackmail, extortion, witness tampering, obstruction of justice, obstruction of state law enforcement, and money laundering. (*See* Compl. ¶¶ 203, 224, 230, 236.) For the reasons that follow, Plaintiff has not alleged any RICO predicates, which forecloses all four RICO claims.

a.    Plaintiff Failed to Allege Wire Fraud

"The elements of . . . wire fraud are (i) a scheme to defraud (ii) to get money or property (iii) furthered by the use of interstate . . . wires." *Williams*, 889 F.3d at 124 (citation and internal quotation marks omitted). A "scheme to defraud" is "a plan to deprive a person of something of value by trick, deceit, chicane or overreaching." *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (citation and internal quotation marks omitted). Here, Plaintiff has failed to plead any instance of wire fraud.

As an initial matter, the allegations surrounding several instances of purported wire fraud are not pleaded with the particularity required by Rule 9(b). *See Williams*, 889 F. 3d at 124. For instance, in Paragraph 205, Plaintiff avers that Messrs. Nelms, Weinberg, and Pallaki "filed a false complaint" "[o]n or [a]bout September 2020." (Compl. ¶ 205.) But he fails to describe what the allegedly false complaint contained and/or why it was purportedly fraudulent. (*Id.*)

More importantly, Plaintiff has failed to assert that "money or property" was "the object of the [purported] scheme" to defraud. *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021). For example, Plaintiff alleges that "[o]n or [a]bout September 2020," Messrs. Weinberg and Pallaki "transmitted by the internet, intentionally defective work product" to Plaintiff. (Compl. ¶ 207; *see also id.* ¶¶ 64–65 (seemingly describing the same incident).) But he does not allege how transmitting "defective work product" was, in any way, an effort to obtain money or property. Similarly, while Plaintiff avers that "[o]n or about August 9, 2022," Professor Epstein "denied . . . that anyone from [NYU FedSoc] was involved in the recent defamations" (*id.* ¶ 215), he fails to explain how this purported misrepresentation targeted money or property.

16

At most, Plaintiff has alleged "a collective effort to damage [his] reputation." *Black v. Ganieva*, 619 F. Supp. 3d 309, 344 (S.D.N.Y. 2022). "But, as pled, this effort, even treating the damaging statements about [Plaintiff] as false, are not alleged to have been part of a scheme to obtain money or property, a *sine qua non* of the federal anti-fraud statutes." *Id.*; *see also Hollander v. Pressreader, Inc.*, 2020 WL 2836189, at *4 (S.D.N.Y. May 30, 2020) ("At bottom, [the plaintiff's] wire fraud allegations are—at best—thinly clothed defamation claims. And it is firmly established that defamation and many other similar allegations do not provide the requisite predicate for RICO violations." (citation and internal quotation marks omitted)).

Accordingly, Plaintiff has failed to allege any wire fraud predicates.

> b.      Plaintiff Failed to Allege Extortion[4]

The RICO statute provides for two extortion-based predicate acts: (1) "any act which is indictable under . . . [the Hobbs Act]" and (2) "any act or threat involving . . . extortion . . . which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1). Plaintiff has not alleged either Hobbs Act extortion or state law extortion.

The Hobbs Act defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). None of the purported instances of extortion identified in the Complaint (*see* Compl. ¶¶ 208–10, 216), meet the elements of Hobbs Act extortion because Defendants are not alleged to have obtained any property, let alone done so "by wrongful use of

---

[4] "Blackmail" is not an enumerated RICO predicate. *See* 18 U.S.C. § 1961(1). Additionally, although Plaintiff lists both "blackmail" and "extortion" as purported RICO predicates (*see* Compl. ¶ 203), he consistently refers to them together (*see id.* ¶¶ 209, 210). Further, in common parlance, extortion and blackmail are frequently used interchangeably. Accordingly, Mr. Pallaki will address only extortion in this brief. To the extent Plaintiff subsequently argues that extortion and blackmail are distinguishable (and that blackmail is, itself, a RICO predicate), Mr. Pallaki expressly reserves the right to address that argument in his reply brief.

