**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

GIDEON RAPAPORT,                                     Case No.: 24-cv-7439-JGLC

                    Plaintiff,

            v.

RICHARD ALLEN EPSTEIN, et al.,

                    Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT MITCHELL K. PALLAKI'S MOTION TO DISMISS**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................... 3

    I.      The Parties and Claims ............................................................................................ 3

    II.     Plaintiff's Allegations ............................................................................................. 4

         A.     Plaintiff's Allegations Regarding Supreme Court Clerkships and Professor
               Epstein's Purported Influence and Power as a Supreme Court Recommender ...... 4

         B.     Plaintiff's Allegations Regarding Defendants' Purported Misconduct ................. 5

PLEADING STANDARD ......................................................................................................... 8

ARGUMENT ........................................................................................................................ 9

    I.      The Court Should Dismiss the RICO Claims ............................................................. 9

         A.     Plaintiff Fails to Allege a Cognizable RICO Injury............................................. 10

         B.     Plaintiff Fails to Allege Causation ........................................................................ 12

         C.     Plaintiff Fails to Allege a Pattern of Racketeering Activity ................................. 14

    II.     The Court Should Dismiss the Antitrust Claims......................................................... 23

         A.     Plaintiff Fails to Allege Any Plausible, Cognizable Market................................. 23

         B.     Plaintiff Fails to Allege that Mr. Pallaki Committed Any Antitrust Violations ... 24

         C.     Plaintiff Fails to Allege Antitrust Injury .............................................................. 26

CONCLUSION ..................................................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Alix v. McKinsey & Co., Inc.*,
   2023 WL 5344892 (S.D.N.Y. Aug. 18, 2023) ........................................................ 21

*Alphas Co. of N.Y., Inc. v. Hunts Point Terminal Produce Coop., Inc.*,
   2017 WL 1929506 (S.D.N.Y. May 9, 2017) ........................................................ 12

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .................................................................................. 8, 11, 14

*Bayshore Cap. Advisors, LLC v. Creative Wealth Media Fin. Corp.*,
   667 F. Supp. 3d 83 (S.D.N.Y. 2023) ................................................................ 15, 22

*Black v. Ganieva*,
   619 F. Supp. 3d 309 (S.D.N.Y. 2022) ................................................................ 17

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977) ...................................................................................... 26

*Ciminelli v. United States*,
   598 U.S. 306 (2023) ...................................................................................... 17

*D. Penguin Bros. Ltd. v. City Nat'l Bank*,
   587 F. App'x 663 (2d Cir. 2014) ................................................................... 9, 10

*Dangerfield v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   2003 WL 22227956 (S.D.N.Y. Sept. 26, 2003) .................................................. 19

*Iowa Pub. Emps. Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
   340 F. Supp. 3d 285 (S.D.N.Y. 2018) ................................................................ 24

*Dial Corp. v. News Corp.*,
   165 F. Supp. 3d 25 (S.D.N.Y. 2016) ................................................................ 25

*Doe v. Trump Corp.*,
   385 F. Supp. 3d 265 (S.D.N.Y. 2019) ................................................................ 13

*First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*,
   385 F.3d 159 (2d Cir. 2004) ........................................................................... 10

*George Haug Co. v. Rolls Royce Motor Cars Inc.*,
   148 F.3d 136 (2d Cir. 1998) ........................................................................... 26

iii

*GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*,
  67 F.3d 463 (2d Cir. 1995) ................................................................. 22

*H.J. Inc. v. Nw. Bell Tel. Co.*,
  492 U.S. 229 (1989) ......................................................................... 15

*Harbulak v. Suffolk Cnty.*,
  654 F.2d 194 (2d Cir. 1981) ................................................................ 9

*Hassan v. FEC*,
  893 F. Supp. 2d 248 (D.D.C. 2012)........................................................ 9

*Hemi Grp., LLC v. City of New York, N.Y.*,
  559 U.S. 1 (2010) ...................................................................... 12, 13

*Hollander v. Pressreader, Inc.*,
  2020 WL 2836189 (S.D.N.Y. May 30, 2020) ............................................. 17

*In re Mexican Gov. Bonds Antitrust Litig.*,
  412 F. Supp. 3d 380 (S.D.N.Y. 2019) .................................................... 24

*Jingle Kids USA, LLC v. In Colour Cap., Inc.*,
  2023 WL 5016496 (S.D.N.Y. June 6, 2023) ............................................. 11

*Kennedy v. Vermont*,
  2018 WL 9815980 (D. Vt. Oct. 9, 2018)................................................. 27

*Kerik v. Tacopina*,
  64 F. Supp. 3d 542 (S.D.N.Y. 2014) ..................................................... 10

*Kimm v. Chang Hoon Lee & Champ, Inc.*,
  196 F. App'x 14 (2d Cir. 2006) ...................................................... 11, 12

*Kousisis v. United States*,
  145 S. Ct. 1382 (2025) ................................................................... 17

*Lerner v. Fleet Bank, N.A.*,
  459 F.3d 273 (2d Cir. 2006) ............................................................. 10

*Long Island Anesthesiologists PLLC v. United Healthcare Ins. Co. of N.Y.*,
  2023 WL 8096909 (E.D.N.Y. Nov. 21, 2023) ............................................ 26

*Mack v. Parker Jewish Inst. for Health Care & Rehab.*,
  2014 WL 5529746 (E.D.N.Y. Oct. 30, 2014) ............................................ 12

*Miller v. Carpinello*,
  2007 WL 4207282 (S.D.N.Y. Nov. 20, 2007) ........................................... 19

iv

*Miller v. Nicholas*,
 2021 WL 9037639 (E.D.N.Y. Nov. 3, 2021) .................................................. 26, 27

*MinedMap, Inc. v. Northway Mining, LLC*,
 2022 WL 570082 (2d Cir. Feb. 25, 2022) ........................................................ 22

*Petroff Amshen LLP v. Alfa Rehab PT PC*,
 2021 WL 960394 (E.D.N.Y. Mar. 15, 2021)...................................................... 12

*Rajaratnam v. Motley Rice, LLC*,
 449 F. Supp. 3d 45 (E.D.N.Y. 2020) ............................................................... 20

*Regeneron Pharms., Inc. v. Novartis Pharma AG*,
 96 F.4th 327 (2d Cir. 2024) ......................................................................... 23

*Scheidler v. Nat'l Org. for Women, Inc.*,
 537 U.S. 393 (2003) .................................................................................... 19

*Shetiwy v. Midland Credit Mgmt.*,
 15 F. Supp. 3d 437 (S.D.N.Y. 2014) ................................................................ 21

*Skilling v. United States*,
 561 U.S. 358 (2010) .................................................................................... 17

*United States ex rel. Camburn v. Novartis Pharms. Corp.*,
 124 F.4th 129 (2d Cir. 2024) .......................................................................... 8

*United States v. Autuori*,
 212 F.3d 105 (2d Cir. 2000) .......................................................................... 16

*United States v. Jabar*,
 19 F.4th 66 (2d Cir. 2021) ............................................................................ 16

*United States v. Mangano*,
 128 F.4th 442 (2d Cir. 2025)......................................................................... 17

*United States v. Percoco*,
 317 F. Supp. 3d 822 (S.D.N.Y. 2018) .............................................................. 18

*Westchester Cnty. Indep. Party v. Astorino*,
 137 F. Supp. 3d 586 (S.D.N.Y. 2015) ...................................................... 9, 10, 14

*Wilkie v. Robbins*,
 551 U.S. 537 (2007) .................................................................................... 19

*Williams v. Affinion Grp., LLC*,
 889 F.3d 116 (2d Cir. 2018) ................................................................. 8, 15, 16

