**MEMORANDUM OF LAW**

August 25, 2025

Respectfully submitted,

/s/ Gideon Rapaport, *pro se*
GideonRapaportLaw@Outlook.com
(862) 213-0895
#627 1078 Summit Avenue
Jersey City, New Jersey, 07310

**Preliminary Statement**

Defendant Epstein is a law professor who utilizes his position of exceptional privilege and influence to punish the innocent while rewarding the guilty. He has punished and retaliated against the innocent plaintiff while benefiting and protecting, including by wire fraud, his students who forged materials in order to support a fabricated narrative that the plaintiff was fired from his summer associate position for sexual harassment and barred from the premises of his former employer. In fact, no such complaint had even been made against the plaintiff, and defendant Epstein's students invented this malicious lie because they believed that he would recommend the plaintiff instead of one of them to a Supreme Court clerkship.

To defendant Epstein, such conduct by his students in order to improve their careers while victimizing an innocent person is merely a "squabble". It would be difficult to think of a response better demonstrating the correctness of the complaint and the need for the application of the Racketeer Influenced and Corrupt Organizations Act to address the broad and continuous pattern of racketeering that defendant Epstein and his co-defendants engage in. It is shocking that a person who is positioned to teach the law unto others, condescends to this Court by expecting to be addressed as "Professor Epstein" and is in fact the author of a leading torts casebook should conduct himself in such a lawless manner, and attempt to justify such cruel and unlawful behavior.

Defendant Epstein would also have the Court believe that his about-face with respect to the plaintiff is "mysterious", thereby attempting to attack the plausibility of the complaint. This about-face is extremely obvious rather than mysterious. Defendant Epstein cares for the immense amount of influence he has cultivated as a clerkship "recommender" (but really placer) more than he cares for truth or the suffering of "just one student" as he put it. As soon as his co-defendant students created a controversy with their forged evidence and fabricated allegations against the plaintiff, he felt that this

influence of his was threatened by association, and so he turned on the plaintiff. Shortly thereafter, when defendant Epstein discovered that the truth about the forgeries and fabrications, also specifically that his own students whom he had recommended to prestigious state supreme court and federal appellate clerkships created them, he doubled down on lie and committed at least two predicate acts of wire fraud against the plaintiff to prevent the discovery of this fact and rob (successfully so far) the plaintiff of his legal rights. Any racketeer, even one with a Yale law degree such as defendant Epstein, must protect the reputation of his product, and law clerks who forge evidence to frame innocent people for sexual offenses are clearly not fit for purpose.

Defendant Epstein states that the plaintiff "conjures" his allegations as if by magic, when in fact they are not only detailed and plausible, but are also supported by exhibits and testimony which demonstrate that defendant Epstein's students forged evidence twice to support their fabricated allegations against the plaintiff, and that defendant Epstein was involved in their dissemination to ensure maximum injury to the plaintiff. Insofar as the complaint broadly details the operations of defendant Epstein's racket which seeks to subvert the administration of justice in the United States to promote his ideological beliefs and personal importance, much of this is based upon information within the public domain and even the public statements of defendant Epstein himself. Defendant Epstein contradicts not only the complaint, but also his own remarks made before several hundred people before a plenary session of the Federalist Society's National Lawyer's Convention of November, 2024, even after this action was brought.

Defendant Epstein has previously defaulted in this action, even as he was actively represented in a related case involving state law claims before this same Court. In moving to vacate that default, he expressed a desire to defend on the merits. Now that the Court has graciously provided with defendant Epstein the opportunity to engage with the merits of this case, he moves to deny the plaintiff the same

opportunity. Defendant Epstein improperly pleads alternative facts, fabricates omissions in the operative complaint and ignores clear precedent.

## Factual Background

Without accepting defendant Epstein's selective and transformative representation of the pleadings, or restating the entire First Amended Complaint here, some factual omissions and additions are hereby corrected.

