UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GIDEON RAPAPORT,

                                        Plaintiff,

              -against-

RICHARD ALLEN EPSTEIN, et al.,

                                        Defendants.

24-CV-7439 (JGLC)

**OPINION AND ORDER**

JESSICA G. L. CLARKE, United States District Judge:

Plaintiff Gideon Rapaport, proceeding pro se, is a recent graduate of the New York University School of Law ("NYU Law") who dreamed of clerking on the Supreme Court of the United States. For Rapaport, like so many before him, that dream did not come to fruition. But unlike so many others, Rapaport alleges that law school gossip and an organized conspiracy destroyed his reputation and the connections that he believes would have guaranteed him that clerkship. More than just losing access to this country's highest court, Rapaport alleges that the conduct underlying this action prevented him from becoming a licensed attorney, getting any federal clerkship, and securing legal employment at a law firm or conservative think tank.

Plaintiff filed the instant action on September 27, 2024, alleging civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and attempted monopolization and unreasonable restraints on trade in violation of the Sherman Act. The defendants in this case are Richard Epstein, a professor at NYU Law who previously served as a mentor to Plaintiff; former NYU Law Federalist Society student board members Mitchell Kevalla Pallaki, Ajay Srinivasan Iyer, Zachary Goerge Garrett, William Stuart Lasseter Weinberg, and Andrew Nelms ("Student Defendants"); and John Does, who may have been involved in the underlying allegations.

None of these claims, however, have merit. Despite bringing antitrust claims, Plaintiff fails to define a relevant market where the alleged anti-competitive behavior took place and to allege a competitive harm—instead focusing on the harms that he experienced as an individual. In his civil RICO claims, Plaintiff fails to allege conduct that constitutes racketeering activity under any one of the seven predicates he tries to invoke, fails to establish any type of pattern, and fails to allege that Defendants cause any injuries cognizable under the statute. In all of the claims at issue, Plaintiff attempts to repackage state tort claims under federal law. For these reasons, and as more fully set forth below, Defendants' motions to dismiss are granted in full, and Plaintiff is denied leave to further amend his complaint.

## BACKGROUND

Unless otherwise noted, the following facts are taken from the First Amended Complaint, ECF No. 71 ("FAC"), and presumed to be true for the purposes of this Order. *See J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004). Plaintiff was briefly president of NYU Law's chapter of the Federalist Society ("NYU Federalist Society") during the 2020–2021 school year. *See* ¶¶ 59, 61, 73, 85, 92, 114, 206. During his tenure, Defendant Nelms, another student, filed a complaint with the NYU Law administration about Plaintiff's leadership, and one of the Student Defendants complained to the national Federalist Society ("National Organization") about the same. ¶¶ 59, 67. Ultimately, following a controversy with another board member, the student board of the NYU Federalist Society unanimously voted Plaintiff out of his position and replaced him with Defendant Weinberg. *See* ¶¶ 68–85. Plaintiff believes that Student Defendants Pallaki, Weinberg, and Nelms, who he refers to as the "NYU Crew," schemed behind the scenes to ensure his ouster. ¶¶ 54, 71, 76, 79–83. In particular, he alleges that Nelms threatened two board members of the group with humiliation and limited career prospects if they did not vote to

remove him. ¶ 77. And, he claims the "NYU Crew" threatened to dissolve the chapter if he refused to step down and threatened him with "severe ramifications, including to his reputation and career" if he "did not surrender his position as president . . . quietly." ¶¶ 206, 208. In the years following his removal from the NYU Federalist Society board, Plaintiff describes his intentional social exclusion from various events. *See, e.g.*, ¶ 104. But ultimately, he declined an opportunity to have the dispute between him and the student board adjudicated by the National Organization. ¶ 84.

The Complaint also details various disputes Plaintiff had with the "NYU Crew" and other members of the NYU Federalist Society, including over an email announcement for Constitution Day, a screening of a documentary about Justice Clarence Thomas, and the leadership of the board. *See* ¶¶ 62–80. In many of these disputes, Plaintiff believed that Defendants Pallaki, Weinberg, and Nelms intended to humiliate him. *See* ¶¶ 77, 79–80, 83. After Plaintiff was ousted from the NYU Federalist Society, his professor and mentor Defendant Epstein "decided to punish" the newly announced president, Weinberg, for his role in these disputes. ¶ 86. Epstein allegedly brought "his full might down" on Weinberg and ensured he would never clerk for a federal judge. ¶¶ 86–88. According to Plaintiff, Epstein did so to make an example out of Weinberg and to "maintain control over his racket"—which Plaintiff characterizes as his "control over the staffing of an unrivaled number of federal clerkships." ¶¶ 27, 88.

Plaintiff then took a leave of absence from NYU Law for the remainder of the 2020–2021 academic year because of remote learning during the pandemic and other reasons unrelated to his disputes with the NYU Crew. ¶ 89. While Plaintiff was absent, Pallaki, Weinberg, and Nelms continued talking about him. ¶ 100. They told members of the National Organization that

Plaintiff was "transferring to Northwestern University, which was not a T6 school"[1] and that he "was older than 30." *Id*. According to Plaintiff, this information was not only false but would render him "ineligible for priority investment and attention." ¶¶ 100–02.

After Plaintiff returned to NYU Law in the fall of 2021, the rumors continued. Without indicating the content, Plaintiff alleges that Defendant Pallaki "spread defamations" about him at a leadership conference held by the National Organization. ¶ 106. Other students, at the behest of Pallaki, also perpetuated rumors about Plaintiff within the NYU Law community, including about his alleged entanglements with sex workers, illicit drugs, and psychiatric medications. ¶¶ 108–11. Nonetheless, at Epstein's encouragement, Plaintiff sought to re-join the NYU Federalist Society student board. ¶¶ 112, 114. He was unsuccessful. ¶ 115.

In the spring of 2022, Plaintiff was denied re-entry to a bar at an NYU Law event because of a complaint by a female former board member of the NYU Federalist Society. *See* ¶¶ 116–20. According to Plaintiff, a doorman refused to let him, based on the bar's policy, because of the complaint from the female former board member. *Id.* Defendant Garrett stood next to Plaintiff at the door, but was allowed in. ¶ 118. Believing the incident to be gender discrimination, Plaintiff filed a complaint with the New York State Division of Human Rights (NYSDHR). ¶ 121. During a phone interview with NYSDHR, Garrett is alleged to have "denied everything he had witnessed," which caused NYSDHR to close their investigation. ¶ 123. Plaintiff believes that Garrett lied about what he saw at the urging of Defendants Iyer and Pallaki, in exchange for being named as the new president of the NYU Federalist Society. ¶¶ 122–23.

---

[1] The Court understands "T6 school" to mean a Top 6 law school according to U.S. News and World Report rankings.