17

actual or threatened force, violence, or fear, or under color of official right." *Id.*; *see also United States v. Percoco*, 317 F. Supp. 3d 822, 827 (S.D.N.Y. 2018) ("Both extortion under color of official right and extortion by force, violence, or fear involve coercing another person to make a payment."). Encouraging Plaintiff to step down from his leadership role on NYU FedSoc (Compl. ¶ 208), pressuring other NYU FedSoc board members to vote against Plaintiff (*id.* ¶ 209), leveraging their influence over the national FedSoc organization (*id.* ¶ 210), and informing Plaintiff that an official NYU Law Title IX proceeding would not be interfered with (*id.* ¶ 216), plainly do not qualify as Hobbs Act extortion.

Plaintiff's attempts to premise RICO liability on purported instances of state law extortion likewise fall flat. The Supreme Court has held that state law extortion "cannot qualify as a predicate offense for a RICO suit unless it is capable of being generically classified as extortionate," *Wilkie v. Robbins*, 551 U.S. 537, 567 (2007), and that the generic definition of extortion is "obtaining something of value from another with his consent induced by the wrongful use of force, fear, or threats," *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 409 (2003). Accordingly, the analysis under state law mirrors the Hobbs Act analysis, and Plaintiff's state law allegations are insufficient for the reasons discussed above.

Thus, Plaintiff has failed to allege any extortion predicates.

### c.    Plaintiff Failed to Allege Witness Tampering

Violation of 18 U.S.C. § 1512, the federal witness tampering statute, is a RICO predicate. *See* 18 U.S.C. § 1961(1). That statute, in turn, requires interference with an "official proceeding," 18 U.S.C. § 1512, which is defined as "a proceeding before a judge or court of the United States," "a proceeding before the Congress," "a proceeding before a Federal Government agency which is authorized by law," or "a proceeding involving the business of insurance," 18 U.S.C. § 1515(a);

18

*see also Edmondson v. Raniere*, 2024 WL 4334374, at *11 (E.D.N.Y. Sept. 27, 2024) ("[T]he definition of 'official proceeding' under Section 1512 is not limitless.").

Here, Plaintiff has failed to allege the existence of any "official proceeding" within the meaning of Section 1512, much less that Defendants allegedly tampered with any witness in connection with such a proceeding. Instead, he attempts to premise his witness tampering RICO predicate on the purported tampering of a witness vis-à-vis the far-fetched NYSDHR investigation that Plaintiff instigated when he was denied reentry to a pub based on a complaint by a female patron. (*See* Compl. ¶¶ 212–13, 122–24.) This tack, however, is foreclosed by black-letter law. *See, e.g., Miller v. Carpinello*, 2007 WL 4207282, at *7 n.6 (S.D.N.Y. Nov. 20, 2007) ("Proceedings in state courts or before state administrative bodies are not official proceedings, and witness tampering with respect to them does not violate Section 1512 or constitute a predicate act under RICO.").

As such, Plaintiff has failed to allege any witness tampering predicates.

### d.    Plaintiff Failed to Allege Obstruction of Justice

Plaintiff's effort to plead an obstruction of justice RICO predicate fails for the same reason his effort to plead witness tampering does. Section 1503—the obstruction of justice statute cited as a RICO predicate, *see* 18 U.S.C. § 1961(1)—is limited to federal court proceedings, *see* 18 U.S.C. § 1503(a); *see also Kashelkar v. Rubin & Rothman*, 97 F. Supp. 2d 383, 392 (S.D.N.Y. 2000) ("[T]he federal obstruction of justice statute only applies to proceedings in federal court."), *aff'd* 1 F. App'x 7 (2d Cir. 2001). And as noted above, Plaintiff has failed to allege that Defendants obstructed any federal court proceedings. Accordingly, Plaintiff has not alleged obstruction of justice. *See Dangerfield v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2003 WL 22227956, at *8 (S.D.N.Y. Sept. 26, 2003) ("The alleged obstruction of justice in this case, violating the

19

subpoenas issued by the Texas state court, is not a cognizable violation of section 1503 and cannot form a predicate act for RICO purposes.").