*World Wrestling Ent., Inc. v. Jakks Pac., Inc.*,
   530 F. Supp. 2d 486 (S.D.N.Y. 2007) ........................................................................ 10, 11

*Xerox Corp. v. Media Scis. Int'l, Inc.*,
   511 F. Supp. 2d 372 (S.D.N.Y. 2007) ............................................................................ 25

## <u>Statutes</u>

18 U.S.C. § 1503 .................................................................................................................... 19

18 U.S.C. § 1511 ............................................................................................................... 20, 21

18 U.S.C. § 1512 .................................................................................................................... 19

18 U.S.C. § 1951 .................................................................................................................... 18

18 U.S.C. § 1961 ............................................................................................................. *Passim*

18 U.S.C. § 1962 ............................................................................................................. *Passim*

18 U.S.C. § 1964 ............................................................................................................. 10, 12

## <u>Rules</u>

Federal Rule of Civil Procedure 9 ........................................................................................ 1, 8

Federal Rule of Civil Procedure 12 ......................................................................................... 1

Defendant Mitchell K. Pallaki respectfully submits this memorandum of law in support of his motion to dismiss Plaintiff Gideon Rapaport's Amended Complaint (ECF No. 71 (the "Amended Complaint" or "Am. Compl.")) pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) (the "Motion").

## PRELIMINARY STATEMENT

Plaintiff's original complaint (ECF No. 1) was a meritless, incoherent, 256-paragraph diatribe premised on a purported vast conspiracy at New York University School of Law ("NYU Law") that allegedly had the ability—without any judicial input or oversight—to place students in one hundred federal district and appellate court clerkships, as well as up to four United States Supreme Court clerkships. It was full of vitriolic, *ad hominem* attacks regarding Mr. Pallaki's personal life and religious beliefs that are irrelevant to Plaintiff's claims, all of which were brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and the Sherman Antitrust Act of 1890 (the "Sherman Act"). Given the implausibility of, and myriad deficiencies with, Plaintiff's claims, Mr. Pallaki moved to dismiss the original complaint in its entirety. (*See* ECF Nos. 43 (motion), 44 (brief).) Although Mr. Pallaki's motion (and the other defendants' motions) detailed for Plaintiff the meritless nature of this case, Plaintiff still decided to pursue his deficient claims, amending his complaint to add only a handful of conclusory allegations aimed at evading dismissal. (*See* Am. Compl.) But, as set forth below, the Amended Complaint is just as defective as the original. The Court should thus reject Plaintiff's feeble attempt to avoid dismissal. Plaintiff's plainly meritless claims should never have been brought, and they should be dismissed with prejudice.

According to Plaintiff, his once-mentor, Defendant Richard Allen Epstein ("Professor Epstein") allegedly banded together with Plaintiff's former NYU Law classmates, including Mr. Pallaki, to prevent Plaintiff from obtaining a Supreme Court clerkship that he had purportedly

been promised (but for which he never actually applied).  To do so, Plaintiff avers, the defendants took control of the NYU Law chapter of the Federalist Society ("FedSoc," and NYU Law chapter, "NYU FedSoc") and the NYU Law Journal of Law and Liberty ("JLL") and operated them as racketeering enterprises to destroy Plaintiff's reputation and career prospects.

Plaintiff's RICO claims are facially implausible and are legally deficient for multiple independent reasons.  First, a civil RICO plaintiff must allege a concrete injury to property or business, and the loss of a tentative job opportunity, such as the clerkship to which Plaintiff boldly claims he was entitled, does not qualify.  Second, Plaintiff's allegations make clear that there were multiple intervening factors—including that he did not actually apply for any clerkship or successfully clerk for a "feeder" judge—breaking the implausible causal connection that Plaintiff alleges exists between the purported RICO violations and his claimed injury.  Third, Plaintiff has failed to allege that Mr. Pallaki committed any RICO predicates.   While Plaintiff accuses Defendants, in conclusory and entirely implausible fashion, of committing the serious crimes of wire fraud, blackmail, extortion, witness tampering, obstruction of justice, obstruction of state law enforcement, and money laundering, the Amended Complaint lacks factual allegations that would establish that Mr. Pallaki (or any of the other Defendants) committed any such predicate acts.  Nor has Plaintiff alleged that Mr. Pallaki engaged in a pattern of racketeering activity, as is required to plead a RICO claim.

Plaintiff's antitrust claims are equally implausible and fare no better.  They fail at the threshold because Plaintiff has not alleged any plausible, cognizable market.  Even if he had, those claims would still fail because Plaintiff has engaged in impermissible group pleading by failing to specifically identify any allegedly anticompetitive conduct undertaken by Mr. Pallaki.  Further,

Plaintiff's antitrust claims are deficient because Plaintiff has alleged only that he was personally injured, not that competition as a whole has been adversely impacted.

For these reasons, Plaintiff's claims should be dismissed with prejudice.

## BACKGROUND

The Amended Complaint advances an implausible narrative and contains dozens of nonsensical allegations, and Mr. Pallaki disputes the facts alleged therein. Nevertheless, pursuant to the applicable standard of review, Mr. Pallaki accepts as true the Amended Complaint's well-pleaded factual allegations for purposes of the Motion.

### I.    The Parties and Claims

Plaintiff was a summer associate at Kirkland & Ellis LLP ("Kirkland") and is an NYU Law graduate. (Am. Compl. ¶ 1.) Professor Epstein is a law professor at NYU Law and the faculty advisor for both NYU FedSoc and the JLL. (*Id.* ¶ 2.) Mr. Pallaki is an NYU Law graduate who had a leadership role in NYU FedSoc when he was a law student. (*Id.* ¶ 4.) Defendants Ajay Srinivasan Iyer, Zachary George Garrett, William Stuart Lasseter Weinberg, and Andrew Nelms (with Mr. Pallaki and Professor Epstein, "Defendants") are NYU Law graduates who also had various leadership roles in NYU FedSoc. (*Id.* ¶¶ 6, 7, 9, 11.)

The Amended Complaint asserts the following nine claims: (1) a RICO claim under § 1962(b) (Count I); (2) a RICO claim under § 1962(c) (Count II); (3) a RICO conspiracy claim premised on § 1962(b) (Count III); (4) a RICO conspiracy claim premised on § 1962(c) (Count IV, and together with Counts I–III, the "RICO Claims"); (5) a claim for monopolization of the NYU Law clerkship market (Count V); (6) a claim for attempted monopolization of the NYU Law clerkship market (Count VI); (7) a claim for unreasonable restraints of trade concerning academic journal work (Count VII); (8) a claim for unreasonable restraints of trade concerning think tank work (Count VIII); and (9) a claim for unreasonable restraints of trade concerning clerkships

3

(Count IX, and, together with Counts V–VIII, the "Antitrust Claims").[1]  (*See* Am. Compl. ¶¶ 199–220 (Count I), 221–27 (Count II), 228–36 (Count III), 237–43 (Count IV), 244–48 (Count V), 249–53 (Count VI), 254–57 (Count VII), 258–63 (Count VIII), 264–67 (Count IX).)

## II.     Plaintiff's Allegations

The scattershot fifty-seven page, 267-paragraph Amended Complaint touches on a variety of topics.  At its core, however, it can be boiled down to a single basic assertion: Defendants allegedly worked in concert to prevent Plaintiff from obtaining a Supreme Court clerkship.

### A.     Plaintiff's Allegations Regarding Supreme Court Clerkships and Professor Epstein's Purported Influence and Power as a Supreme Court Recommender

According to Plaintiff, young lawyers can obtain a Supreme Court clerkship in two ways: (1) clerk for a federal appellate court judge referred to as a "feeder" judge, perform well, and get recommended by the feeder judge to a Supreme Court Justice; or (2) arrange a feeder judge clerkship and a Supreme Court clerkship simultaneously.  (Am. Compl. ¶¶ 188–90.)