As to causation, Defendant Epstein ignores the fact that he himself recognized the injury done by the student defendants with their forgeries and fabrications of 2022 just as he recognized the injuries of the wire fraud and extortion of September 2020. This was even before defendant Epstein personally added to the plaintiff's injury in late summer 2022 by doing everything necessary to thwart his career, including through the commission of additional predicate acts in the form of wire fraud to prevent the plaintiff from ameliorating the injuries. If the racket-related injuries caused defendant Epstein to believe that the plaintiff's career was rendered worthless even then, before he resolved to further destroy it by retaliation, the Court should take him at his word as it was then when he described these grave injuries as "shipwrecks".

Defendant Epstein also neglects to address the fact that the plaintiff actually had JD-advantaged employment as well as an additional job offer that was revoked (the plaintiff accepted the job offer but never heard back from the employer) due to defendant Epstein's retaliation. Instead, defendant Epstein pretends that the main or only injury alleged is the loss of an opportunity to have a Supreme Court clerkship, when in fact he and the student defendants have done everything possible to prevent the plaintiff from engaging in business as an attorney or a professional of any variety.

As to motive, which is not legally required to be alleged by the plaintiff, defendant Epstein improperly pleads in his motion that his turning upon the plaintiff is "mysterious". The allegations clearly demonstrate that it is obvious rather than mysterious, Defendant Epstein cares for the immense amount of influence he has cultivated as a clerkship "recommender" (but really placer) more than he cares for truth or the suffering of "just one student" as he put it. As soon as his co-defendant students created a controversy with their forged evidence and fabricated allegations against the plaintiff, he felt that this influence of his was threatened by association, and so he turned on the plaintiff. Shortly thereafter, when defendant Epstein discovered that the truth about the forgeries and fabrications, also specifically that his own students whom he had recommended to prestigious state supreme court and federal appellate clerkships created them, he doubled down on lie and committed at least two predicate acts of wire fraud against the plaintiff to prevent the discovery of this fact and rob the plaintiff of his legal rights, which are the plaintiff's property.

Defendant Epstein also misrepresents the nature of the wire fraud he committed against the plaintiff. Defendant Epstein claims that there cannot be wire fraud because there was no reliance. This directly contradicts the pleading, which explicitly states that the plaintiff believed defendant Epstein as to *some* of his representations but *not* others. There was reliance as to the parts of defendant Epstein's telephone and email communication that were believed, specifically that defendant Epstein's co-defendants Iyer, Garrett nor any other student affiliated with the NYU FedSoc chapter was involved. Defendant Epstein skips all of these factual details because they clearly make his arguments relating to wire fraud invalid.

Defendant Epstein represents that it is alleged that most the dark money funds he uses to finance his racket go to do-nothing student fellowships. While that is a sizable portion, it is not the main purpose. In the interest of complying with FRCP Rule 8(a)(2) and providing "a short and plain

statement", the plaintiff did not exhaustively detail the full scope of all of the entities and organizations that defendant Epstein's racket involves, and such detail would probably require a lengthening of the pleading by at least one hundred pages.

A similar system to the one depicted in Appendix A is repeated at the University of Chicago rather than NYU, and many other organizations are part as well under different arrangements. For example, the Epstein racket also folds-in organizations such as "Protect Our Parks", an activist litigation group created to prevent the construction of the Obama presidential library in Chicago. In connection with that organization, defendant Epstein has funded and personally litigated multiple state and federal actions brought to enjoin the construction of the Obama library, even personally arguing before the Seventh Circuit. To fill his large quota of clerkship slots, defendant Epstein has also obtained human capital from this and other organizations as well.

## Legal Analysis

### Defendant Epstein Wrongly Attempts To Engender Bias Against RICO Claims

Defendant Epstein begins with the usual recitations meant to engender bias against RICO claims brought by plaintiffs. While it is true that the broad and open-ended nature of the relatively short statute can sometimes be taken too far or inappropriately tacked-on to a commercial dispute, this action falls very neatly within even a narrow interpretation of the text and relevant precedents.