In mid-April 2022, Plaintiff and Defendant Epstein spoke on the phone about Plaintiff's plans for his third and final year of law school. ¶¶ 124–25. During that conversation, Epstein "offered [Plaintiff] a 'feeder' federal appellate clerkship . . . to be followed by a Supreme Court clerkship as available, a top position on his journal, the Journal of Law and Liberty and to teach Property in addition to Food and Drug Law." ¶ 125. At Epstein's direction, Defendant Iyer interviewed and offered a student board position on the journal to Plaintiff, which Plaintiff accepted with the understanding that he would be a Senior Article Editor. ¶ 126.

During the summer of 2022, Plaintiff was a summer associate at the law firm Kirkland & Ellis LLP ("K&E"). ¶¶ 1, 24. Going into July, he had given a list of desired judges to Epstein and was preparing to apply for federal appellate clerkships. ¶ 24. On July 15, 2022, Plaintiff attended a get-together for members of the NYU Federalist Society. ¶ 127. At the get-together, Plaintiff told Defendants Iyer and Garrett that he would be attending the James Kent Academy in early August. *Id.* The James Kent Academy is attended by many former and future Supreme Court clerks, and Plaintiff alleges that his attendance made Iyer and Garrett think he would "occupy the one slot maximum personally reserved" for Epstein's students as a Supreme Court Clerk. ¶¶ 127–28.

A few weeks later, on July 29, 2022, Defendant Iyer photographed a guard desk at the lobby of 601 Lexington Avenue, where K&E is located. ¶ 131. Iyer then digitally altered a photograph at the desk to replace it with a picture of Plaintiff's face and the following text:

DO NOT ADMIT

GIDEON RAPAPORT

KIRKLAND AND ELLIS

*Id.; see also* ECF No. 71-1. Plaintiff alleges that Iyer then posted the altered image online on two internet sites: Reddit.com and Top-Law-Schools.com. ¶ 132. Iyer's postings included anonymous assertions that Plaintiff had been fired for sexual harassment and banned from the K&E building. ¶ 133. Anonymous users on both websites also made assertions about Plaintiff's "personality, habits, mannerisms, modes of dress and pastimes"—namely, that he "celebrat[ed]" the *Dobbs* ruling (the 2022 Supreme Court decision overturning *Roe v. Wade*) and that he was "racist." ¶ 133; ECF No. 71-3 at 4–5. Garrett showed the online materials to the Student Division Directors of the National Organization, who did not take any action. ¶¶ 136–37. Garrett and Iyer also informed Epstein about the allegations around the same time. *See* ¶¶ 138–40; ECF No. 71-3 at 2. At the time, Plaintiff was unaware of who created the altered images and postings.[2] See ¶ 163.

According to Plaintiff, "[o]nce [D]efendant Epstein was informed about the allegations by [D]efendants Iyer and Garrett, he decided to pull all support of and totally destroy the career of [Plaintiff]." ¶ 139. Two weeks after the posting incident, on August 9, 2022, Epstein called Plaintiff and told him that he would be removed from his position on the Journal of Law and Liberty and would not receive a federal clerkship. ¶¶ 140–41. Epstein also discouraged Plaintiff from participating in a fellowship Epstein allegedly connected him to known as the "Bradley fellowship."[3] ¶ 143. And, Epstein "extorted and threatened [Plaintiff] with expulsion from the

---

[2] In the first case Plaintiff filed regarding these events, he was still unaware of the identity of the online posters. *See* ECF No. 1, *Rapaport v. Doe #1 et al*. ("Originating Action"), 23-CV-6709 (JGLC) (S.D.N.Y. July 28, 2023). But after filing third-party subpoenas, Plaintiff learned the names of the online posters. *See* ECF No. 34, Originating Action (S.D.N.Y. Apr. 30, 2024).

[3] Allegations regarding the "Bradley Fellowship" are inconsistent. Although Plaintiff indicates that Defendant Epstein revoked a Bradley Fellowship offer on the August 2022 call, *see* ¶ 143, he subsequently alleges that Defendant Epstein offered him a $10,000 position from the "Bradley group" in February 2023 "if he would 'stop bothering people,'" which Plaintiff turned down, ¶¶ 148, 150. Plaintiff does not allege a point at which Defendant Epstein offered him the Bradley Fellowship prior to August 2022.

law school," allegedly stating that if a Title IX proceeding were filed against Plaintiff, Epstein "would not lift a finger to prevent [it] despite his immense influence at the law school." ¶ 214. Epstein then took full responsibility for these decisions, decrying the involvement of other NYU students. ¶ 145.

During the 2022–2023 school year, Plaintiff alleges that Epstein treated him poorly. Plaintiff asked Epstein for help multiple times, seeking to understand what had happened, but Epstein held steady. ¶ 161. Defendant Epstein "loudly insult[ed] [Plaintiff] . . . in front of a large ballroom that included judges, professors and many other students" at a symposium dinner. ¶ 162. As a result, Plaintiff's attendance in Epstein's classes declined, and indeed, "[P]laintiff hoped that defendant Epstein would report him for attendance and allow for a confrontation with the administration." ¶¶ 169, 171. Although Epstein did in fact report Plaintiff for excessive absences, nothing came of it. ¶ 171. Throughout this period, Plaintiff tried unsuccessfully to learn the identities of who had made the online posts about him, which at this point he still did not know, from Epstein and staff from the National Organization. *See* ¶¶ 163, 169, 172.

Plaintiff decided to file suit related to the altered images and posts from his time at K&E. *See* ECF No. 1, Originating Action (S.D.N.Y. July 28, 2023). Shortly before filing that action, Plaintiff met with Epstein. He asked Epstein to review the complaint later filed in that case and asked if Epstein had any corrections or changes to the proposed draft. ¶¶ 153–55. Epstein maintained that he did not want to be involved. ¶ 157.

Plaintiff alleges that after commencing the Originating Action, Epstein further hurt his employment prospects. More specifically, he "prevented [Plaintiff] from working in the legal field, and got him fired from two jobs that were JD-advantaged and of an academic nature." ¶ 177. Plaintiff explains that Epstein "would enthusiastically tell others that [Plaintiff] was

frequently absent from his classes, and described him as delinquent, unreliable and untrustworthy." ¶ 179. Plaintiff disputes these allegations, claiming that he had "perfect attendance . . . prior to being betrayed" and that after he was only "occasionally absent." *Id*. Plaintiff also refers to an "exclusive Christmas party conspicuously attended by the right-of-center political, media and intellectual elites of New York" where he believes, based on a friend's retelling, that Defendant Epstein "disparage[ed]" him in 2022 and 2023 in "the presence of the ultimate decision maker at [his] place of first employment that he lost as a result of [D]efendant Epstein's interference."[4] ¶ 180. Plaintiff further alleges that Epstein revoked an offer he had personally extended for Plaintiff to be his research assistant on a project funded by the Manhattan Institute. ¶ 181. As a result of Defendants' conduct, Plaintiff contends that he cannot be admitted to the Bar as an attorney, nor can he obtain employment as a judicial clerk or at a think tank. ¶¶ 263, 265, 267.