> e.    Plaintiff Failed to Allege Obstruction of State Law Enforcement

The obstruction of state law enforcement RICO predicate is set forth in 18 U.S.C. § 1511. *See* 18 U.S.C. § 1961(1).  That statute, however, requires that the obstruction be undertaken "with the intent to facilitate an illegal gambling business."  18 U.S.C. § 1511(a).  The Complaint lacks any allegations concerning gambling, and § 1511 is therefore unavailable as a RICO predicate. *See, e.g.*, *Shetiwy v. Midland Credit Mgmt.*, 15 F. Supp. 3d 437, 445 (S.D.N.Y. 2014) (rejecting obstruction of state law enforcement RICO predicate where there were no allegations of illegal gambling); *Hamza v. Yandik*, 2020 WL 2092487, at \*7 (N.D.N.Y. May 1, 2020) (similar).

> f.    Plaintiff Failed to Allege Money Laundering

"[T]o state a claim for money laundering as a RICO predicate, a plaintiff must plead (1) that the defendant conducted a financial transaction; (2) that the transaction in fact involved the proceeds of specified unlawful activity . . . ; (3) that the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity; and (4) that the defendant knew that the financial transaction was designed in whole or in part to conceal or disguise the source, ownership, control, etc., of those proceeds."  *Alix v. McKinsey & Co., Inc.*, 2023 WL 5344892, at \*21 (S.D.N.Y. Aug. 18, 2023) (citation and internal quotation marks omitted).  Plaintiff's conclusory money laundering allegations (*see* Compl. ¶ 217), fall short for two reasons.  First, Plaintiff does not allege that the purportedly laundered money represented the proceeds of any specified unlawful activity.  Plaintiff merely generally and vaguely alleges that Professor Epstein had access to "'dark money provided by large corporations and wealthy donors." (*Id.* ¶ 33; *see also id.* ¶ 29.)  Second, Plaintiff fails to identify any specific financial transactions involving purportedly laundered money.  Indeed, he specifically alleges that Professor Epstein

20

"offered" him money, not that Professor Epstein actually gave it to him.  (*See id.* ¶ 217.)  Thus, Plaintiff has failed to allege a money laundering RICO predicate.

### 2.    *Plaintiff Has Not Alleged Continuity*

Even if Plaintiff had adequately alleged at least two RICO predicates, the RICO Claims would still fail because he has failed to allege a pattern of racketeering activity.

RICO plaintiffs can "adequately plead a pattern of racketeering activity either by alleging that Defendants engaged in repeated racketeering activity extending over a substantial period of time or by alleging that they have engaged in racketeering activity that by its nature projects into the future with a threat of repetition." *Bayshore*, 667 F. Supp. 3d at 134.  These are referred to as open-ended continuity and closed-ended continuity, respectively.  Plaintiff has not alleged either.

Plaintiff has not alleged close-ended continuity because he alleges a single, relatively simple scheme, involving only a handful of alleged conspirators, which renders his claims "more akin to garden variety . . . tort claims than a large-scale civil RICO claims." *MinedMap, Inc. v. Northway Mining, LLC*, 2022 WL 570082, at *2 (2d Cir. Feb. 25, 2022); *see also Bayshore*, 667 F. Supp. 3d at 135–36 (finding a lack of closed-ended continuity and collecting cases).

Plaintiff has likewise failed to allege open-ended continuity.  The Complaint includes no allegations suggesting that any purported misconduct will continue into the future.  Additionally, "it is well established law that fraud does not fall within the 'inherently unlawful' category of predicate acts so as to imply a threat of continued criminal activity." *Bayshore*, 667 F. Supp. 3d at 136.  Further, open-ended continuity does not exist here because the purported scheme is "*inherently* terminable." *GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 466 (2d Cir. 1995).  As alleged, Defendants' scheme was directed exclusively at Plaintiff and depended on an ongoing affiliation with NYU Law.  Messrs. Iyer, Garrett, Weinberg, Nelms, and Pallaki have all graduated.  (*See* Compl. ¶¶ 4, 6, 8, 10, 12.)  Moreover, as alleged, Defendants' goal was

purportedly to prevent Plaintiff from obtaining a clerkship.  Because Plaintiff is not a Supreme Court clerk (and has no realistic chance of becoming one), there would be nothing left to be done. *See, e.g.*, *GICC*, 67 F.3d at 466 ("It defies logic to suggest that a threat of continued looting activity exists when . . . there is nothing left to loot."); *MinedMap*, 2022 WL 570082, at *2 (similar).