Plaintiff alleges that Professor Epstein "has established an unprecedentedly powerful apparatus around himself and under his control" and "placed himself as a clearinghouse between significant amounts of 'dark money' keen to influence public policy and the administration of justice, the brand and credentialing power of elite institutions, exceptionally talented and sometimes idealistic students with lofty career ambitions . . . and the judicial branch . . . through his control over the staffing of an unrivaled number of federal clerkships."  (Am. Compl. ¶¶ 26–27.)

Plaintiff avers that Professor Epstein wields this influence in three ways.  First, he purportedly unilaterally controls "up to four" Supreme Court clerkships and "approximately one

---

[1] Counts V and VI are presumably brought under § 2 of the Sherman Act, and Counts VII, VIII, and IX are presumably brought under § 1 of the Sherman Act.

hundred [clerkship] slots in the federal trial and appellate courts." (Am. Compl. ¶¶ 35.) Second, he purportedly "sits as an intermediary between vast amounts of 'dark money' provided by large corporations and wealthy donors who seek to influence public policy and the administration of justice . . . in a manner consistent with their personal interest and beliefs" and "controls this money with broad discretion." (*Id.* ¶ 31.) Third, he purportedly "plays God over the lives of [] students" and "young professionals" who "serve as the grist for [his] mill and the foot-soldiers that occupy the positions he controls." (*Id.* ¶ 32.) In short, according to Plaintiff, because of Professor Epstein's "unrivaled combination of power, resources, and influence, and his monopoly as the only NYU Law professor in this business on the right, every NYU Law student aspiring to any ideologically-involved position right of center, must be blessed by [Professor] Epstein, and even a slight disapproval is fatal." (*Id.* ¶ 33.)

      B.    <u>Plaintiff's Allegations Regarding Defendants' Purported Misconduct</u>

      Plaintiff alleges that during the 2020-21 academic year, Messrs. Weinberg, Nelms, and Pallaki unjustifiably removed Plaintiff from his leadership role with NYU FedSoc. (Am. Compl. ¶¶ 53–57.) Plaintiff contends that they did so by, among other things: filing a "false and meritless [complaint] to the NYU Law Administration about [P]laintiff's leadership of the [NYU FedSoc]" (*id.* ¶ 59); introducing typos into a document circulated by Plaintiff and telling Professor Epstein about the joke that Plaintiff made following distribution of the typo-ridden document (*id.* ¶¶ 62–67); facilitating a clash between Plaintiff and another NYU FedSoc member concerning a documentary about Justice Thomas (*id.* ¶¶ 68–74); gathering votes to remove Plaintiff from his leadership position on the NYU FedSoc and, after a majority was gathered by agreement, allegedly "blackmail[ing] and extort[ing]" the other voters to ensure a unanimous vote (*id.* ¶¶ 76–78); and saying unkind things about Plaintiff during a meeting and preventing him from fully defending

5

himself (*id.* ¶¶ 79–80). Purportedly upset by this series of events (and other factors), Plaintiff took a leave of absence from NYU Law for the remainder of the 2020-21 academic year. (*Id.* ¶ 89.)

While Plaintiff was on leave, certain Defendants allegedly lied to two individuals at the student division of FedSoc by telling them that Plaintiff was transferring to another school and was older than thirty. (Am. Compl. ¶ 100.) Messrs. Weinberg, Nelms, and Pallaki are also alleged to have changed the NYU FedSoc constitution in a way that would purportedly affect only Plaintiff and would prevent him from holding any future leadership positions. (*Id.* ¶ 101.)

According to Plaintiff, Defendants continued to wrong him when he returned to school the next year. Plaintiff avers that, at a conference Mr. Pallaki allegedly attended, he "spread defamations" about Plaintiff. (Compl. ¶¶ 105–06.) Additionally, Plaintiff asserts that when he attempted to re-join the NYU FedSoc board, he was prevented from doing so. (*Id.* ¶¶ 114–15.)

Plaintiff next alleges that in early April 2022, he attended a party at a pub hosted by the NYU Student Bar Association. (Am. Compl. ¶¶ 116–17.) While he was speaking with Mr. Garrett outside the pub, a female NYU Law student complained to the pub's doorman about Plaintiff. (*Id.* ¶ 117.) Citing a policy that applied to female patrons complaining about male ones (and not vice versa), the doorman purportedly refused Plaintiff reentry. (*Id.* ¶¶ 118–19.) Plaintiff avers that Mr. Garrett acknowledged that this was "primae [sic] facie discrimination." (*Id.* ¶ 120.) Plaintiff alleges that he filed a "human rights complaint" against the pub the next day, which led to an investigation by the New York State Division of Human Rights ("NYSDHR"). (*Id.* ¶ 121.) As part of that complaint, Plaintiff provided NYSDHR with Mr. Garrett's phone number. (*Id.*) According to Plaintiff, Messrs. Pallaki and Iyer allegedly told Mr. Garrett to lie about the incident to NYSDHR, which he purportedly did. (*Id.* ¶¶ 122–23.) Based on Mr. Garrett's purportedly perjured testimony, NYSDHR's investigation ended. (*Id.* ¶ 123.)

On April 10, 2022, Plaintiff allegedly informed Professor Epstein that he was planning to spend his final year of law school away from NYU Law.  (Am. Compl. ¶ 124.)  Shortly thereafter, Professor Epstein purportedly implored Plaintiff to stay and "offered the [sic] him a 'feeder' federal appellate clerkship from a list [] [P]laintiff would provide to be followed by a Supreme Court clerkship as available, a top position on [JLL,] and to teach" two classes instead of only one. (*Id.* ¶ 125.)  Plaintiff allegedly accepted this offer and canceled his plans to leave NYU Law.  (*Id.*) According to Plaintiff, Professor Epstein insisted that Mr. Iyer extend Plaintiff an offer to join the JLL board, which Plaintiff accepted.  (*Id.* ¶ 127.)

In mid-July 2022, Plaintiff attended a NYU FedSoc gathering and told Messrs. Iyer and Garrett that he would be attending the James Kent Academy—a prestigious FedSoc event frequently attended by former and future Supreme Court clerks—later that summer.  (Am. Compl. ¶ 127.)  Purportedly envious that Professor Epstein was planning to recommend Plaintiff, and not them, for a Supreme Court clerkship, Messrs. Iyer, Garrett, and Pallaki allegedly resolved to "maintain their power and status, as well as increase their own chances [of obtaining Supreme Court clerkships]."  (*Id.* ¶¶ 128–30.)

In late July 2022, Mr. Iyer allegedly "surreptitiously photographed a guard desk" in Kirkland's lobby and "used digital image manipulation software to erase the actual contents of a page posted at the desk and replace them with a picture of [P]laintiff's face, and the text: DO NOT ADMIT GIDEON RAPAPORT KIRKLAND AND ELLIS."  (Am. Compl. ¶ 131.)  Plaintiff avers that Mr. Iyer then posted this image online, falsely stating that Plaintiff had been fired from his summer associate job for sexual harassment and that he had been banned from Kirkland's office building, and providing unflattering information regarding Plaintiff's "personality, habits, mannerisms, modes of dress and pastimes."  (*Id.* ¶¶ 132–33.)  According to Plaintiff, the "posts

. . . mentioned [P]laintiff's political, ideological and jurisprudential beliefs" "to mask the attack as not coming from individuals with shared ideology and membership in [FedSoc]." (*Id.* ¶ 134.)