Defendants generally attempt to subject RICO claims to an ephemeral standard that requires the claim to 'feel' like one involving racketeering as depicted in mainstream media and culture. The statute is not only broad, but was passed with instructions that it "be liberally construed to effectuate its remedial purposes" Pub. L.491-452, § 904(a), 84 Stat. 94. Professor G. Robert Blakey, one of the principal drafters of the RICO Act, declared "We don't want one set of rules for people whose collars

are blue or whose names end in vowels, and another set for those whose collars are white and have Ivy League diplomas" Alain L. Sanders, *Law: Showdown At Gucci*, Time Magazine 1989. The *je ne sais quoi* or 'it' factor analysis wished for by defendants is generally inappropriate for a court of law, and especially so when applying statute with a liberal construction clause.

It is a perfectly fitting to apply the RICO Act, including with regard to the principles of equality before the law and social justice, in an action involving an influential law professor (with a very white collar and multiple Ivy diplomas no less) running an ambitious and successful racket to subvert the administration of justice in the United States to the interests and fringe ideological aims of himself and his financiers. Defendant Epstein controls and deploys a sum in excess of one million dollars per year, none of it his own, for these purposes. In a remarkable soliloquy considering the accusation brought against him in the Original Complaint filed September 27, 2024, defendant Epstein spoke before several hundred people about his role, and the importance of controlling the future of the law as an institution through placing the right people in charge. Among the many positions listed by him were law clerks, solicitors and attorneys-general and of course judges. Defendant Epstein claims that his activities connected to this racket and their successes are inherently "implausible", but his public comments of November 2024 are precisely those of such a brazen offender as is alleged herein.

Though defendant Epstein has committed many RICO predicate acts over many years, the fact that his underlings, the student defendants whom he has rewarded and protected, have committed a broad, varied, continuous and continuing pattern of RICO predicate acts further discredits his attempts to engender bias against RICO claims, or distance himself from his own racket.

## The Epstein Racket Has Committed Ample RICO Predicates To Support A Pattern Of Racketeering

**Wire Fraud**

Defendant Epstein represents that the plaintiff may not recover for injuries he suffered due to frauds committed against third parties. The Supreme Court conclusively resolved this in *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) and ruled that a plaintiff may recover for such injuries. In *Bridge* the Supreme Court also held that a plaintiff does not have to show his own first-party reliance as a matter of proximate cause.

Defendant Epstein represents that two parties to an exchange of communication must by physically present in different states. Rather, it is enough that the system used (such as the telephone system or internet) involve the operation or transmission over state lines as part of an interstate system. When defendant Epstein asserted federal Section 230 immunity against defamation in a related case, he did not (and could not) allege that he was physically in a different state as the other purported user from whom he received the defamatory material, as the federal jurisdictional hook. As with Section 230 immunity (which is constitutional but does not apply to defendant Epstein in the related case) telecommunications system was inherently interstate due to its connectivity. In any event, the plaintiff was present in New Jersey while defendant Epstein was not.

Defendant Epstein represents that he did not have a duty to disclose omitted facts to the plaintiff. This is not relevant because the wire fraud relevant to this action arises from false facts and not omitted facts. Defendant Epstein specifically denied that defendants Iyer, Garrett or any other student from the NYU FedSoc chapter was involved in creating or disseminating the forgeries and fabrications meant to injure the plaintiff in his business. That was a falsity rather than an omission.

Defendant Epstein represents that a fraud victim must have suffered an economic loss in order to be a victim of wire fraud. The Supreme Court conclusively resolved this in *Kousisis v. United States,* 605 U.S. ___ (2025) where it held that while a defendant must commit a deception meant to obtain money or property there does not actually have to be an economic loss to the victim, rather only a fraudulent inducement.