Plaintiff filed this case on September 27, 2024, alleging civil RICO and antitrust claims. ECF No. 1. He amended the complaint on June 16, 2025, after Defendants first moved to dismiss. *See* ECF Nos. 41, 43; FAC. Plaintiff seeks treble damages for all claims, legal costs, and a declaration that Defendants acted unlawfully to monopolize and restrain various markets, among other relief. FAC at 54–55.

Previously, in 2023, he filed the Originating Action in this Court, alleging claims for defamation, false light, and intentional infliction of emotional distress. ECF No. 1, Originating Action (S.D.N.Y. July 28, 2023). In an Opinion and Order in that case, the Court consolidated this case and the Originating Action, finding that the two cases "share a strong common core of

---

[4] The FAC does not provide any clarity regarding the "first employment" that Plaintiff alleges he lost. It is not clear if Plaintiff is referring to the Bradley Fellowship, his work at K&E, or some other position.

facts and parties." ECF No. 54; ECF No. 55 at 29–30. Although the Court dismissed Plaintiff's claims without prejudice in the Originating Action and granted Plaintiff leave to amend, Plaintiff declined to amend the dismissed complaint. ECF No. 111, Originating Action (S.D.N.Y. June 2, 2025). Accordingly, the Court dismissed that action. ECF No. 112, Originating Action (S.D.N.Y. June 11, 2025). Mr. Rapaport also appears before this Court in two other related cases, *Rapaport v. Finkelman*, 24-CV-5942 (JGLC) and *Rapaport v. Finkelman*, 25-CV-7294 (JGLC).

Before the Court now are Motions to Dismiss the FAC filed by, respectively, Defendant Epstein, Defendant Pallaki, and Defendants Iyer, Garrett, Weinberg, and Nelms. ECF Nos. 75, 77, 79. The Court grants Defendants' Motions to Dismiss in full and *sua sponte* denies Plaintiff leave to amend.

## LEGAL STANDARD

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008) (internal citation omitted). A claim will survive a Rule 12(b)(6) motion only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

"Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common

9

sense." *Id.* at 679. "Plausibility thus depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011). "Even if their truth seems doubtful, 'Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (quoting *Twombly*, 550 U.S. at 556). "However, there is a narrow exception to this rule for factual assertions that are contradicted by the complaint itself, by documents upon which the pleadings rely, or by facts of which the court may take judicial notice." *Perry v. NYSARC, Inc.*, 424 F. App'x 23, 25 (2d Cir. 2011). If a complaint does not state a plausible claim for relief, it must be dismissed. *Iqbal*, 556 U.S. at 679.

Pro se complaints "must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (internal citation omitted). "Such a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hughes v. Rowe*, 449 U.S. 5, 10 (1980) (internal citation omitted); *see also Boykin v. KeyCorp.*, 521 F.3d 202, 216 (2d Cir. 2008) ("[D]ismissal of a pro se claim as insufficiently pleaded is appropriate only in the most unsustainable of cases."). Because Plaintiff is proceeding pro se, the Court must liberally construe the FAC and interpret it "to raise the strongest claims

that it suggests." *Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 489 (2d Cir. 2018) (internal quotation marks omitted).[5]

## DISCUSSION

This section proceeds in three parts. In the first and second parts, the Court analyzes and ultimately dismisses Plaintiff's claims under the Sherman Act and the RICO statute. Last, the Court *sua sponte* considers and denies leave to amend the FAC, finding that any such attempt would be futile.

## I.    Plaintiff's Antitrust Claims Must Be Dismissed

Plaintiff brings five claims under the Sherman Antitrust Act of 1890, collectively referred to here as the "antitrust claims."[6] He alleges that Defendants unreasonably restrained trade regarding academic journal work, think tank work, and clerkships in violation of Section 1 of the Sherman Act and that they attempted to monopolize and in fact monopolized the judicial clerkship market at NYU in violation of Section 2 of the Sherman Act. *See* FAC ¶¶ 244–267.

---

[5] Assuming without deciding, the Court affords Mr. Rapaport the full special solicitude available to pro se litigants because he is not a barred attorney and the Court has granted it to him in the past. ECF No. 55 at 7; ECF No. 76 ("Epstein MTD") at 19 (citing ECF No. 38 ¶ 14, Originating Action (S.D.N.Y. May 24, 2024)) (noting that Plaintiff "never even sought admission to the bar"); *but see Tracy v. Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010) ("[T]he degree of solicitude may be lessened where the particular pro se litigant is experienced in litigation and familiar with the procedural setting presented.").

[6] Plaintiff has manifested an intent to abandon his antitrust claims. He failed to substantively oppose both motions to dismiss filed by the Student Defendants, instead writing a conclusory opposition of four sentences, and did not oppose Defendants' arguments about the antitrust claims, despite writing more than 5,000 words discussing the civil RICO arguments. *See* ECF Nos. 83–86. Plaintiff also did not request a sur-reply to oppose the abandonment arguments, despite a pattern elsewhere of requesting a sur-reply where he felt it was necessary to address arguments. *See* ECF Nos. 65, 100, *Rapaport v. Finkelman*, 24-CV-5942 (JGLC) (S.D.N.Y. Sept. 10, 2025; Dec. 5, 2025). Nonetheless, in deference to Mr. Rapaport's pro se status, the Court considers the merits of his antitrust claims. *See Lipton v. Cnty. of Orange, NY*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) ("Application of this [abandonment] proposition is, however, tempered by this Court's discretion.").

Defendants argue that Plaintiff's antitrust claims must fail because they do not allege (1) a plausible, cognizable market or (2) any antitrust injury. ECF No. 78 ("Pallaki MTD") at 23, 26–27; Epstein MTD at 20–25; ECF No. 80 ("Iyer et al. MTD") at 21–24.

The Court agrees with Defendants as to both arguments. "To state a claim under either Section 1 or Section 2 of the Sherman Act, a plaintiff must plausibly allege that the defendants' anti-competitive conduct restricted competition within a relevant market." *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 338 (2d Cir. 2024). Under both sections of the Sherman Act, plaintiffs must identify "product and geographic components [to] illuminate the relevant market analysis, which is essential for assessing the potential harm to competition from the defendants' alleged misconduct." *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 53 (2d Cir. 2016) (quoting *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 481 (S.D.N.Y. 2001)). This is because "without a definition of that market there is no way to measure the defendant's ability to lessen or destroy competition." *Id.* (quoting *Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 383 (S.D.N.Y. 2007)).