Thus, Plaintiff has failed to allege a pattern of racketeering activity, and the RICO Claims should be dismissed.

## II.    The Court Should Dismiss the Antitrust Claims

The Antitrust Claims, which are equally implausible, fare no better, as they are legally deficient for several, independent reasons.  Plaintiff has failed to allege: (1) any cognizable market; (2) that Mr. Pallaki committed any antitrust violations; and (3) an antitrust injury.

### A.    Plaintiff Failed to Allege Any Plausible, Cognizable Market

The Antitrust Claims should be dismissed because Plaintiff has failed to allege any plausible, cognizable market.

"To state a claim under either Section 1 or Section 2 of the Sherman Act, a plaintiff must plausibly allege that the defendants' anticompetitive conduct restricted competition within a relevant market."  *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 338 (2d Cir. 2024).  "At the motion-to-dismiss stage, a plaintiff's proposed relevant market must bear a rational relation to the methodology courts prescribe to define a market and include a plausible explanation as to why a market should be limited to exclude possible substitutes."  *Id.* (citation and internal quotation marks omitted).

The markets that Plaintiff has identified—the "Judicial Clerkship Market at NYU," "Academic Journal Work," and "Think Tank Work" (Compl. ¶¶ 237, 242, 247, 251)—bear none of the hallmarks of the markets that courts typically analyze in antitrust cases.  These implausible markets have no prices in the traditional sense of the word, and it is not even clear who the market

participants are and what roles they play.  In the "Judicial Clerkship Market at NYU," for instance, it is unclear who the consumers are (NYU Law students, Supreme Court Justices, or both).  Further, Plaintiff's proposed markets suffer from other inconsistencies and logical flaws.  For example, whereas Plaintiff alleges in Paragraph 239 that Professor Epstein "is the only provider in th[e NYU Law judicial clerkship market]" (Compl. ¶ 239), he alleges elsewhere that Professor Epstein's purported influence extends only to clerkship opportunities for NYU Law students *with right-of-center views* (*see, e.g.*, *id.* ¶¶ 20, 35).  Similarly, whereas Plaintiff seems to aver that the relevant market for Count VII is "Academic Journal Work" (*see id.* ¶ 247), Professor Epstein is only alleged to have influence over a single academic journal, the JLL, and it is common knowledge that NYU Law has several academic journals.

Plaintiff has therefore failed to plausibly allege a relevant market, and the Antitrust Claims should therefore be dismissed.

B.    Plaintiff Failed to Allege that Mr. Pallaki Committed Any Antitrust Violations

Even if Plaintiff's proposed markets were legally cognizable, Plaintiff's antitrust claims would still fail because he has failed to allege that Mr. Pallaki committed any antitrust violations.

When asserting antitrust claims against multiple defendants, a plaintiff cannot rely on group pleading.  *In re Mexican Gov. Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 388 (S.D.N.Y. 2019) ("Allegations about the defendants as a general collective bloc, or generalized claims of parallel conduct, must . . . be set aside . . . as impermissible group pleading." (ellipses in original) (citation and internal quotation marks omitted)).  Rather, "[p]laintiffs must allege a factual connection between each Defendant and the alleged conspiracy[.]"  *Iowa Pub. Emps. Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 316 (S.D.N.Y. 2018) (second alteration in original) (citation and internal quotation marks omitted); *see also In re Mexican Gov. Bonds*, 412 F. Supp 3d at 388 ("[W]ithout a coherent explanation for each defendant['s

23

participation in the alleged conspiracy, an antitrust claim can stand only against those defendants as to whom the [c]omplaint offers some specific, individual showing of anticompetitive conduct." (citation and internal quotation marks omitted)).