Plaintiff further alleges that during an August 2022 phone call, Professor Epstein—who purportedly learned of the allegations against Plaintiff contained in the aforementioned postings— told Plaintiff that he "will not have a federal clerkship" and "will not serve as Senior Article Editor of the [JLL]." (Am. Compl. ¶¶ 141.) Notably, Plaintiff does not allege that Professor Epstein consulted with Mr. Pallaki regarding Plaintiff or that Mr. Pallaki was otherwise directly involved in this decision. Further, Plaintiff does not allege that he applied for any clerkship following this purported phone call with Professor Epstein (or at any other time), let alone that any such application was rejected. Indeed, Plaintiff does not allege that he took any concrete steps to obtain a clerkship with any judge, such as seeking another professor to act as a recommender or contacting any judge concerning a potential clerkship.

## PLEADING STANDARD

To survive a motion to dismiss, a complaint must contain sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). Although the Court must accept as true all factual allegations in the Amended Complaint, that "tenet" is "inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Moreover, the only inferences to which Plaintiff is entitled are *reasonable* ones. *See United States ex rel. Camburn v. Novartis Pharms. Corp.*, 124 F.4th 129, 135 (2d Cir. 2024).

Importantly, insofar as Plaintiff's RICO claims are premised on purported instances of wire fraud, the elements "must be pled with particularity" pursuant to Federal Rule of Civil Procedure 9(b). *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018). Thus, "the [Amended C]omplaint must detail the specific statements that are false or fraudulent, identify the speaker,

state when and where the statements were made, and explain why the statements were fraudulent."

*Id.*

Finally, while courts typically afford *pro se* litigants the benefit of the doubt, because Plaintiff is a recent law school graduate, the Court need not do so here. *See, e.g.*, *Harbulak v. Suffolk Cnty.*, 654 F.2d 194, 198 (2d Cir. 1981) ("Harbulak is a lawyer and, therefore, he cannot claim the special consideration which the courts customarily grant to pro se parties."); *Hassan v. FEC*, 893 F. Supp. 2d 248, 253 (D.D.C. 2012) (similar).

## ARGUMENT[2]

As detailed below, each of Plaintiff's claims is implausible on its face and legally deficient for multiple, independent reasons. Accordingly, the Amended Complaint should be dismissed.

## I.    The Court Should Dismiss the RICO Claims

While the RICO statute has a broad remedial purpose, "courts have cautioned that, because the mere assertion of a RICO claim has an almost inevitable stigmatizing effect on those named as defendants, courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." *Westchester Cnty. Indep. Party v. Astorino*, 137 F. Supp. 3d 586, 599 (S.D.N.Y. 2015) (citation and internal quotation marks omitted). As set forth below, Counts I through IV are precisely the sort of "frivolous" RICO claims that this Court should "strive to flush out." *Id.* Specifically, Plaintiff's substantive RICO claims fail because he has failed to allege: (1) a cognizable RICO injury; (2) causation; and (3) a pattern of racketeering activity. Further, because Plaintiff's RICO conspiracy claims rise or fall with his substantive RICO claims, the deficiencies with Plaintiff's substantive RICO claims are equally fatal to Counts III and IV. *See, e.g.*, *D.*

---

[2] To the extent applicable, Mr. Pallaki expressly adopts and incorporates by reference the arguments set forth in the memoranda of law submitted in support of the motions to dismiss filed by Professor Epstein and by Messrs. Iyer, Garrett, Weinberg, and Nelms.

*Penguin Bros. Ltd. v. City Nat'l Bank*, 587 F. App'x 663, 669 (2d Cir. 2014) ("The failure to state a claim for a substantive RICO violation . . . is fatal to plaintiffs' RICO conspiracy claim under § 1962(d)."); *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir. 2004) (similar).

     A.    <u>Plaintiff Fails to Allege a Cognizable RICO Injury</u>

     Plaintiff's RICO claims should be dismissed because he has failed to allege a cognizable injury to his business or property.

     To assert a civil RICO claim, a plaintiff must allege, among other things, an injury to his business or property.  18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue . . . ."); *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 283 (2d Cir. 2006) ("[A] plaintiff must plead . . . an injury to the plaintiff's business or property . . . ." (citation and internal quotation marks omitted)).  Importantly, courts require plaintiffs alleging RICO injuries to plead "actual, quantifiable injury," *Kerik v. Tacopina*, 64 F. Supp. 3d 542, 560 (S.D.N.Y. 2014) (citation and internal quotation marks omitted), and consistently hold that "a RICO plaintiff may not recover for speculative losses or where the amount of damages is unprovable," *World Wrestling Ent., Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 519 (S.D.N.Y. 2007) (citation and internal quotation marks omitted); *see also Westchester Cnty.*, 137 F. Supp. 3d at 613 (noting that "the loss alleged must be clear and definite, rather than speculative" (citation and internal quotation marks omitted)).  Put simply, "[i]f the damages cannot be ascertained, then there is no lawful way to compensate the plaintiff.  Thus, the courts regularly have held that a plaintiff who alleges injuries that are indefinite and unprovable does not have standing under, and cannot recover damages pursuant to, RICO."  *World Wrestling*, 530 F. Supp. 2d at 521 (citation and internal quotation marks omitted).

Although Plaintiff pays lip service to RICO's statutory language by alleging injury to his "business and property" (*see* Am. Compl. ¶¶ 218, 225, 234, 242), the Court need not give any credence to these "threadbare recitals of [RICO's] elements," *Iqbal*, 556 U.S. at 663. The injury that Plaintiff actually alleges here—losing out on a potential Supreme Court clerkship to which he arrogantly and implausibly asserts he was *entitled*—is far too indefinite and unprovable to be cognizable under the RICO statute.

Plaintiff's own allegations make clear that this opportunity was far from certain and would require him to perform well enough as a feeder judge's clerk to merit a Supreme Court Justice's consideration. (*See* Am. Compl. ¶ 125 (averring that he was offered a "Supreme Court clerkship *as available*" (emphasis added)); *see also id.* ¶¶ 189–90 (asserting that individuals cannot clerk on the Supreme Court unless they perform well during feeder judge clerkships).) Plaintiff fails to allege which Supreme Court Justice he was to clerk for or when this clerkship would start (or even that he applied or otherwise contacted any Justice). Moreover, Plaintiff does not even attempt to quantify his purported damages (let alone adequately do so). *See Jingle Kids USA, LLC v. In Colour Cap., Inc.*, 2023 WL 5016496, at *9 (S.D.N.Y. June 6, 2023) ("[T]o plausibly allege a RICO injury, conclusory allegations of injury to pecuniary interest will not suffice; rather, a plaintiff must allege a *concrete financial loss*." (emphasis added) (citation and internal quotation marks omitted)). Indeed, quantifying Plaintiff's purported injury would require consideration of multiple variables and would undoubtedly devolve into impermissible conjecture and speculation. *See World Wrestling*, 530 F. Supp. 2d at 522 (finding that the number of "variables" at issue in calculating injury "doom[ed] [p]laintiff's efforts to establish a cognizable RICO injury").