**Money Laundering**

Defendant Epstein only addresses the money laundering predicate acts as if they were founded upon 18 USC 1956(a)(1) involving financial transactions with money that is the proceeds of specified unlawful activity. In fact, defendant Epstein's racket engages in repeated violations of 18 USC 1956(a)(2), which may involve financial transactions with money that is not the proceeds of specified unlawful activity, but which is nonetheless deployed to "promote the carrying on of specified unlawful activity".

Specified unlawful activity is defined by 18 USC 1956(c)(7) and includes not only all RICO predicate acts "racketeering activity" listed in 18 USC 1961(1), but also certain other activities prohibited by other federal statutes. Among the additional specified unlawful activities, which may invoke 18 USC 1956(a)(2) money laundering culpability, are offenses relating to "interstate communications" as defined by 18 USC 875. Particularly relevant is 18 USC 875(d) providing that:

> "Whoever, with intent to extort from any person, firm, association, or corporation, any money or **other thing of value**, transmits in interstate or foreign commerce **any communication containing any threat to injure the property or reputation of the addressee or of another** or the reputation of a deceased person or any threat to accuse the

addressee or any other person of a crime, shall be fined under this title or imprisoned not more than two years, or both." (emphasis added)

Because the Epstein racket has has spent money to "promote the carrying on of specified unlawful activity", specifically because it has violated 18 USC 875, such transactions meant to conceal even money with lawful origins counts as a predicate act. Thus, while RICO does not explicitly provide for injury to reputation (as with the common law tort of defamation for example) in a plain case, when money whose (potentially lawful) origins are obfuscated is used to promote activity that results in a threat to injure reputation is transmitted interstate, RICO is still implicated.

Defendant Nelms alone provides at least two instances of such specified unlawful activity in September 2020, by his threats to the reputations and careers of Patrick Griffin and Anderson Westerman transmitted by phone and wire. Those two innocent board members who did not approve of how the NYU Crew conducted themselves to bully others and advance themselves, but felt compelled to join in the ritualistic injury to the plaintiff lest they receive similar treatment later (a credible threat considering the lengths to which the student defendants went to injure the reputation of the plaintiff such as forging materials to support a fabricated narrative that he was fired from his summer associate position for sexual harassment).

**Extortion**

The operative complaint details a number of instances of extortion. Most obvious is the pressure exerted over Patrick Griffin and Anderson Westerman by defendant Nelms as detailed above.

Defendants Pallaki, Weinberg and Nelms also collectively threatened the Federalist Society national organization that they would dissolve the NYU chapter if their coup was not respected, which

would have long-term effects on the organization's interests in the school. The pecuniary injury to the organization would exceed $10,000 due to a loss of accounts held on behalf of the chapter by NYU.

The plaintiff does not allege extortion under the Hobbs Act, but rather by state corollaries in Minnesota, New York and Washington DC. In DC Code § 22-3251 prohibits "wrongful threat of economic injury" with a period of imprisonment not to exceed 10 years, thus satisfying 18 USC 1961(1). Minnesota Statutes 609.27 punishes "a threat to unlawfully injure a trade, business, profession, or calling" or "a threat to expose a secret or deformity, publish a defamatory statement, or otherwise to expose any person to disgrace or ridicule" with a period of imprisonment not to exceed 10 years.

**Obstruction Of Justice**

While perjury is also a separate offense, the filing of a false document may obstruct justice just the same. Knowingly filing a perjured affidavit is an act that "corruptly" "impede" a court in the proper execution of its duties within the meaning of 18 USC 1503. A RICO action may be brought based upon racketeering predicates committed by another party in a prior, related action. *Feld Entertainment Inc. v. American Society for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288

Defendant Iyer's and Garrett's perjured affidavits exhibited with the First Amended Complaint are not only so according to the mere allegations of the plaintiff, but also the exhibits in the record. Defendant Garrett, in his email to the Federalist Society Student Division identified defendant Iyer as the original source of the second forgery even as he affirms under oath that neither he nor defendant Iyer have engaged in any wrongdoing, together or separately. Nonetheless, the plaintiff is still entitled for the factual allegations to be accepted as true, with all reasonable inferences drawn in his favor.