Here, Plaintiff has not alleged facts sufficient to ascertain and assess the market within which Defendants are alleged to have acted anti-competitively. Counts V and VI broadly reference the "judicial clerking market at NYU," but Plaintiff's allegations throughout the FAC indicate that the relevant market he is concerned with is for conservative students seeking clerkships. *See* FAC ¶¶ 18, 33, 244–53. Count IX refers even more broadly to the "clerkships" market, with little accompanying information. *Id.* ¶¶ 264–67. Setting aside the plausibility of any of these allegations, the only market information Plaintiff provides is in "Appendix A" attached to the Complaint, wherein he contends that Defendant Epstein controls four of thirty-six clerkship slots at the Supreme Court and approximately one hundred of two thousand clerkship

12

slots in district and circuit courts. *Id.* at 56; *see also id.* ¶ 35 (alleging that Defendant Epstein "publicly boasts" that he controls four Supreme Court and one hundred other federal clerkship slots). Count VII concerns "academic journal work," but Plaintiff only discusses one NYU Law journal—the Journal of Law and Liberty. *See* FAC ¶¶ 2, 125, 141, 254–57. Similarly, Count VIII concerns "think tank work," but Plaintiff only names three think tanks and provides no information about the broader market. *See id.* ¶¶ 31, 181, 258–63. Consequently, for each count of the antitrust claims, the Court is left guessing at how to appropriately define the relevant market. *See Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP,* 612 F. Supp. 2d 330, 359 (S.D.N.Y. 2009) ("[I]n a case that requires proof of a relevant market, it is not enough to survive even a Rule 12(b)(6) motion to dismiss to make bald assertions as to its existence or definition.").

Furthermore, "[a] private plaintiff seeking to state a claim for violation of sections 1 or 2 of the Sherman Act must allege that it has suffered antitrust injury." *George Haug Co. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 139 (2d Cir. 1998). An antitrust injury is an "injury of the type the antitrust laws were intended to prevent"—laws that "were enacted for the protection of competition, not competitors." *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 438 (2d Cir. 2005) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488–89 (1977)) (cleaned up). Plaintiff does not claim that anti-competitive actions undertaken by Defendants against him *as an individual* have any bearing on how competition functions in the relevant markets. *See Long Island Anesthesiologists PLLC v. United Healthcare Ins. Co. of N.Y. Inc.*, No. 22-CV-04040 (HG), 2023 WL 8096909, at *4 (E.D.N.Y. Nov. 21, 2023) ("The antitrust injury requirement obligates a plaintiff to demonstrate, as a threshold matter, that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market; to prove it has

13

been harmed as an individual competitor will not suffice." (citation omitted)). Instead of alleging any facts to suggest an adverse effect on competition more generally, Mr. Rapaport only identifies his own failures to secure a federal clerkship, journal appointment, and position at a think tank.

For the foregoing reasons, the Court dismisses Plaintiff's antitrust claims against all Defendants.

## II.    Plaintiff's RICO Claims Are Deficient

Plaintiff next asserts civil RICO claims against Defendants. These claims likewise fail. "[C]ivil RICO has resulted in a flood of what are and should be state court cases that are being reframed and brought in federal court as RICO actions because of the carrot of treble recovery and the availability of a federal forum." *Acklin v. Eichner*, No. 20-CV-7042 (GHW), 2021 WL 4442819, at \*5 (S.D.N.Y. Sept. 27, 2021) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Archway Ins. Servs. LLC*, 2012 WL 1142285 (WHP), at \*3 (S.D.N.Y. Mar. 23, 2012)). Consequently, "courts carefully scrutinize RICO claims at the motion to dismiss stage." *Secure Source Claims Co., LLC v. Miller*, No. 22-CV-9764 (JGLC) (OTW), 2024 WL 1342804, at \*3 (S.D.N.Y. Mar. 29, 2024) (citation omitted). Although civil RICO has a broad construction, *see Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985), "plaintiffs wielding RICO almost always miss the mark," *Flexborrow LLC v. TD Auto Fin. LLC*, 255 F. Supp. 3d 406, 414 (E.D.N.Y. 2017) (citing *Gross v. Waywell*, 628 F.Supp.2d 475, 479–83 (S.D.N.Y. 2009)).

Here, Plaintiff tries and fails to repackage tort claims that the Court dismissed in the Originating Action under the umbrella of civil RICO. In what follows, the Court analyzes Plaintiff's substantive and conspiracy RICO claims pursuant to 18 U.S.C. § 1962(b), (c), and (d), and determines that each fails to state a claim for relief.

14

### A. Plaintiff Fails to State a RICO Claim Under 18 U.S.C. § 1962(b) and (c)

"To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (cleaned up). Under the first element, to prove a violation of Sections 1962(b) and (c), a plaintiff must plead seven elements: "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Westchester Cnty. Indep. Party v. Astorino*, 137 F. Supp. 3d 586, 600 (S.D.N.Y. 2015) (quoting *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983)); *O'Neill v. Hernandez*, No. 8-CV-1689 (KMW), 2010 WL 1257512, at *9 (S.D.N.Y. Mar. 25, 2010). The Court first addresses the racketeering activity requirement, and then considers whether two or more acts constituting a pattern have been adequately alleged. Lastly, the Court assesses whether Plaintiff has alleged an injury to business or property that is cognizable and caused by a civil RICO violation. Ultimately, each element reviewed constitutes an independent basis on which to dismiss Plaintiff's claims under Sections 1962(b) and (c).[7]

#### 1. Plaintiff Fails to Allege Any RICO Predicates

The RICO statute enumerates a list of offenses that can constitute a "racketeering activity." 18 U.S.C. § 1961(1). Defendants argue that Plaintiff fails to plausibly allege any of the seven racketeering activities, or RICO predicates, he identifies. *See* Epstein MTD at 7–12; Pallaki MTD at 15–21; Iyer et al. MTD at 7–12. The Court agrees. In each RICO count in the

---

[7] For the reasons stated in Defendants' briefs, the Court also finds that Plaintiff failed to adequately allege the existence of an enterprise. *See* Epstein MTD at 15–16; Iyer et al. MTD at 6–7.

Complaint, Plaintiff alleges that Defendants engaged in acts including "wire fraud, blackmail, extortion, witness tampering, obstruction of justice, obstruction of state law enforcement and money laundering." FAC ¶¶ 201, 224, 232, 241. Because of his limited opposition to the motions to dismiss and inartful pleadings, the Court is left to surmise which allegations Plaintiff intended to connect to which predicates.

### i. Wire Fraud

First, Plaintiff does not sufficiently allege wire fraud. "RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 489 (2d Cir. 2014) (citation omitted). Wire fraud requires "(i) a scheme to defraud (ii) to get money or property (iii) furthered by the use of interstate . . . wires." *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018) (quoting *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000)).

Plaintiff fails to allege that the purpose of the supposed wire fraud was money or property. He alleges that Defendant Epstein lied to him by phone and electronic mail in stating that no one from the NYU Federalist Society was involved in spreading a falsified image about him online. FAC ¶ 213; *see also id.* ¶ 145. But as Defendant Epstein correctly points out, even with some misrepresentation, an email that "did not seek to defraud [Plaintiff] out of money or property" and is not otherwise alleged to be part of a scheme to defraud "fails to state a claim for wire fraud." Epstein MTD at 8; *Santana v. Adler*, No. 17-CV-6147 (AT) (SDA), 2018 WL 2172699, at *5 (S.D.N.Y. Mar. 26, 2018), *report and recommendation adopted*, 2018 WL 2170299 (S.D.N.Y. May 10, 2018). And, nowhere in Plaintiff's pleadings, nor in his opposition

to Defendants' motions, does Plaintiff allege, or even argue, that gaining money or property was the purpose of any of the other grievances he has with the Student Defendants.