Here, Plaintiff's allegations tying Mr. Pallaki to the purportedly anticompetitive conduct are precisely the type of conclusory, threadbare allegations that courts routinely reject. With respect to the alleged monopoly of the "Judicial Clerkship Market at NYU," Plaintiff alleges only that "[a]ll other defendants joined in [Professor] Epstein's monopoly and assisted in operating it." (Compl. ¶¶ 240, 245.) Similarly, with respect to the unreasonable restraints of trade claims, Plaintiff avers only that Professor Epstein's boycott of Plaintiff was "driven and motivated by other defendants." (*Id.* ¶¶ 248, 252.) In short, Plaintiff has impermissibly attempted to lump Mr. Pallaki in with Professor Epstein based on vague allegations connecting him to the alleged misconduct in a wholly unspecified manner.

Accordingly, the Antitrust Claims should be dismissed.

C.    Plaintiff Failed to Allege Antitrust Injury

The Antitrust Claims should be dismissed for another, independent reason: Plaintiff has failed to allege an antitrust injury.

"A private plaintiff seeking to state a claim for violation of sections 1 or 2 of the Sherman Act must allege that it has suffered antitrust injury." *George Haug Co. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 139 (2d Cir. 1998). Because the "antitrust laws . . . were enacted for the protection of competition not competitors," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (citation and internal quotation marks omitted), "a plaintiff must allege an injury beyond harm to an individual competitor," *Miller v. Nicholas*, 2021 WL 9037639, at *2 (E.D.N.Y. Nov. 3, 2021). "The antitrust injury requirement obligates a plaintiff to demonstrate, as a threshold matter, that the challenged action has had an *actual* adverse effect on competition

24

as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice." *Long Island Anesthesiologists PLLC v. United Healthcare Ins. Co. of N.Y.*, 2023 WL 8096909, at *4 (E.D.N.Y. Nov. 21, 2023) (citation and internal quotation marks omitted); *see also Nicholas*, 2021 WL 9037639, at *2 (noting that an antitrust plaintiff must allege, among other things, "market-wide harm to competition, such as a reduction in output or increase in prices to consumers as a result of the restraint").

Given these pleading requirements, Plaintiff's allegations fall short. As for the "Judicial Clerkship Market at NYU" that he identifies in connection with Counts V and VI (*see* Compl. ¶¶ 237–46), Plaintiff has failed to allege any market-wide disruptions or distortions. He does not allege, for example, that the output of conservative-leaning NYU Law clerks has decreased or that Supreme Court Justices are somehow paying higher prices for NYU Law clerks because of Professor Epstein's purported monopoly. Similarly, with respect to the "Academic Journal Work" and "Think Tank Work" markets identified in connection with Counts VII and VIII (*see* Compl. ¶¶ 247–56), Plaintiff has not alleged that anyone other than him has been impacted in any way by Defendants' purportedly unreasonable restraints of trade. Indeed, the notion that the exclusion of a single student from a clerkship, journal, and/or think tank would stifle competition in the market as a whole "sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 738 (2013). Simply put, Plaintiff has failed to allege a market-wide effect on competition as is required to plead an antitrust claim. *See Nicholas*, 2021 WL 9037639, at *3 (dismissing antitrust claims where the plaintiff "fail[ed] to allege any facts to support a conclusion that [d]efendants' actions had any effect on the competitive structure of the market"); *Kennedy v. Vermont*, 2018 WL 9815980, at *5 (D. Vt. Oct. 9, 2018) (rejecting antitrust claim where the plaintiff alleged "that *he* was harmed" but "allege[d] no facts suggesting any detrimental effects on competition as a whole").

As such, the Antitrust Claims should be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant the Motion and dismiss the Complaint with prejudice.

Dated: New York, New York
      February 13, 2025

Respectfully submitted,

By:   <u>*/s/ Seth L. Levine*</u>
     Seth L. Levine
     Steven W. Kessler

**LEVINE LEE LLP**

400 Madison Avenue
New York, New York 10017
Telephone: (212) 223-4400
slevine@levinelee.com
skessler@levinelee.com

*Attorneys for Defendant Mitchell K. Pallaki*

## <u>LOCAL CIVIL RULE 7.1(c) CERTIFICATION</u>

Pursuant to Local Civil Rule 7.1(c), the total number of words in the foregoing memorandum of law, inclusive of footnotes and exclusive of the caption, indices, tables, signature blocks, and certificates, is 8,231.

Dated: February 13, 2025

*/s/ Seth L. Levine*
Seth L. Levine