Additionally, insofar as Plaintiff asserts a reputational injury affecting future employment or business prospects, that injury is likewise not cognizable under RICO. *See, e.g.*, *Kimm v. Chang*

*Hoon Lee & Champ, Inc.*, 196 F. App'x 14, 16 (2d Cir. 2006) ("[T]he generalized reputational harms alleged, including the risk of future lost business commissions, are too speculative to constitute an injury to business or property."); *Mack v. Parker Jewish Inst. for Health Care & Rehab.*, 2014 WL 5529746, at *6 (E.D.N.Y. Oct. 30, 2014) ("Plaintiff has not quantified the loss she alleges to suffer, instead simply that she has not been able to find employment reflective of her level of education and experience. Such allegations are too speculative to constitute an injury to business or property."); *Alphas Co. of N.Y., Inc. v. Hunts Point Terminal Produce Coop., Inc.*, 2017 WL 1929506, at *4 (S.D.N.Y. May 9, 2017) (similar); *Petroff Amshen LLP v. Alfa Rehab PT PC*, 2021 WL 960394, at *12 (E.D.N.Y. Mar. 15, 2021) (similar). Similarly, to the extent Plaintiff posits that Defendants' purported capture or operation of the NYU Law FedSoc or the JLL, itself, constitutes an injury, that position is untenable. The RICO statute makes clear that the plaintiff's injury and the RICO violation are distinct elements of a claim. *See* 18 U.S.C. § 1964(c) ("Any person injured in his business or property *by reason of a violation* of section 1962 of this chapter may sue . . . ." (emphasis added)).

Thus, despite conclusory allegations throughout the Amended Complaint regarding purported injury to business and property (*see, e.g.*, Am. Compl. ¶¶ 218, 225, 234, 242), Plaintiff has failed to actually allege a cognizable injury to his business or property. The RICO claims should be dismissed on that basis.

### B. Plaintiff Fails to Allege Causation

Even if Plaintiff had alleged a cognizable RICO injury, the RICO Claims would still be deficient because Plaintiff has failed to allege that the purported RICO violations caused his claimed injury.

"[T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense not only was a but for cause of his injury, but was the proximate cause as well." *Hemi*

*Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010) (citation and internal quotation marks omitted). "Proximate cause for RICO purposes . . . should be evaluated in light of its common-law foundations; proximate cause thus requires some direct relation between the injury asserted and the injurious conduct alleged." *Id.* (citation and internal quotation marks omitted). "A link that is too remote, purely contingent, or indirec[t] is insufficient." *Id.* (alteration in original) (citation and internal quotation marks omitted). Accordingly, "even at the pleading stage, civil RICO's direct relation requirement is rigorous and requires dismissal where substantial intervening factors attenuate the causal connection between the defendant's conduct and the plaintiff's injury." *Doe v. Trump Corp.*, 385 F. Supp. 3d 265, 276–77 (S.D.N.Y. 2019).

As an initial matter, none of the purported predicate acts that occurred before Plaintiff's April 10, 2022, communication with Professor Epstein could have caused Plaintiff's alleged injury because, according to Plaintiff's allegations, Professor Epstein did not offer him the clerkship until *after* that communication. (*See* Am. Compl. ¶¶ 124–25.) That is, if Plaintiff's purported injury is a revoked clerkship offer (for an unspecified judge or Justice), then nothing that pre-dated when that offer was first extended could possibly have caused that injury.

Moreover, based on Plaintiff's own allegations, there were "substantial intervening factor[s] [which] attenuate[d] the causal connection between [Defendants'] conduct and [Plaintiff's claimed] injury." *Trump Corp.*, 385 F. Supp. 3d at 277. For one, that Plaintiff did not, in fact, apply for any clerkship, much less apply and get rejected, breaks any conceivable causal chain. As noted above, the Amended Complaint is devoid of allegations that Plaintiff took any concrete steps to pursue a clerkship. Therefore, to the extent he was injured (he was not), such an injury was due to Plaintiff's own inaction, not any alleged misconduct. Additionally, as Plaintiff acknowledges, a candidate must perform well in an initial clerkship before clerking for a Supreme

13

Court Justice, and Plaintiff's failure to allege that he did so is another rupture in any purported causal chain.

Moreover, although his allegations are not crystal clear, while disputing the reason, Plaintiff seems to acknowledge that he was fired from his summer associate position at Kirkland (or, at minimum, did not finish the summer program).  (*See* Am. Compl. ¶¶ 24, 133.)  Notably, Plaintiff consistently uses the formulation "fired *for sexual harassment*" when describing why certain statements were purportedly false.  (*See id.* ¶ 133 (emphasis added); *id.* ¶ 24.)  In fact, even though he had an opportunity to clear up this issue by adjusting his allegations in response to Mr. Pallaki's initial motion papers (*see* ECF No. 44 at 14 (making same argument regarding Plaintiff's separation from Kirkland)), nowhere in the Amended Complaint does Plaintiff squarely allege that he completed Kirkland's summer program.  Assuming Plaintiff did not complete the program, the notion that Plaintiff could still have clerked is "[im]plausible on its face." *Iqbal*, 556 U.S. at 678.  Indeed, there are myriad reasons why Plaintiff did not obtain a clerkship—none are attributable to Defendants' actions.[3]

Accordingly, as Plaintiff has failed to allege causation, the RICO claims should be dismissed.

C.      Plaintiff Fails to Allege a Pattern of Racketeering Activity

The RICO Claims also fail because Plaintiff has not alleged a pattern of racketeering activity.

---

[3] Counts I and III are deficient for another reason: Plaintiff has failed to allege that he "suffered an injury as a result of the acquisition or control [of the purported enterprises], separate and apart from any injuries attributable to the individual predicate acts of racketeering." *Westchester Cnty.*, 137 F. Supp. 3d at 616.  The injury that Plaintiff alleges has nothing to do with Defendants' purported acquisition or maintenance of control over the NYU FedSoc or the JLL—and Plaintiff never alleges otherwise.

A pattern of racketeering activity is the heart of a RICO claim. *See* 18 U.S.C. § 1962(b) ("It shall be unlawful for any person *through a pattern of racketeering activity* . . . to acquire or maintain . . . any interest in or control of any enterprise . . . ." (emphasis added)); 18 U.S.C. § 1962(c) ("It shall be unlawful for any person employed by or associated with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs *through a pattern of racketeering activity* . . . ." (emphasis added)). The statute "defines a pattern of racketeering activity to require at least two acts of racketeering activity occurring within a ten-year period," but "the Supreme Court has imposed additional requirements that must be met for racketeering activity to constitute a 'pattern.'" *Bayshore Cap. Advisors, LLC v. Creative Wealth Media Fin. Corp.*, 667 F. Supp. 3d 83, 134 (S.D.N.Y. 2023). Specifically, a plaintiff "must show that the racketeering predicates . . . amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).

As discussed below, Plaintiff's allegations are deficient on both scores. He has not alleged any RICO predicates. And even if he had, he has not alleged that any such predicates amount to, or pose a threat of, continued criminal activity.

### 1.    Plaintiff Has Not Alleged Any RICO Predicates

Section 1961(1) enumerates an exhaustive list of predicates. 18 U.S.C. § 1961(1). While Plaintiff identifies seven—wire fraud, blackmail, extortion, witness tampering, obstruction of justice, obstruction of state law enforcement, and money laundering (*see* Am. Compl. ¶¶ 201, 224, 232, 241)—he has not plausibly alleged any, which forecloses all four RICO claims.

### a.    Plaintiff Fails to Allege Wire Fraud

"The elements of . . . wire fraud are (i) a scheme to defraud (ii) to get money or property (iii) furthered by the use of interstate . . . wires." *Williams*, 889 F.3d at 124 (citation and internal quotation marks omitted). A "scheme to defraud" is "a plan to deprive a person of something of

15

value by trick, deceit, chicane or overreaching." *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (citation and internal quotation marks omitted).  Here, Plaintiff has failed to plead any instance of wire fraud.