### The Epstein Racket Consists Of A Pattern Of Racketeering

**The Racketeering Predicates Are Related**

The Epstein racket, as diagrammed in its part relevant to this action in Appendix A, is manifest through a pattern of acts related by similar purposes, results, participants and victims.

The predicate acts are related in their purposes, which are to obtain control of judicial clerkships and student organizations that play credentialing or career augmenting roles. This is both the high-level purpose of the racket for defendant Epstein, the boss of the racket who controls the staffing of many such positions and organizations, and the lower-level purpose of defendant Epstein's subordinates in the racket, the student defendants, who seek to obtain such positions for themselves as well as lower-level control over these organizations.

Defendant Epstein engaged in his wire fraud injuring the plaintiff in order to prevent a potential loss of his control over judicial clerkship slots were it to become known that he illegally thwarted the candidacy and legal career of the plaintiff in order to benefit and protect his students who had forged evidence meant to support a narrative they fabricated that the plaintiff was fired for sexual harassment and barred from the former premises of his employer. Defendant Epstein engaged in money laundering in order to conceal the odious sources of the funds provided to him by the financiers of his racket, which would otherwise would not have been accepted due to reputational risks to the recipients, thus preventing their deployment to increase his influence. Defendant Epstein's students for their part, engaged in their wire fraud, extortion, and obstruction of justice to increase their access to the racket's resources and protect themselves from the legal consequences of their actions.

The predicate acts are related in their results. The results of the racket are improvement the careers, wealth and influence of the racketeers at the expense of the plaintiff and other student or job candidate victims. The predicate acts committed to protect and conceal the racket result in the achievement of the same goals, as well as additional injuries to the victims and to society at large. Even the tenured defendant Epstein, enhances his career and academic freedom with his influence as a "recommender" that he obtains through his racket. He is routinely subject to student petitions demanding that NYU terminate its association with him or at a minimum offer alternative sections to whatever degree-required course he teaches due to his ideological beliefs and while the school has conceded to the latter demands but not the former, his influence obtained and protected through a pattern of racketeering has still benefited his career at the expense of the plaintiff.

The predicate acts are related in their participants. Defendant Epstein is at all times the center of the eponymous racket, and the student defendants have remained as thick as thieves for the relevant period of this action. This may be demonstrated by the irredeemably conflicted concurrent representation of student defendants Iyer, Garrett, Weinberg and Nelms by the same legal counsel. Defendant Pallaki, due to his senior status in the racket to all other student defendants, is the only student defendant to have separate counsel. As recently as October 2024, defendants Iyer and Garrett conspired to and did in fact obstruct justice by filing perjured affidavits in support of their irredeemably conflicted concurrent representation in a related case. The perjury in their affidavits is not only evident in relation to the plaintiff's allegations, but also due to inherent impossibility (defendant Garrett identifies defendant Iyer as the original source of the forgery he trafficked in while they both disclaiming any wrongdoing on either part) and the exhibits in the record.

The predicate acts are related by having the plaintiff as a common target and victim of the racket for the benefit of its interests. Other similarly situated students, the public at large as well as the

United States have been injured by the racket, but the plaintiff has been a clear and consistent victim for the relevant period examined by this action. Instead of contend with the escalating offenses, injuries and retaliations as the plaintiff has, most similarly situated victims have given up.

### The Epstein Racket Satisfies Both The Open-Ended Scheme and Closed-Ended Scheme Continuity Tests

The Epstein racket satisfies the open-ended scheme test for continuity, but even if it did not, just the racketeering activity already described in the pleadings would satisfy the closed-ended scheme test for continuity.