To the extent Plaintiff contends that the Student Defendants sought money or property by sabotaging his future job and clerkship prospects, that argument, too, is unavailing. "[T]he object of mail or wire fraud must be the deprivation of money or tangible or intangible property in the hands of the victim . . . ." *Astorino*, 137 F. Supp. 3d at 602. It "does not suffice . . . that the object of the fraud *may become* property in the recipient's hands." *Id.* (quoting *Cleveland v. United States*, 531 U.S. 12, 15 (2000)) (emphasis added). Plaintiff fails to contend that the relevant clerkship and think tank jobs—and the accompanying salary—were, in fact, his. They appear to have been mere expectations as alleged in the Complaint. Indeed, he does not allege applying for clerkships or receiving and accepting a definitive think tank job offer. Similarly, because Plaintiff does not allege that he applied for and was denied admission as an attorney, the Court does not attribute to the Student Defendants any lost income stemming from his status as a non-attorney law graduate. The only job loss that Plaintiff alleges with some specificity is the research assistant job at the Manhattan Institute. *See* FAC ¶ 181. But he never alleges that the Student Defendants sought to replace Plaintiff in his research assistant job, or for any of the other non-clerkship jobs. And finally, by Plaintiff's own allegations, the Student Defendants could not have taken money or property from Plaintiff by interfering with his clerkship prospects, because Plaintiff did not anticipate receiving pay while clerking. *See* FAC ¶ 191.

### ii.  Blackmail and Extortion

Second, Plaintiff does not sufficiently allege blackmail or extortion here.[8] The basis of Plaintiff's extortion claim appears to be the following allegations: (1) Defendant Nelms threatening two board members of the NYU Federalist Society with humiliation and limited career prospects if they did not vote to remove Plaintiff from his position as president, FAC ¶ 77; (2) Defendants Pallaki, Weinberg, and Nelms threatening Plaintiff with "severe ramifications, including to his reputation and career" if he "did not surrender his position as president . . . quietly," FAC ¶ 206; (3) Defendants Pallaki, Weinberg, and Nelms threatening the National Organization to dissolve the NYU Federalist Society if their removal of Plaintiff were challenged, FAC ¶ 208; and (4) Defendant Epstein threatening Plaintiff with "suspension and eventual expulsion" from the law school as the result of a Title IX proceeding, which he refused to "lift a finger to prevent," or more broadly from "any controversy" Plaintiff might be involved in, FAC ¶ 214. *See* ECF No. 83 ("Opp. to MTD") at 10–11.

There are two extortion-based predicate acts: (1) "any act which is indictable under . . . [the Hobbs Act]" and (2) "any act or threat involving . . . extortion . . . which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1). Plaintiff "does not allege extortion under the Hobbs Act," but rather depends on "state corollaries" in Minnesota, New York, and Washington, DC. Opp. to MTD at 11. But Plaintiff is not free to utilize whichever state's laws suit him, and this Court has already determined that New York law should govern the underlying conduct. *See* ECF No. 55 at 11. Accordingly, the Court refers to New York law here.

---

[8] The Court interprets Plaintiff's references to blackmail in the Complaint as references to extortion. Section 1961 identifies extortion, but not blackmail, as a predicate act, and in his Opposition, Plaintiff only references extortion. *See* 18 U.S.C. § 1961(1); ECF No. 83 at 4, 10–11.

Extortion is a form of larceny in New York. *See United States v. Kirsch*, 903 F.3d 213, 223–24 (2d Cir. 2018). "A person is guilty of grand larceny in the fourth degree when he steals property and when . . . [t]he property, regardless of its nature and value, is obtained by extortion . . . ." N.Y. Penal Law § 155.30. As relevant here:

> A person obtains property by extortion when he compels or induces another person to deliver such property to himself or to a third person by means of instilling in him a fear that, if the property is not so delivered, the actor or another will: . . . [e]xpose a secret or publicize an asserted fact, whether true or false, tending to subject some person to hatred, contempt or ridicule; or . . . [p]erform any other act which would not in itself materially benefit the actor but which is calculated to harm another person materially with respect to such other person's health, safety, business, calling, career, financial condition, reputation or personal relationships . . . .

N.Y. Penal Law § 155.05(2)(e). "[L]arceny by extortion requires the particular element of forcing a person to surrender property." *United States v. Delano*, 55 F.3d 720, 726–27 (2d Cir. 1995). "Significantly, 'services are not property' under New York law." *Id.* at 727 (quoting *People v. Tansey*, 593 N.Y.S.2d 426, 432 (N.Y. Sup. Ct. 1992)). Rather, "property" is "any money, compensation for labor or services, personal property, real property, computer data, computer program, thing in action, evidence of debt or contract, or any article, substance or thing of value, including any gas, steam, water or electricity, which is provided for a charge or compensation." N.Y. Penal Law § 155.00(1).

Plaintiff fails to establish a predicate act of extortion because he does not allege that any property was taken. His first two allegations regarding his removal as the NYU Federalist Society student president do not allege "property" within the meaning of New York Penal Law. That is because any taking of Plaintiff's unpaid student board position is not covered by the statute. *See* N.Y. Penal Law § 155.00(8) (making clear that "labor" is considered a "service," and not "property" under the applicable Penal Law); *Delano*, 55 F.3d at 727 (reversing a jury finding

of a RICO predicate act because "Delano's theft of the labor of his subordinates, which must be termed a 'service' and thus does not constitute property under New York law, cannot subject him to criminal liability under New York's larceny by extortion statute").

His next two allegations—that Epstein and Pallaki, Weinberg, and Nelms made certain threats—fare no better. Neither of these allegations establishes a predicate act because, assuming without deciding that "property" was at stake, nothing was actually taken. Plaintiff seems to allege that the property in the third allegation was the $10,000 that the National Organization stood to lose if the NYU chapter dissolved, *see* Opp. to MTD at 11, and the property in the last allegation was his position as a law student in good standing, *see* FAC ¶ 214—including, by implication, his tuition money. But at no point in the Complaint does Plaintiff allege that the NYU Federalist Society was in fact dissolved or that he was suspended or expelled from NYU Law. Thus, no property was taken. Accordingly, Plaintiff does not establish a predicate act of extortion.