As an initial matter, the allegations surrounding several instances of purported wire fraud are not pleaded with the particularity required by Rule 9(b).  *See Williams*, 889 F. 3d at 124.  For instance, in Paragraph 203, Plaintiff avers that Messrs. Nelms, Weinberg, and Pallaki "filed a false complaint" "[o]n or [a]bout September 2020."  (Am. Compl. ¶ 203.)  But he fails to describe what the allegedly false complaint contained and/or why it was purportedly fraudulent.  (*Id.*)

More importantly, Plaintiff has failed to assert that "money or property" was "the object of the [purported] scheme" to defraud.  *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021).  For example, Plaintiff alleges that "[o]n or [a]bout September 2020," Messrs. Weinberg and Pallaki "transmitted by the internet, intentionally defective work product" to Plaintiff.  (Am. Compl. ¶ 205; *see also id.* ¶¶ 62–63 (seemingly describing the same incident).)  But he does not allege how transmitting "defective work product" was, in any way, an effort to obtain money or property. Similarly, while Plaintiff avers that "[o]n or about August 9, 2022," Professor Epstein "denied . . . that anyone from [NYU FedSoc] was involved in the recent defamations" (*id.* ¶ 213), he fails to explain how this purported misrepresentation targeted money or property.

Crucially, the Court should reject Plaintiff's feckless effort to shoehorn wire fraud buzzwords into the Amended Complaint to avoid dismissal.  (*See* Am. Compl. ¶¶ 209 (alleging that purported lie to FedSoc "deprive[d] [P]laintiff of beneficial treatment by the organization" and "the organization of a more favorable relationship with [him]"), 210 (alleging that Mr. Garrett's purported perjured testimony to the NYSDHR "depriv[ed] [P]laintiff of the honest services of the NYSDHR"), 212 (alleging that allegedly defamatory posts about the Kirkland

security desk photo "deprived [Plaintiff] of his property and honest services to which he was entitled").) "Beneficial treatment" and a "more favorable relationship" are precisely the sort of "intangible interests unconnected to property" not covered by the federal fraud statutes. *Kousisis v. United States*, 145 S. Ct. 1382, 1391 (2025) (quoting *Ciminelli v. United States*, 598 U.S. 306, 315 (2023)). Further, "honest services" fraud has its own statute, and "the Supreme Court [has] applied a limiting construction that narrowed the statute's reach to cover only 'offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes.'" *United States v. Mangano*, 128 F.4th 442, 470 (2d Cir. 2025) (quoting *Skilling v. United States*, 561 U.S. 358, 407 (2010)). Plaintiff has alleged no bribery or kickback scheme here. And in all events, "because money or property must be an *object* of the defendant's fraud, the traditional property interest at issue must play more than some bit part in a scheme. Obtaining the victim's money or property must have been the aim, not an incidental byproduct, of the defendant's fraud." *Kousisis*, 145 S. Ct. at 1391 (citation and internal quotation marks omitted). Here, Plaintiff's tacked-on allegations concerning purported deprivations of property at bottom describe quintessential "byproducts" of any purported fraud.

At most, Plaintiff has alleged "a collective effort to damage [his] reputation." *Black v. Ganieva*, 619 F. Supp. 3d 309, 344 (S.D.N.Y. 2022). "But, as pled, this effort, even treating the damaging statements about [Plaintiff] as false, are not alleged to have been part of a scheme to obtain money or property, a *sine qua non* of the federal anti-fraud statutes." *Id.*; *see also Hollander v. Pressreader, Inc.*, 2020 WL 2836189, at *4 (S.D.N.Y. May 30, 2020) ("At bottom, [the plaintiff's] wire fraud allegations are—at best—thinly clothed defamation claims. And it is firmly established that defamation and many other similar allegations do not provide the requisite predicate for RICO violations." (citation and internal quotation marks omitted)).

17

Accordingly, Plaintiff has failed to allege any wire fraud predicates.

### b.    Plaintiff Fails to Allege Extortion[4]

The RICO statute provides for two extortion-based predicate acts: (1) "any act which is indictable under . . . [the Hobbs Act]" and (2) "any act or threat involving . . . extortion . . . which is chargeable under State law and punishable by imprisonment for more than one year."  18 U.S.C. § 1961(1).  Plaintiff has not alleged either Hobbs Act extortion or state law extortion.

The Hobbs Act defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951(b)(2).  None of the purported instances of extortion identified in the Amended Complaint (*see* Am. Compl. ¶¶ 206–08, 214), meet the elements of Hobbs Act extortion because Defendants are not alleged to have obtained any property, let alone done so "by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  *Id.*; *see also United States v. Percoco*, 317 F. Supp. 3d 822, 827 (S.D.N.Y. 2018) ("Both extortion under color of official right and extortion by force, violence, or fear involve coercing another person to make a payment.").  Encouraging Plaintiff to step down from his leadership role on NYU FedSoc (Am. Compl. ¶ 206), pressuring other NYU FedSoc board members to vote against Plaintiff (*id.* ¶ 207), leveraging their influence over the national FedSoc organization (*id.* ¶ 208), and informing Plaintiff that an official NYU Law Title IX proceeding would not be interfered with (*id.* ¶ 214), plainly do not qualify as Hobbs Act extortion.

---

[4] "Blackmail" is not an enumerated RICO predicate.  *See* 18 U.S.C. § 1961(1).  Accordingly, Mr. Pallaki will address only extortion in this brief.  To the extent Plaintiff subsequently argues that extortion and blackmail are distinguishable (and that blackmail is, itself, a RICO predicate), Mr. Pallaki expressly reserves the right to address that argument in his reply brief.

Plaintiff's attempts to premise RICO liability on purported instances of state law extortion likewise fall flat. The Supreme Court has held that state-law extortion "cannot qualify as a predicate offense for a RICO suit unless it is capable of being generically classified as extortionate," *Wilkie v. Robbins*, 551 U.S. 537, 567 (2007), and that the generic definition of extortion is "obtaining something of value from another with his consent induced by the wrongful use of force, fear, or threats," *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 409 (2003). Accordingly, the analysis under state law mirrors the Hobbs Act analysis, and Plaintiff's state law allegations are insufficient for the reasons discussed above.

As such, Plaintiff has failed to allege any extortion predicates.

### c.    Plaintiff Fails to Allege Either Witness Tampering or Obstruction of Justice

As an initial matter, for RICO predicate purposes, neither witness tampering (18 U.S.C. § 1512) nor obstruction of justice (18 U.S.C. § 1503) can be premised on misconduct in connection with a state court or state administrative proceeding. Accordingly, insofar as Plaintiff attempts to premise any witness-tampering and obstruction-of-justice predicates on activity taken in connection with the NYSDHR investigation that Plaintiff claims to have instigated when he was denied reentry to a pub based on a complaint by a female patron (*see* Am. Compl. ¶¶ 210–11, 121–23), that tack is foreclosed by black-letter law. *See, e.g.*, *Miller v. Carpinello*, 2007 WL 4207282, at *7 n.6 (S.D.N.Y. Nov. 20, 2007) ("Proceedings in state courts or before state administrative bodies are not official proceedings, and witness tampering with respect to them does not violate Section 1512 or constitute a predicate act under RICO."); *Dangerfield v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2003 WL 22227956, at *8 (S.D.N.Y. Sept. 26, 2003) ("[V]iolating the subpoenas issued by the Texas state court[] is not a cognizable violation of section 1503 and cannot form a predicate act for RICO purposes.").

Additionally, Plaintiff's effort to base any witness-tampering and/or obstruction-of-justice RICO predicates on Mr. Iyer's purported influence over the sworn statement Mr. Garrett submitted in connection with a related case (*see* Am. Compl. ¶ 215) fails for multiple reasons: (1) Plaintiff does not allege (nor could he plausibly allege) that Mr. Iyer threatened, harmed, or otherwise intimidated Mr. Garrett; (2) Plaintiff has not offered, and cannot offer, any plausible explanation as to how affidavits concerning Messrs. Iyer and Garrett's *opinions* as to the existence of any conflict of interest between them (*see* ECF Nos. 71-4, 71-5) could even be false or misleading or otherwise interfere with the administration of justice; and (3) attempting to manufacture a RICO predicate based on affidavits filed in a civil proceeding is plainly improper.  *See Rajaratnam v. Motley Rice, LLC*, 449 F. Supp. 3d 45, 72–73 (E.D.N.Y. 2020) (noting that "courts are loath to permit litigation activities to be shoehorned into civil RICO predicates" and that a "civil RICO action . . . is not the appropriate mechanism to seek redress for [purportedly] false statements made in court filings by a litigation adversary").