Even after this action relating to the Epstein racket was filed on September 27, 2024, defendant Epstein spoke before several hundred people at a plenary session of Federalist Society's National Lawyers Convention his role, and the importance of controlling the future of the law as an institution through placing the right people in charge. Among the many positions listed by him were law clerks, solicitors and attorneys-general and of course judges. This provides a clear indication that defendant Epstein intends to continue his racket to pursue the same aims. Likewise, the student defendants have continued to commit predicate offenses even in the context of related litigation by filing perjured affidavits to obstruct justice. Although just a real risk of recurrence is required for open-ended continuity, this action for exceeds this standard because every indication is that this racket will continue to pursue its goals until stopped by a higher power.

The open-ended continuity of the Epstein racket is also affirmed by the testimony provided by the 2023/24 NYU FedSoc chapter president, Keeton Kakkar, who stated that the organization was attempting to remove and replace defendant Epstein as its faculty sponsor. Immediately prior to expressing this desire to remove defendant Epstein, Kakkar lamented that the clerkship "pipeline" for

2023/24 had dried up to practically nothing. Defendant Epstein has demonstrated this continuous power and influence by enacting a collective punishment against the NYU FedSoc chapter, instead shifting his resources elsewhere, in order to suppress testimony that would interfere with the continued operation of his racket.

The Epstein racket also satisfies the closed-ended continuity. Two years is a universally accepted amount of time between predicate acts, though shorter periods may be allowed *United States v. Veliz*, 623 Fed. Appx. 538, 543 (2d Cir. 2015), cert. denied, 136 S. Ct. 848, 193 L. Ed. 2d 750 (2016). Here, the predicate acts committed in September 2020 by the student defendants were followed up by additional predicate acts as recently as October 2024 in obstructing justice, clearly exceeding not only two but four years. Furthermore, defendant Epstein's money laundering predicates predate this period and are ongoing in the financing of his racket.

### The Epstein Racket Has Interests In And Controls Multiple Enterprises

The Epstein racket has interests in various degrees of control in a number of enterprises by 18 USC 1961. According to § 1961 an "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity". The existence of a RICO enterprise may be proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. *U.S. v. Payne*, 591 F.3d 46 (2d Cir. 2010).

A single entity cannot be both a defendant and an enterprise for the purposes of RICO. The plaintiff has not brought any action against the enterprises influenced and corrupted through a pattern of racketeering, but rather the individuals who have done so.

The NYU Federalist Society chapter, NYU Journal of Law and Liberty and the Courts of the United States are the enterprises involved in the Epstein racket, and they exist separately and apart from the six racketeering defendants. All of these entities participate in and affect interstate commerce, and have been impacted by the Epstein racket.

### Injuries To Employment As Part of Business May Be Brought Under RICO

The plaintiff may recover for injuries relating to his employment, including the current employment he enjoyed before defendant Epstein retaliated against him in 2024, after filing the related defamation action, and the job offer he received which he similarly lost to retaliation in March 2024. As affirmed by *Medical Marijuana, Inc. v. Horn*, 604 U.S. ___ (2025), injuries to a persons employment may also be recoverable under RICO, even if they are not in business as a sole proprietor or shareholder. "At the time of § 1964(c)'s codification, the term 'business' did not 'embrace' a single 'legal meaning.' Black's Law Dictionary 248 (Rev. 4th ed. 1968). Instead, the term embraced concepts like 'employment, occupation, or profession engaged in for gain or livelihood,' and 'commercial or industrial establishment or enterprise.' *Id.*; *see also Flint v. Stone Tracy Co.*, 220 U.S. 107, 17114 (1911)" *Horn v. Medical Marijuana, Inc.*, No. 22-349 (2d Cir. 2023).

The plaintiff's injury is even more proximately near than the one in *Horn*, because rather than sell a product was adulterated to cause the Horn plaintiff to fail a drug test, this plaintiff was directly retaliated against to prevent him from litigating against, and thus endangering the Epstein racket.

**<u>Conclusion</u>**

Defendant Epstein's motion to dismiss should be denied.

August 25, 2025

Respectfully submitted,

/s/ Gideon Rapaport, *pro se*
GideonRapaportLaw@Outlook.com
(862) 213-0895
#627 1078 Summit Avenue
Jersey City, New Jersey, 07310