### iii. Witness Tampering and Obstruction of Justice

Third, Plaintiff does not sufficiently allege witness tampering or obstruction of justice. To support these predicate acts, Plaintiff appears to point to affidavits submitted in this Court and to his allegations that Defendant Garrett lied in a NYSDHR investigation about what occurred when Plaintiff was prevented from re-entering a bar. Opp. to MTD at 11; FAC ¶¶ 123, 215. However, "[p]roceedings in state courts or before state administrative bodies are not official proceedings, and witness tampering with respect to them does not violate Section 1512 or constitute a predicate act under RICO." *Miller v. Carpinello*, No. 06-CV-12940 (LAP), 2007 WL 4207282, at *7 n.6 (S.D.N.Y. Nov. 20, 2007). Similarly, obstruction of justice may only be recognized as a RICO predicate when it occurs in federal court. *O'Malley v. N.Y.C. Transit Auth.*,

20

896 F.2d 704, 708 (2d Cir. 1990). Thus, to the extent these allegations are based on the

NYSDHR investigation, they cannot form a RICO predicate. To the extent the allegations are

based on affidavits from Defendants Iyer and Garrett that Plaintiff contends were perjured, FAC

¶ 215, those, too, cannot qualify as a predicate act. *See Lynch v. Amoruso*, 232 F. Supp. 3d 460,

467 (S.D.N.Y. 2017) ("Congress did not include perjury as one of the enumerated RICO

predicate offenses." (citation omitted)).

To the extent that the claims are based on Defendant Epstein's "collective punishment of

all NYU students . . . to intimidate them from testifying as to facts relevant to this case," *see*

FAC ¶ 216, those allegations are conclusory and without sufficient detail to avoid being a

prohibited "formulaic recitation of the elements." *Twombly*, 550 U.S. at 555; *see also*

*Rajaratnam v. Motley Rice*, *LLC*, 449 F. Supp. 3d 45, 75 (E.D.N.Y. 2020).

### iv.   Obstruction of State Law Enforcement

Fourth, Plaintiff does not sufficiently allege obstruction of state law enforcement. This

RICO predicate requires "intent to facilitate an illegal gambling business" and is thus

inapplicable here. 18 U.S.C. § 1511(a); s*ee also, e.g.*, *Shetiwy v. Midland Credit Mgmt.*, 15 F.

Supp. 3d 437, 445 (S.D.N.Y. 2014).

### v.   Money Laundering

Finally, Plaintiff does not sufficiently allege money laundering.

> [T]o state a claim for money laundering as a RICO predicate, a
> plaintiff must plead (1) that the defendant conducted a financial
> transaction; (2) that the transaction in fact involved the proceeds of
> specified unlawful activity; (3) that the defendant knew that the
> property involved in the financial transaction represented the
> proceeds of some form of unlawful activity; and (4) that the
> defendant knew that the financial transaction was designed in whole
> or in part to conceal or disguise the source, ownership, control, etc.,
> of those proceeds.

*Alix v. McKinsey & Co., Inc.*, No. 18-CV-4141 (JMF), 2023 WL 5344892, at *21 (S.D.N.Y. Aug. 18, 2023) (cleaned up). Here, Plaintiff does not allege that any Defendants engaged in any realized financial transactions, and thus the first element of money laundering is not met.

### 2. Plaintiff Fails to Allege a Pattern of Racketeering

Even assuming that Plaintiff had properly alleged a RICO predicate, his Sections 1962(b) and (c) claims fail because he does not allege a pattern of racketeering activity. The statute "defines a pattern of racketeering activity to require at least two acts of racketeering activity occurring within a ten-year period." *Bayshore Cap. Advisors*, *LLC v. Creative Wealth Media Fin. Corp.*, 667 F. Supp. 3d 83, 134 (S.D.N.Y. 2023) (citing 18 U.S.C. § 1961(5)); *see also Sedima*, 473 U.S. at 496 n.14 ("[W]hile two acts are necessary, they may not be sufficient."). "A plaintiff in a RICO action must allege either an open-ended pattern of racketeering activity (i.e., past criminal conduct coupled with a threat of future criminal conduct) or a closed-ended pattern of racketeering activity (i.e., past criminal conduct extending over a substantial period of time)." *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 180 (2d Cir. 2004) (internal citation omitted). These patterns are also referred to as open-ended or closed-ended "continuity." *Id.* The Court analyzes each in turn.

#### i. Closed-Ended Continuity

To plead closed-ended continuity, the Second Circuit generally requires a RICO plaintiff to allege predicate acts spanning at least two years. *See MinedMap, Inc. v. Northway Mining*, *LLC*, No. 21-1480, 2022 WL 570082, at *1 (2d Cir. Feb. 25, 2022); *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184 (2d Cir. 2008). "While two years may be the minimum duration necessary to find closed-ended continuity, the mere fact that predicate acts span two years is insufficient, without more, to support a finding of a closed-ended pattern." *Grace Int'l*

*Assembly of God v. Festa*, 797 F. App'x 603, 605 (2d Cir. 2019) (cleaned up). Courts must also consider "the number and variety of predicate acts, the complexity and number of the schemes, and the number of participants and victims." *MinedMap*, 2022 WL 570082, at *2. This analysis helps distinguish "garden variety breach of contract and tort claims" from those of a "large-scale civil RICO claim." *Id.*

It is challenging to ascertain a relevant time period, given Plaintiff's failure to adequately allege any predicate offenses. But under any plausible reading that excludes the 2020 allegations as clearly non-actionable predicates, *see supra* Section II(A)(1)(ii), a two-year period is not established. Most of Plaintiff's allegations cluster around the summer 2022 internet postings and fallout thereafter, which did not begin until the end of July. His latest allegations extend to the end of 2023. *See* FAC ¶ 180.

Even if the Court were to include Plaintiff's 2020 allegations, thus exceeding two years, Plaintiff's claims would still fail to establish closed-end continuity. Courts look "suspiciously on RICO schemes directed at one victim" but allow "complaints alleging multiple economic injuries to the same victim." *World Wrestling Ent., Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 509 (S.D.N.Y. 2007), *aff'd*, 328 F. App'x 695 (2d Cir. 2009) (collecting cases); *see also Watral v. Silvernails Farm LLC*, 51 F. App'x 62, 65 (2d Cir. 2002) ("[C]ourts have found that such a discrete and limited scheme aimed at one victim is insufficient to support closed-ended continuity."). Here, Mr. Rapaport alleges that he is the only victim of a scheme that resulted in, at most, minor economic harm based on lost income from a research assistant job. Mr. Rapaport's claims are exactly the type of garden-variety tort claims warned against by the Second Circuit in *MinedMap*, and the Court does not find closed-ended continuity here.

###### ii.  Open-Ended Continuity

Open-ended continuity is likewise not satisfied here. "When a RICO action is brought before there is long-term criminal conduct that would establish closed-ended continuity, a plaintiff may establish open-ended continuity by showing that there is a threat of continuity." *Watral*, 51 F. App'x at 66. "Open-ended continuity does not exist where the scheme is 'inherently terminable.'" *MinedMap*, 2022 WL 570082, at *2 (quoting *GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 466 (2d Cir. 1995)). Plaintiff is now a graduate of NYU Law who does not allege any ongoing interactions with the Defendants in this action. *See* FAC ¶ 1. The schemes he alleges center around NYU, involving extracurricular activities and a professor–student relationship. Because Plaintiff is no longer a student, the Court finds that he cannot establish open-ended continuity.