Finally, Plaintiff's outlandish claim that Professor Epstein boycotted unnamed NYU Law students from his clerkship slots "to intimidate them from testifying as to facts relevant to this case" (*see* Am. Compl. ¶ 216), cannot be credited either.  RICO witness tampering allegations must contain specifics, *see, e.g.*, *Rajaratnam*, 449 F. Supp. 3d at 74–75; Plaintiff's allegations are vague (as well as patently implausible).

Plaintiff has thus failed to allege any witness tampering or obstruction of justice predicates.

### d.    Plaintiff Fails to Allege Obstruction of State Law Enforcement

The obstruction-of-state-law-enforcement RICO predicate, 18 U.S.C. § 1511, requires that the obstruction be undertaken "with the intent to facilitate an illegal gambling business."  18 U.S.C. § 1511(a).  Because the Amended Complaint lacks any allegations concerning gambling, Section

1511 is unavailable as a RICO predicate.  *See, e.g.*, *Shetiwy v. Midland Credit Mgmt.*, 15 F. Supp. 3d 437, 445 (S.D.N.Y. 2014).

### e.    Plaintiff Fails to Allege Money Laundering

"[T]o state a claim for money laundering as a RICO predicate, a plaintiff must plead (1) that the defendant conducted a financial transaction; (2) that the transaction in fact involved the proceeds of specified unlawful activity . . . ; (3) that the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity; and (4) that the defendant knew that the financial transaction was designed in whole or in part to conceal or disguise the source, ownership, control, etc., of those proceeds."  *Alix v. McKinsey & Co., Inc.*, 2023 WL 5344892, at *21 (S.D.N.Y. Aug. 18, 2023) (citation and internal quotation marks omitted).  Plaintiff's conclusory money laundering allegations (*see* Am. Compl. ¶ 217) fall short for at least two reasons.  First, Plaintiff does not allege that the purportedly laundered money represented the proceeds of any specified unlawful activity.  Plaintiff merely generally and vaguely alleges that Professor Epstein had access to "dark money provided by large corporations and wealthy donors."  (*Id.* ¶ 33; *see also id.* ¶ 27.)  Second, Plaintiff fails to identify any specific financial transactions involving purportedly laundered money.  Indeed, he specifically alleges that Professor Epstein "offered" him money, not that Professor Epstein actually gave it to him.  (*See id.* ¶ 217.)  Thus, Plaintiff has failed to allege a money laundering RICO predicate.

### 2.    *Plaintiff Has Not Alleged Continuity*

Even if Plaintiff had adequately alleged at least two RICO predicates, the RICO Claims would still fail because he has failed to allege a pattern of racketeering activity.

RICO plaintiffs can "adequately plead a pattern of racketeering activity either by alleging that Defendants engaged in repeated racketeering activity extending over a substantial period of time or by alleging that they have engaged in racketeering activity that by its nature projects into

the future with a threat of repetition." *Bayshore*, 667 F. Supp. 3d at 134.  These are referred to as open-ended continuity and closed-ended continuity, respectively.

Plaintiff has not alleged close-ended continuity because he alleges a single, relatively simple scheme, involving only a handful of alleged conspirators, which renders his claims "more akin to garden variety . . . tort claims than a large-scale civil RICO claims." *MinedMap, Inc. v. Northway Mining, LLC*, 2022 WL 570082, at *2 (2d Cir. Feb. 25, 2022); *see also Bayshore*, 667 F. Supp. 3d at 135–36 (finding a lack of closed-ended continuity and collecting cases).

Plaintiff has likewise failed to allege open-ended continuity.  The Amended Complaint includes no allegations suggesting that any purported misconduct will continue into the future. Additionally, "it is well established law that fraud does not fall within the 'inherently unlawful' category of predicate acts so as to imply a threat of continued criminal activity." *Bayshore*, 667 F. Supp. 3d at 136.  Further, open-ended continuity does not exist here because the purported scheme is "*inherently* terminable." *GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 466 (2d Cir. 1995).  As alleged, Defendants' scheme was directed exclusively at Plaintiff and depended on an ongoing affiliation with NYU Law.  Messrs. Iyer, Garrett, Weinberg, Nelms, and Pallaki have all graduated.  (*See* Am. Compl. ¶¶ 4, 6, 7, 9, 11.)  Moreover, as alleged, Defendants' goal was purportedly to prevent Plaintiff from obtaining a clerkship.  Because Plaintiff is not a Supreme Court clerk (and has no realistic chance of becoming one), there would be nothing left to be done.[5] *See, e.g.*, *GICC*, 67 F.3d at 466 ("It defies logic to suggest that a threat of continued looting activity exists when . . . there is nothing left to loot."); *MinedMap*, 2022 WL 570082, at *2 (similar).

---

[5] Plaintiff's request for equitable relief to "restrain current and future racketeering and anti-trust violations" (*see* Am. Compl. at 55), is without merit.  No relief is appropriate given the deficiencies with Plaintiff's claims; injunctive relief is particularly inappropriate given the lack of any ongoing conduct by Defendants, and the addition of this request to the Amended Complaint, alone or in combination with the other additions, cannot save Plaintiff's claims.

Thus, Plaintiff has failed to allege a pattern of racketeering activity, which means that the RICO Claims should be dismissed.

## II.    __The Court Should Dismiss the Antitrust Claims__

The Antitrust Claims, which are equally implausible, fare no better, as they are deficient for several independent reasons.  Plaintiff has failed to allege: (1) any cognizable market; (2) that Mr. Pallaki committed any antitrust violations; and (3) an antitrust injury.

### A.    Plaintiff Fails to Allege Any Plausible, Cognizable Market

The Antitrust Claims should be dismissed because Plaintiff has failed to allege any plausible, cognizable market.

"To state a claim under either Section 1 or Section 2 of the Sherman Act, a plaintiff must plausibly allege that the defendants' anticompetitive conduct restricted competition within a relevant market."  *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 338 (2d Cir. 2024).  "At the motion-to-dismiss stage, a plaintiff's proposed relevant market must bear a rational relation to the methodology courts prescribe to define a market and include a plausible explanation as to why a market should be limited to exclude possible substitutes."  *Id.* (citation and internal quotation marks omitted).

The purported markets that Plaintiff has identified—the "Judicial Clerkship Market at NYU," "Academic Journal Work," "Think Tank Work," and "Clerkships" (Am. Compl. ¶¶ 244, 249, 254, 258, 264)—bear none of the hallmarks of those that courts typically analyze in antitrust cases.  These implausible markets have no prices in the traditional sense of the word, and it is not even clear who the market participants are and what roles they play.  In the "Judicial Clerkship Market at NYU," for instance, it is unclear who the consumers are (NYU Law students, Supreme Court Justices, or both).

Further, Plaintiff's proposed markets suffer from other inconsistencies and logical flaws. For example, whereas Plaintiff alleges in Paragraph 246 that Professor Epstein "is the only provider in th[e NYU Law judicial clerkship] market" (Am. Compl. ¶ 246), he alleges elsewhere that Professor Epstein's purported influence extends only to clerkship opportunities for NYU Law students *with right-of-center views* (*see, e.g.*, *id.* ¶¶ 18, 33). Similarly, whereas Plaintiff seems to aver that the relevant market for Count VII is "Academic Journal Work" (*see id.* ¶ 254), Professor Epstein is only alleged to have influence over a single academic journal, the JLL, and it is common knowledge that NYU Law has several academic journals.