###### 3.  Plaintiff Fails to Allege That Defendants Caused Any Cognizable Injury

Even setting aside the previous two problems, Plaintiff's Sections 1962(b) and (c) claims must be dismissed because he fails to allege an injury cognizable under RICO or that Defendants caused any injury. "A RICO plaintiff 'only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation.'" *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994) (quoting *Sedima*, 473 U.S. at 496). "'[C]onclusory allegations of injury to pecuniary interest' will not suffice; rather, a plaintiff must allege a 'concrete financial loss.'" *Jingle Kids USA, LLC v. In Colour Cap., Inc.*, No. 22-CV-7089 (JHR) (SLC), 2023 WL 5016496, at *9 (S.D.N.Y. June 6, 2023), *report and recommendation adopted*, 2023 WL 6389080 (S.D.N.Y. Oct. 2, 2023) (citing *Beter v. Murdoch*, No. 17-CV-10247 (GBD), 2018 WL 3323162, at *5 (S.D.N.Y. June 22, 2018), *aff'd*, 771 F. App'x 62 (2d Cir. 2019) (summary order)); *see also, e.g.*, *Astorino*, 137 F. Supp. 3d at 613

24

("Courts have required that the plaintiff show concrete financial loss in order to show injury under RICO." (quoting *Kerik v. Tacopina*, 64 F.Supp.3d 542, 560 (S.D.N.Y. 2014)) (cleaned up)). "Without a distinct 'acquisition injury,' [the plaintiff] cannot state a cause of action under subsection 1962(b)." *Cont'l Fin. Co. v. Ledwith*, No. 8-CV-7272 (PAC), 2009 WL 1748875, at *4 (S.D.N.Y. June 22, 2009) (quoting *Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055, 1063 (2d Cir.1996), *vacated on other grounds*, 525 U.S. 128 (1998)). At the outset, Plaintiff's conclusory allegations of "injury to his business and property," *see* FAC ¶¶ 218, 225, 234, 242, cannot suffice for the damages element.

Plaintiff alleges damages in the form of lost academic, extracurricular, and job opportunities, lost income, intangible reputational and fair process harms, and legal costs.[9] He alleges that "Defendant Epstein, as driven and motivated by other [D]efendants," foreclosed his participation in academic journal work, prevented him from performing think tank work in two instances, and enacted reputational harm—all of which impacted Plaintiff's job prospects. *See* FAC ¶¶ 162, 179–81, 255–57, 259, 263; Opp. to MTD at 4. Plaintiff also alleges that he cannot be admitted to the Bar as an attorney, nor can he obtain employment as a judicial clerk or at a think tank because of Defendants' actions. *See* FAC ¶¶ 265, 267. In his Opposition, Plaintiff references losing active employment because of Defendant Epstein's "retaliation." Opp. to MTD at 16. He similarly alleges that he was deprived of a fair adjudication of his NYSDHR complaint in light of Defendant Garrett's "perjury." FAC ¶¶ 121, 123, 210. Finally, he contends he was deprived of "a more favorable relationship" with and "beneficial treatment" from the National

---

[9] At the outset, the Court notes that the "legal costs" Plaintiff claims as damages, *see* FAC ¶¶ 219, 226, 235, 243, are not recoverable under RICO. *See Azima v. Dechert LLP*, No. 22-CV-8728 (PGG) (JW), 2024 WL 4665106, at *36 (S.D.N.Y. Sept. 26, 2024) ("[W]here Plaintiffs' legal fees were incurred in *offensive* litigation, the legal fees are not RICO injuries.").

Organization and of his presidency at the NYU Federalist Society. FAC ¶ 209. None of these allegations are sufficient to allege a cognizable injury.

First, Plaintiff alleges intangible damages in the form of reputational and fair process harms that are too speculative to be cognizable under RICO. There is some variance in this District about whether to permit a plaintiff to recover for reputational harm. *See Azima v. Dechert LLP*, 2024 WL 4665106, at *33–34 (describing the "split"). However, most courts follow the principle that "[r]eputational harm may be cognizable . . . if 'the [pecuniary] loss of business opportunities is . . . quantifiable and non-speculative.'" *El Omari v. Buchanan*, No. 20-CV-2601 (VM), 2021 WL 5889341, at *7 (S.D.N.Y. Dec. 10, 2021), *aff'd*, No. 22-55-CV, 2022 WL 4454536 (2d Cir. Sept. 26, 2022) (quoting *Nygård v. Bacon*, No. 19-CV1559 (LGS), 2021 WL 3721347, at *5 (S.D.N.Y. Aug. 20, 2021)). Here, Plaintiff alleges reputational harm among the Federalist Society, the NYU Law community, and online. *See, e.g.*, FAC ¶¶ 106–09, 131–36, 162. Although Plaintiff may have understandably suffered emotional damages from the spread of such "defamation," emotional damages—including annoyance, embarrassment, and mental anguish—do not constitute an injury under RICO.[10] *Angermeir v. Cohen*, 14 F. Supp. 3d 134, 152 (S.D.N.Y. 2014); *see also Astorino*, 137 F. Supp. 3d at 612–13 (collecting cases).

Second, Plaintiff does not concretely tie the general reputational damage to any loss of a quantifiable business opportunity. To the extent Plaintiff alleges that the reputational harm rendered it "impossible" for him to be admitted as an attorney or find gainful employment, *see* FAC ¶ 265, that claim is too speculative without more—particularly in light of the fact that

---

[10] Mr. Rapaport's recourse for any defamation harms stemming from the underlying facts was to amend his complaint in the Originating Action and pursue them. Instead, Mr. Rapaport elected for the Court's Opinion to be considered a final decision on the merits and abandoned his defamation claims in district court. ECF No. 111, Originating Action (S.D.N.Y. June 2, 2025).

Plaintiff apparently never applied for admission to the Bar. Applying a similar principle, Plaintiff's lost positions on an academic journal and in the NYU Federalist Society are too far removed from concrete pecuniary interests to be cognizable under RICO. Plaintiff does not allege that either position, in itself, would financially benefit him or was closely tied to seeking employment.

Third, Plaintiff's expectation that he would have received judicial clerkships and think tank jobs absent Defendants' actions is too speculative to give rise to a cognizable injury. The Second Circuit "has made clear that a mere 'expectation' cannot constitute 'business or property' under RICO." *Villoldo v. BNP Paribas S.A.*, 648 F. App'x 53, 55 (2d Cir. 2016) (quoting *McLaughlin v. Am. Tobacco Corp.*, 522 F.3d 215, 228 (2d Cir.2008), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008)). "Rather, the plaintiff 'must allege *actual*, quantifiable injury.'" *Astorino*, 137 F. Supp. 3d at 613 (quoting *Kerik v. Tacopina*, 64 F. Supp. 3d 542, 560 (S.D.N.Y. 2014)). Here, Plaintiff's expectation of receiving judicial clerkships and think tank jobs never became a reality. Where Plaintiff fails to allege an accepted job offer or ongoing employment, he only possessed a non-actionable expectation of getting those jobs.