Plaintiff has therefore not plausibly alleged a relevant market—the Antitrust Claims should accordingly be dismissed.

B.    <u>Plaintiff Fails to Allege that Mr. Pallaki Committed Any Antitrust Violations</u>

Even if Plaintiff's proposed markets were legally cognizable, Plaintiff's antitrust claims would still fail because he has failed to allege that Mr. Pallaki committed any antitrust violations.

When asserting antitrust claims against multiple defendants, a plaintiff cannot rely on group pleading. *In re Mexican Gov. Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 388 (S.D.N.Y. 2019) ("Allegations about the defendants as a general collective bloc, or generalized claims of parallel conduct, must . . . be set aside . . . as impermissible group pleading." (ellipses in original) (citation and internal quotation marks omitted)). Rather, "[p]laintiffs must allege a factual connection between each Defendant and the alleged conspiracy[.]" *Iowa Pub. Emps. Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 316 (S.D.N.Y. 2018) (second alteration in original) (citation and internal quotation marks omitted); *see also In re Mexican Gov. Bonds*, 412 F. Supp 3d at 388 ("[W]ithout a coherent explanation for each defendant['s] participation in the alleged conspiracy, an antitrust claim can stand only against those defendants

as to whom the [c]omplaint offers some specific, individual showing of anticompetitive conduct." (citation and internal quotation marks omitted)).

Here, Plaintiff's allegations tying Mr. Pallaki to the purportedly anticompetitive conduct are precisely the type of conclusory, threadbare allegations that courts routinely reject. With respect to the alleged monopoly of the "Judicial Clerkship Market at NYU," Plaintiff alleges only that "[a]ll other defendants joined in [Professor] Epstein's monopoly and assisted in operating it." (Am. Compl. ¶¶ 247, 252.) Similarly, with respect to the unreasonable restraints of trade claims regarding "Academic Journal Work" and "Think Tank Work," Plaintiff avers only that Professor Epstein's boycott of Plaintiff was "driven and motivated by other defendants." (*Id.* ¶¶ 255, 259.) Likewise, in connection with the unreasonable restraint of trade claim with respect to "Clerkships," Plaintiff alleges only that Defendants "created and conspired to create unreasonable and unlawful restraints of trade against [] [P]laintiff to prevent him from obtaining a judicial clerkship" (*id.* ¶ 265), making no effort to *specifically* identify which purportedly anticompetitive acts were performed by whom.[6] Simply put, Plaintiff has impermissibly attempted to lump Mr. Pallaki in with Professor Epstein based on vague allegations connecting him to the alleged misconduct in a wholly unspecified manner.

Accordingly, the Antitrust Claims should be dismissed.

---

[6] In all events, the "forgeries" and "defamations" that Plaintiff alleges (*see* Am. Compl. ¶ 265), are not anticompetitive conduct within the meaning of the Sherman Act. *See, e.g., Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 37 (S.D.N.Y. 2016) ("The Sherman Act is not a panacea for all evils that may affect business life. It is well settled that employing tactics that undermine one's competitors—even unfairly—does not violate the antitrust laws. Moreover, false and misleading statements are presumed to have a *de minimis* effect on competition for purposes of the Sherman Act." (citations and internal quotation marks omitted)); *Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 382 (S.D.N.Y. 2007) ("Mere allegations of business disparagement are not the type of injuries to competition that the antitrust laws were designed to prevent." (citation and internal quotation marks omitted)).

C.    Plaintiff Fails to Allege Antitrust Injury

The Antitrust Claims should be dismissed for another independent reason: Plaintiff has failed to allege an antitrust injury.

"A private plaintiff seeking to state a claim for violation of sections 1 or 2 of the Sherman Act must allege that it has suffered antitrust injury." *George Haug Co. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 139 (2d Cir. 1998). Because the "antitrust laws . . . were enacted for the protection of competition not competitors," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (citation and internal quotation marks omitted), "a plaintiff must allege an injury beyond harm to an individual competitor," *Miller v. Nicholas*, 2021 WL 9037639, at *2 (E.D.N.Y. Nov. 3, 2021). "The antitrust injury requirement obligates a plaintiff to demonstrate, as a threshold matter, that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice." *Long Island Anesthesiologists PLLC v. United Healthcare Ins. Co. of N.Y.*, 2023 WL 8096909, at *4 (E.D.N.Y. Nov. 21, 2023) (citation and internal quotation marks omitted); *see also Nicholas*, 2021 WL 9037639, at *2 (noting that an antitrust plaintiff must allege, among other things, "market-wide harm to competition, such as a reduction in output or increase in prices to consumers as a result of the restraint").

Given these pleading requirements, Plaintiff's allegations fall short. With respect to the "Academic Journal Work" and "Think Tank Work" markets that he identifies in connection with Counts VII and VIII (*see* Am. Compl. ¶¶ 254, 258), Plaintiff has failed to allege that anyone other than him has been impacted by Defendants' purportedly unreasonable restraints of trade. And as for the "Judicial Clerkship Market at NYU" and "Clerkship" markets identified in connection with Counts V, VI, and IX (*see id.* ¶¶ 244, 249, 264)—apart from Plaintiff's utterly implausible allegation that Professor Epstein stopped facilitating clerkships for NYU Law students "in

26

response to [this and other related lawsuits]" "as a show of power and a deterrence against any testimony as to his conduct" (*id.* ¶ 185)[7]—Plaintiff has pointed to no market-wide disruptions or distortions. Simply put, Plaintiff has failed to allege a market-wide effect on competition as is required to plead an antitrust claim. *See Nicholas*, 2021 WL 9037639, at *3 (dismissing antitrust claims where the plaintiff "fail[ed] to allege any facts to support a conclusion that [d]efendants' actions had any effect on the competitive structure of the market"); *Kennedy v. Vermont*, 2018 WL 9815980, at *5 (D. Vt. Oct. 9, 2018) (rejecting antitrust claim where the plaintiff alleged "that he was harmed" but "allege[d] no facts suggesting any detrimental effects on competition as a whole").

As such, the Antitrust Claims should be dismissed.

---

[7] Even were the Court to give credence to this fantastic allegation as to a purportedly detrimental impact on other NYU FedSoc members, Plaintiff's claims would still fail. He has not alleged that Supreme Court Justices (or any other judges) are being detrimentally impacted by this purported change in the clerkship market. Nor does he allege that NYU Law students generally (as opposed to conservative-leaning students in particular) have been unjustifiably excluded from the market. At bottom, the purported fact that there are fewer right-of-center NYU Law federal clerks than before is not indicative of any market disruption or distortion.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant the Motion and dismiss the Amended

Complaint with prejudice.

Dated: New York, New York           Respectfully submitted,
       July 15, 2025

                                           By:     */s/ Seth L. Levine*
                                               Seth L. Levine
                                               Steven W. Kessler

                                               **LEVINE LEE LLP**

                                               400 Madison Avenue
                                               New York, New York 10017
                                               Telephone: (212) 223-4400
                                               slevine@levinelee.com
                                               skessler@levinelee.com

                                               *Attorneys for Defendant Mitchell K.*
                                               *Pallaki*

## <u>LOCAL CIVIL RULE 7.1(c) CERTIFICATION</u>

Pursuant to Local Civil Rule 7.1(c), the total number of words in the foregoing memorandum of law, inclusive of footnotes and exclusive of the caption, indices, tables, signature blocks, and certificates, is 8,728.

Dated: July 15, 2025

*/s/ Seth L. Levine*
Seth L. Levine