Fourth, the only actual job losses—the revocation of a job offer at an unnamed entity and the loss of a research assistant role at the Manhattan Institute—are insufficiently alleged. "[A]s a general rule, a cause of action does not accrue under RICO until the amount of damages becomes clear and definite." *First Nationwide Bank*, 27 F.3d at 768 (citing *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1106 (2d Cir. 1988), *cert. denied*, 490 U.S. 1007 (1989)). At no point in the Complaint does Plaintiff attempt to quantify an amount of money damages that the alleged RICO violations have caused, including these job offers.

Causation further stymies Plaintiff's pleadings in this context. The causation analysis requires courts to identify whether the injury to the property interest protected by RICO was caused by the RICO violation. *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 91 (2d Cir. 2015). Both proximate and "but-for" causation are required. *First Nationwide Bank*, 27 F.3d at 769. But neither of Plaintiff's job losses, nor the loss of other opportunities, could have been caused by a RICO predicate here. First, the Complaint states that Epstein did not have control to directly renege on the Manhattan Institute offer. *See* FAC ¶ 181 ("[Epstein] demanded that the Manhattan Institute assign the project that the plaintiff was hired to work on to him."). That a separate entity made the decision to reassign Plaintiff "constitute[s] an intervening cause breaking the chain of causation." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 659 (2008). Second, the only information that Plaintiff provides about his unnamed "place of first employment" is that a friend witnessed Epstein speaking poorly about Plaintiff in front of a decisionmaker at that job. FAC ¶ 180. Such vague allegations are insufficient to establish causation in the first instance, but more importantly, Epstein's "disparag[ement]" is not alleged to be—nor can it be—a RICO predicate. *Id.*

Finally, causation fails for many of Plaintiff's other allegations because he fails to allege that he applied and was rejected for either judicial clerkships, attorney admission, or other jobs. Although simply applying would be insufficient to establish causation, Plaintiff did not even do so here.[11] Accordingly, the Court dismisses Counts I and II.

---

[11] Even if Plaintiff did apply to clerkships, he fails to provide any factual support to bolster Defendant Epstein's "public[] boasts" that he can designate up to four clerkships on the Supreme Court and one hundred clerkships in other federal courts. FAC ¶ 35. Indeed, Plaintiff's pleadings on the matter are inconsistent—alleging at points that Defendant Epstein has "one slot maximum personally reserved" from among the four candidates he recommends to the Supreme Court, *id.* ¶

### B. Plaintiff's Claims Under 18 U.S.C. § 1962(d) Necessarily Fail

The dismissal of Plaintiff's substantive RICO claims dooms Plaintiff's racketeering conspiracy claims, because the "failure to state a claim for a substantive RICO violation . . . is fatal to [Plaintiff's] RICO conspiracy claim under § 1962(d)." *D. Penguin Bros. v. City Nat. Bank*, 587 F. App'x 663, 669 (2d Cir. 2014) (citing *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir. 2004)); *see also Astorino*, 137 F. Supp. 3d at 618 (collecting cases). The Court thus dismisses Counts III and IV against all Defendants.

## III. Leave to Amend Would Be Futile

The Court *sua sponte* denies leave to amend the FAC as futile. "Leave to amend should be freely given, and a pro se litigant in particular should be afforded every reasonable opportunity to demonstrate that [he] has a valid claim." *Atherley v. N.Y.C. Dep't of Educ.*, No. 23-CV-383 (JGLC), 2024 WL 1345741, at *13 (S.D.N.Y. Mar. 29, 2024) (internal citation omitted). The Second Circuit interprets Rule 15 of the Federal Rules of Civil Procedure liberally "consistent with [its] strong preference for resolving disputes on the merits." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (internal quotation marks and citation omitted); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) ("If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."). However, "[l]eave may be denied 'for good reason, including futility, bad faith, undue delay, or undue prejudice to the

---

128, and that Defendant Epstein "expects with a very high degree of certainty, approaching 100%, that every candidate [he recommends] will be successful," *id.* ¶ 36. The Complaint also acknowledges that clerkship placements for the NYU Federalist Society were exceptionally poor in the 2023–2024 academic year and blames Defendant Epstein for this inability to place clerks. *Id.* ¶¶ 184–85. Regardless, Epstein's assertions of control do not mean that he in fact exercises that control. And the Complaint does not allege that the Student Defendants have any direct control over clerkship selection.

opposing party.'" *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)).

Here, the Court finds that any attempt to amend would be futile. There is nothing in Plaintiff's motion papers to suggest that any of his claims are viable with better drafting and indeed, as described above, each of his claims fails on numerous grounds. Plaintiff never requested an opportunity for further amendment, already amended the Complaint once after Defendants moved to dismiss the first time, and failed to substantively oppose several aspects of the Motions to Dismiss considered here. Accordingly, the Court concludes any further amendments would be futile.

Furthermore, the Court *sua sponte* dismisses all claims against the John Doe Defendants with prejudice. "[T]he Court has discretion to dismiss claims *sua sponte* pursuant to Rule 12(b)(6), particularly where it is clear that a plaintiff could not have prevailed on the facts as alleged in the complaint." *Bailon v. Pollen Presents*, No. 22-CV-6054 (KPF), 2023 WL 5956141, at \*10 (S.D.N.Y. Sept. 13, 2023) (quoting *Citadel Mgmt., Inc. v. Telesis Trust, Inc.*, 123 F. Supp. 2d 133, 146 (S.D.N.Y. 2000)); *see also Muka v. Murphy*, 358 F. App'x 239, 241 (2d Cir. 2009) (summary order) ("A district court's ability *sua sponte* to dismiss a [pro se] complaint that lacks a basis in law or fact is well-established." (citing *Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 364 (2d Cir. 2000))).

Plaintiff does not allege any specific facts about the John Does. Rather, he only indicates that they have "membership in the same organizations, and [are] co-conspirators of the named defendants, and have aided and participated in the racketeering and anti-competitive activities that give rise to to [sic] this action." FAC ¶ 12. These conclusory allegations do not suffice to state any claim against John Does in this action, there is no indication that Plaintiff can plead

30

otherwise, and these claims necessarily fail for the same reasons stated above. Accordingly, the

Court dismisses all claims against them with prejudice.

## CONCLUSION

For the foregoing reasons, the Court grants all three Motions to Dismiss in full and

dismisses the First Amended Complaint with prejudice. The Clerk of Court is respectfully

directed to terminate ECF Nos. 75, 77, and 79 and close the case.

Dated: March 31, 2026
      White Plains, New York

                    SO ORDERED.

                    *Jessica Clarke*

                    JESSICA G. L. CLARKE
                    United States District Judge