UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
GIDEON RAPAPORT,

                   Plaintiff,

      -against-


RICHARD ALLEN EPSTEIN,
MITCHELL KESHAVA PALLAKI,
AJAY SRINIVASAN IYER,
ZACHARY GEORGE GARRETT,
WILLIAM STUART LASSETER WEINBERG,
ANDREW NELMS, JOHN DOES 1-3

                  Defendants.
-----------------------------------------------------------x

**SECOND AMENDED COMPLAINT**
Case No. 24-cv-07439


**Plaintiff demands trial by jury on all claims so triable.**


## PARTIES

1. Plaintiff Gideon Rapaport is a former employee of the law firm of Kirkland & Ellis LLP, and a graduate of the New York University School of Law. He is a citizen of Canada, and was lawfully admitted to the United States at the time of the filing of the original complaint as a nonresident alien, and that is his current status as well.

2. Defendant Richard Allen Epstein is a professor of law at the New York University School of Law, where he also serves as the faculty advisor to the Federalist Society chapter, and the Journal of Law and Liberty.

3. On information and belief, defendant Epstein is a resident of the City and State of New York and is a U.S. citizen. On information and belief, defendant Epstein is a member of the bar of the State of California.

4. Defendant Mitchell Keshava Pallaki is a graduate of the New York University School of Law, where he served on the board of the Federalist Society chapter for the academic years of 2020/2021 and 2021/2022 as Treasurer, and is a U.S. citizen.

5. Defendant Pallaki is, on information and belief, presently an associate of the law firm Clement & Murphy PLLC based in Washington D.C., and a member of the bar of the State of Ohio.

6. Defendant Ajay Srinivasan Iyer is an associate of Kirkland & Ellis LLP in the Washington D.C. office, and a graduate of the New York University School of Law, where he served as the President of the Federalist Society chapter for the academic year of 2021/2022. He is a resident of the City and State of New York and is a U.S. citizen.

7. Defendant Zachary George Garrett is a graduate of the New York University School of Law, where he served as the President of the Federalist Society chapter for the academic year of 2022/2023, and is a U.S. citizen.

8. Defendant Garrett is, on information and belief, currently a "law clerk" for the law firm Holwell Shuster & Goldberg LLP, and on information and belief, is not a member of the bar of any state.

9. Defendant William Stuart Lasseter Weinberg is a graduate of the New York University School of Law, where he served as President of the Federalist Society chapter for most of the academic year of 2020/2021. He is a resident of the City and State of New York and is a U.S. citizen.

10. Defendant Weinberg is, on information and belief, currently an associate of the law firm Sullivan & Cromwell LLP , and is a member of the bar of the State of New York.

11. Defendant Andrew Nelms is a graduate of the New York University School of Law, where he served on the board of the Federalist Society chapter for the academic year of 2020/2021, and is a U.S.

citizen. He is, on information and belief, currently an associate of the law firm Cooley LLP and is a member of the bar of the State of California.

12.  John Does 1-3 are associates, on information and belief, also through membership in the same organizations, and co-conspirators of the named defendants, and have aided and participated in the racketeering and anti-competitive activities that give rise to to this action. Named witnesses and actors described herein, whose racketeering, anti-competitive activities or association with the named defendants may not be presently known or fully understood, are not precluded from subsequent identification as the John Does.

## JURISDICTION AND VENUE

13.  This Court has original jurisdiction over this action pursuant to 28 U. S. C. § 1331 because it arises under the laws of the United States, particularly the Sherman Act, the Clayton Act and the Racketeer Influenced and Corrupt Organizations Act, and pursuant to 28 U. S. C. § 1337.

14.  This Court has personal jurisdiction over the defendants because they are United States citizens, are domiciled in the United States, and have committed crimes or performed other actions in the United States giving rise to civil causes of actions pursuant to the Sherman Act, Clayton Act and the Racketeer Influenced and Corrupt Organizations Act.

15.  Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## INTRODUCTION

16.  It is well known that a federal clerkship, especially for the Supreme Court of the United States, is a fast-track to the pinnacle of the American legal profession, and that these positions are highly competitive.

17.  This plaintiff arrived in the United States with his American Dream, and a deep love of the law, to study at the New York University School of Law, which is regarded as an elite law school. He was naive, and believed that merit and compatibility would determine outcomes, according to the basic norms of competition and fair play.

18.  At the start of law school, the plaintiff did not plan to clerk, and did not even believe himself to be eligible. He also did not expect that effectively all such opportunities at NYU, on the right of center, would be under the control of a single professor, whom he had admired as an intellectual for many years.

19.  Nor did he expect that this professor would take an instant appreciation of his talent, and eventually push him to raise his ambitions by dedicating the two years after law school for clerking, at first for a United States Circuit Court of Appeal, and then for the Supreme Court of the United States.

20.  The plaintiff knew that law school would be highly competitive, but could not imagine that law students would engage in illegal and even criminal activity to obtain power, gang up on each other, especially through student organizations, file false reports and complaints and engage in forgery and fraud on a brazen and massive scale.

21.  These students have conformed, and still do conform, to a code of conduct more expected from prison gangs vying for dominance and limited resources, than professionals or academicians. They operate on a model requiring shared culpability for their wrongful acts, which generates interlocking rings of blackmail that compel loyalty. They communicate through Signal[1], an encrypted message app that deletes messages and other content within a period of time, typically 24 hours.

22.  The Plaintiff never accepted that anyone, or even many acting in concert, would limit him from reaching his potential and serving his fellow man as best as he was able. Because of his

---

1    The Guardian, *What is Signal, the messaging app at the heart of a US security leak?* https://www.theguardian.com/us-news/2025/mar/28/what-is-signal-the-messaging-app-at-the-heart-of-a-us-security-leak

enthusiastic interest in the law, combined with polite rejection of any attempt to discourage or intimidate him, he became a target of what began as schoolyard bullying, and then escalated into tortious and criminal activity meant to finally defeat him, after all other methods had failed.

23.    Despite a long and escalating train of abuses and crimes including bullying, intimidation, public humiliation, sabotage, defamation and the filing of false complaints, the plaintiff persevered, and remained polite and courteous to his tormentors throughout.

24.    By July 2022, he was on the precipice of a federal appellate clerkship, arranged from a list that he been instructed to draw up of "feeder judges" he wanted to clerk for, and had provided to this highly influential defendant Epstein, who would then pair this with a Supreme Court clerkship, as available. This was too much for these students, and so they formulated a final solution to remove the plaintiff from the competition, and the legal profession, by forging evidence, twice, to support their widely disseminated and completely baseless defamations that he had been fired for sexual harassment from his summer job at Kirkland & Ellis. This occurred in late July 2022 and early August 2022.

25.    Whether or not the highly influential defendant Epstein wished for these abuses and crimes to be perpetrated by these students who wanted his blessing, he was aware of, and ratified all of these malignant deeds by in fact bestowing rewards upon the perpetrators. He not only continued to retain them under his aegis, but also joined with them in a cover-up to protect his own privilege and power, itself accumulated and wielded illegally.

## BACKGROUND FACTS

### THE EPSTEIN "ORGANIZED LAW" RACKET

26.    Over a period of five decades as a tenured law professor, defendant Epstein has established an unprecedentedly powerful apparatus around himself and under his control that can best be described as

a racket both as a colloquial matter, and according to the criteria provided by Congress in the Racketeer Influenced and Corrupt Organizations Act ("RICO Act"). This racket and its actions, as observed over the past five years are diagrammed in Appendix A for ease of understanding.

27.   As the king pin at the center of this mechanism, best understood as a racket of "Organized Law", defendant Epstein has placed himself as a clearinghouse between significant amounts of "dark money" keen to influence public policy and the administration of justice, the brand and credentialing power of elite institutions, exceptionally talented and sometimes idealistic students with lofty career ambitions often as great as their loans, and the judicial branch of the Government of the United States through his control over the staffing of an unrivaled number of federal clerkships.

28.   This racketeering activity, has by this point far exceeded the impact or significance of defendant Epstein's current legitimate academic work as a professor, of teaching and theorizing, and is not merely explainable as being a significant or persuasive "recommender", which many other law professors who do not run afoul of federal law are as well. Hence, his work as a "professor" was a foundation, which has now effectively become just a front for his operation of this racket.

29.   Defendant Epstein's racket has three different forms of stock-in-trade. First and most distinctive, is the control over federal judicial clerkships, which are highly prestigious public service positions established and paid for by the American taxpayer. They typically last one or two years, and have long been regarded as the fast-track, or even a talismanic requirement, to the pinnacle of the law in American society. They open doors to partnerships in elite law firms, tenure-track positions in prestigious academic institutions, department head and cabinet-level positions in the federal government among many others.

30.   The unique expertise and sophistication of defendant Epstein in the area of antitrust law has informed his development of the racket, resulting in a design of broad horizontal and vertical integration that maximizes market power and control over broad fronts for many cumulative effects

rather than one-off high profile acts. Despite the antitrust sophistication, the racket so qualifies because it has acquired and sustained control, and conducted its operations through the commission of predicate acts to support its other tortious actions and antitrust violations as alleged herein.

31.    Second is simply money. Defendant Epstein sits as an intermediary between vast amounts of "dark money" provided by large corporations and wealthy donors who seek to influence public policy and the administration of justice in the United States in a manner consistent with their personal interest and beliefs, as aligned with defendant Epstein's. He controls this money with broad discretion, including through excessive influence over some donors, and dispenses what is referred to by students as "the Epstein Money" or "Epstein Bucks" through often do-nothing "fellowships" handed out as rewards to students among other disbursements, and much more significant quantities to other think tanks and institutes, including the Classical Liberalism Institute. Some of this money is provided by donors, who have remained unknown in the absence of a full forensic audit, in a tax-deductible manner including by the use of 26 U. S. C. § 501(c)(3) organizations. Some of these sources of funds brought to supply the Epstein racket are international, particularly foreign tobacco, drug and chemical companies[2] whose "donations" amounts to remuneration for defendant Epstein's legal advice and influence in class action and tort areas of law. These funds are placed at his disposable, but are used for the purposes of advancing the racket as opposed to his personal consumption, and their true origin is laundered to prevent its refusal by students or others, which would limit the effectiveness of the racket.

32.    Third, are the students and young professionals, who serve as the grist for Epstein's mill and the foot-soldiers that occupy the positions he controls, and implement through the power of the Government of the United States, the worldview shared by him and his financiers. Defendant Epstein

---

2    Some of these foreign enterprises include British American Tobacco Inc., Imperial Brands plc, Chemie Grünenthal GmbH (manufacture of thalidomide), IG Farben AG successors (use of slave labor during the Holocaust and manufacture of Zyklon B), Bayer AG (HIV contaminated blood products) and others that are unpopular in a progressive environment such as NYU Law

plays God over the lives of these students, and his word alone is enough to raise a student to a

Supreme Court clerkship, or prevent a student from obtaining any clerkship or think tank position with

anyone or anyplace that is to the right of center.

33.  As a result of this unrivaled combination of power, resources and influence, and his monopoly

as the only NYU Law professor in this business on the right, every NYU Law student aspiring to any

ideologically-involved position right of center, must be blessed by defendant Epstein, and even a slight

disapproval is fatal. Defendant Epstein has in fact blacklisted students from the entire sector, other

than the plaintiff, as an exercise of his power.

34.  Through the operation of his racket, influence and control over elite institutions, and

innumerable forms and quantities of quid pro quo over a period of many years, defendant Epstein

succeeded in effectively converting a record amount of federal clerkship positions into his private

property, which he has trafficked in for his personal power, gratification and profit, and this forms the

foundation of his racket. Although most of his work and influence is done on the right sometimes

involving the Republican Party, even Democrat-nominated candidates for the federal judiciary have

beseeched him for assistance in smooth confirmation by a Republican Senate through being blessed by

him as non-radicals.

35.  Defendant Epstein publicly boasts, and has also bragged to the plaintiff on multiple occasions,

that he is up to four slots in the Supreme Court of the United States, of which there are only thirty six,

and approximately one hundred slots in the federal trial and appellate courts. He fills these slots

through a combination of his activities at the NYU and University of Chicago law schools, the Hoover

Institute, and countless other think tanks, fellowship programs, impact litigation groups and other

organizations from which he draws the human capital of his operation.

36.  Defendant Epstein rarely if ever "recommends" more than one candidate for one slot, and he

expects with a very high degree of certainty, approaching 100%, that every candidate will be

successful. This is unlike other law professors, who recommend students that they believe are worthy of recommendation with a degree of enthusiasm they find appropriate, without limiting themselves to only one recommendation for every slot, because they do not "own" slots to fill. When ordinary law professors give recommendations, the decision about the slot is determined by the considerer of the recommendation, not by the professor selecting who to recommend *ab initio*.

37.    None of this indicates any error in the ways of the judiciary itself, because the horizontally and vertically integrated operations of defendant Epstein limit choice and information in the market, much in the same way that a customer who has no other feasible choice is a victim and not a co-conspirator of the monopolist. Direct victimization, such as by commission of predicate acts, is saved for those who cross the defendant Epstein, or lower functionaries within the racket. This plaintiff has been directly victimized by predicate acts committed by defendant Epstein and his racket subordinates.

38.    There are also unique factors in the market for judicial clerkships, which amplify the power of defendant Epstein. The positions are typically one year, and there have been instances in past where clerks succeeded in pulling the wool over the eyes of their judges to achieve their own favored ideological outcome, only for the situation to be fully appreciated after the clerk had left to private practice. There is a drastic ideological divide in the hiring of law clerks, and some law students are turncoats. This necessitates ideological vetting, as performed by law professors such as defendant Epstein, because although judges are perfectly capable of evaluating writing ability, talent, grade point averages and personality in an application process, such a process is too short to evaluate ideological convictions and character. High profile leaks at the U.S. Supreme Court and lower profile leaks at the lower courts have also complicated this process.

39.    Defendant Epstein has never held, sought or been nominated for public office, and in his public statements he has frequently and enthusiastically affirmed his own unelectability for any such

role in American society. These racketeering activities have been his way to shape society and the administration of justice while improving his own position. Though he benefits financially from controlling substantial amounts of donor provided funds and professionally from "supertenure" where he is a professor, he is also an ideologically motivated offender, and believes that he is morally and philosophicaly justified in committing these acts in the interest of the "greater good" as he sees it.

40.   Defendant Epstein has not known any other professional role in society after graduating law school other than as a law professor, with this role increasingly being supplemented by these other illicit activities described over the axis of time. Upon information and belief, he became a tenure-track law professor at the age of 26, and obtained tenure at the age of 29.

41.   In contrast to defendant Epstein's academic writings on legal topics relating to similar malfeasance, particularly in the area of antitrust, his efforts in developing, managing and weaponizing this racket against the plaintiff, and others, do not "grow the pie", and do not comply with the Pareto improvement principle as he normally advocates for, where everyone must either benefit or not be harmed. Instead, there are clear losers that are specifically and intentionally harmed, including the plaintiff, in addition to broad and deleterious "market" effects on less discernible participants.

<u>THE NYU CREW</u>

42.   Within the domain of the Epstein "Organized Law" Racket diagrammed in Appendix A, there is a group of NYU law students forming the "NYU Crew", who by engaging in racketeering activities, captured the NYU Federalist Society Chapter and the Journal of Law and Liberty, and maintain control over these entities. These students serve as the foot-soldiers of defendant Epstein on campus and seek to control and influence, as a result of these racketeering activities, to whom he doles out his favor, largesse and prized clerkship slots.

43.   These students generally serve defendant Epstein as a means to obtain what he controls, primarily clerkships, and often do so in a fashion that is manipulative of him, and anti-competitive towards other students in order to prevent those other students from accessing his resources. At NYU, he is the only game in town, and in having to supplicate to him, they feel the chafing of dependence on him as he arbitrarily exercises his power over them, and sorts them according to his private criteria, preordaining them for career mediocrity, greatness, or somewhere in between without explanation or appeal.

44.   This relationship between defendant Epstein and the defendants of the NYU Crew, is best described as Hobbesian rather than Lockean, according to defendant Epstein's paradigm presented in his signature academic work *Takings: Private Property and the Power of Eminent Domain* (1985), in which Chapter 2 is captioned: "Hobbesian Man, Lockean World". The struggle is one of power between individuals at war with each other over a limited pie, rather than a contest of broadly beneficial competition that grows the pie for all, as identified in Chapter 1 Id., which is captioned "A Tale of Two Pies".

45.   These students have compared defendant Epstein to the fictional character Willy Wonka of the Roald Dall children's novel *Charlie and the Chocolate Factory*, due in some part his eccentricity but mostly in consideration of the "golden tickets" he hands out, and to various Roman emperors depending on the degree of oppression they feel from his sorting of them and placing lids on their aspirations.

46.   In contrast to the defendant members of the NYU Crew, the plaintiff, who did not begin law school with interest in a clerkship, had a genuine long-term intellectual interest in the scholarship and ideas of defendant Epstein, which resulted in a "Lockean" relationship of mutual intellectual interest that was collaborative as opposed to warlike. The Plaintiff never sabotaged or belittled others, and enjoyed a sincere relationship with defendant Epstein that included defendant Epstein's mentorship to

be his intellectual successor, especially in certain areas that are heterodox even to the conservative legal movement. The former status of the plaintiff as a protégé of defendant Epstein was well-known in the legal academy.

47.   In fact, rather than pursue the professor for the opening of doors to clerkships and other things as other students did, the opposite occurred. In April 2022, plaintiff wrote to defendant Epstein that he would spend the 2022/2023 academic year elsewhere and would leave the clerkship race for fear of sabotage and mistreatment at NYU, and focus on private practice to economically establish himself. Defendant Epstein then successfully pursued the plaintiff with promise of a "feeder" clerkship from a ranked list that Plaintiff would draw up himself that would then be followed by a Supreme Court clerkship as available, the second highest position on defendant Epstein's journal, and that he would also teach Property in addition to Food and Drug Law. Defendant Epstein also promised the plaintiff a Bradley Fellowship if he returned to NYU with a value of $5,000.

48.   The NYU Federalist Society Chapter is an association-in-fact that was established for legitimate purposes as an NYU Law student organization, with a mandate from the National Organization of the Federalist Society, to foster intellectual diversity and debate at the law school.

49.   The NYU Federalist Society Chapter engages in interstate commerce by purchasing goods and services in interstate commerce, soliciting speakers, including some that are paid honorariums, to travel from outside of New York, and the United States, to speak in New York. These activities are performed using the interstate wires and mail of the United States.  Its annual budget, combining school, national organization and direct donor funding is numbered in the tens of thousands of dollars.

50.   The NYU Journal of Law and Liberty is an association-in-fact that was established by the NYU School of Law and defendant Epstein for the legitimate purposes of publishing in areas relating to freedom, limited government and the rule of law.

51. The NYU Journal of Law and Liberty engages in interstate commerce by purchasing goods and services in interstate commerce, including purchasing printing services, selling copies of the various journals published. These activities are performed using the interstate wires, and mail of the United States. It's revenue is numbered in the tens of thousands of dollars.

52. An anti-competitive result of the NYU Crew's operations is that many students do not engage or show interest with the Chapter or the Journal, or limited their involvement to just the Journal before it was captured. Others maintain secret communications with defendant Epstein in order to circumvent the Crew's sabotage efforts dedicated to limit competition, and access to defendant Epstein's resources. Defendant Epstein is keenly aware of this, but cannot avoid this dynamic playing out.

**2020/2021**

<u>THE RACKET'S CAPTURE OF THE NYU CHAPTER IN SEPTEMBER 2020</u>

53. For the 2020/2021 academic year, the NYU Chapter's board was nominated by the previous board, and consisted of a large number of students, all of whom were second year students, and who did not know each other in some cases as the result of the Covid-19 pandemic induced remote learning environment imposed since March 2020.

54. Almost immediately at the beginning of the academic year, a trio of defendant students, consisting of defendants Pallaki, Weinberg and Nelms, joined together as the "NYU Crew", which was led by defendant Pallaki, to assert their power over the organization, other students, and eventually upon defendant Epstein's apparatus more generally.

55. They formulated a plan to capture the chapter, and divided its implementation among themselves according to their individual wiles and social posture at the law school for maximum success of capture as a first consideration, and damage to be inflicted upon the plaintiff as their main

obstacle in second consideration, by motive of malice as demonstrated most clearly in the ringleader, defendant Pallaki.

56.    Defendant Pallaki, who already had an established relationship with defendant Epstein, and the National Organization, took responsibility for sowing seeds of doubt and undermining the reputation of the plaintiff with those higher authorities, and did in fact do so in a number of phone calls and emails that month to Peter Redpath and Kate Alcantara of the Student Division of the Federalist Society, and to another employee responsible for the student blog initiative.

57.    Defendant Weinberg was assigned the responsibility of taking all actions facing the plaintiff directly, in order to exploit the closer relationship, and greater personal trust that the plaintiff had in him. He would eventually take the President role as the face of the captured organization, and receive the exemplary punishment from defendant Epstein for the foul conduct of the whole group.

58.    Defendant Nelms was assigned responsibility facing the NYU Law Administration and obtaining collaboration other students who were outside of the ideological orbit of the Chapter.

59.    Upon information and belief, on or about September 12, 2020, defendant Nelms filed a false and meritless to the NYU Law Administration about the plaintiff's leadership of the Chapter which did not result in any formal investigation or punishment, but rather provided notice that there was a subversive element at work.

60.    Because the operation of a Federalist Society chapter at a law school is an inherently risky and delicate operation, and many law school administrations are actively hostile for ideological reasons, such a false complaint is an especially treacherous betrayal.

61.    The first attempt to effect a coup against the plaintiff, and acquire control of the organization, was a provocation that did not unseat him due to his support on the board, popularity with defendant Epstein and confidence of the National Organization.

62.   On or about September 16, 2020, the plaintiff drafted a Constitution Day statement for the membership, and sent the draft to defendant Weinberg. The plaintiff wanted defendant Weinberg's opinion because as an international student happy to share and celebrate Constitution Day, he wanted a local opinion. Defendant Weinberg did not make substantive changes, and while formatting the draft into a final version, introduced errors in spelling and punctuation that were not extant in the draft.

63.   On September 17, 2020, out of trust and confidence in the abilities of defendant Weinberg, the plaintiff sent out the statement without a close review. By this time defendant Nelms had recruited an international law student from a non-English-speaking country, Luiza Leao, and prepared a redline for her of all of the errors introduced by Weinberg, that was in excess of her own linguistic familiarity.

64.   Luiza Leao was more than happy to distribute this, in order or to humiliate the plaintiff, as the sender of the holiday greeting, in violation of the student code of conduct which prohibits "Displays or electronic transmission of derogatory, demeaning, or hostile materials".

65.   Luiza Leao was one of the handful students at the law school who could almost always be counted to obsessively respond to every email advertising a Federalist Society event with hatred and vitriol against every visiting speaker, including judges.

66.   Realizing these typographical and stylistic errors, the plaintiff humorously advertised a position for proof-reader as a *mea culpa*, and as a private joke with Weinberg, who he did not suspect as being malicious but rather just sloppy.

67.   Within just hours, the Crew had already informed defendant Epstein, who called the plaintiff to ask him what it was he had heard about the plaintiff hiring a "Research Assistant", and complained to the National Organization over this tempest in a teapot, of a single humorous and modest response to almost a month of voluminous abuse.

68.   On or about September 20, 2020 the Chapter held a meeting to confer about offering a free advanced screening by streaming to Created Equal: Clarence Thomas in His Own Words (2020), a documentary about the life of Justice Clarence Thomas. The screening was offered at minimal cost to the Chapter and was a popular idea except for one dissenting vote.

69.   Sarah Winslow, a board member who missed the previous meeting at which this idea was first raised, was the only member opposed to the idea, on the reasoning that Justice Thomas was a "rapist", a word she specifically used likely in reference to the controversy during his confirmation hearing in which Anita Hill accused then-Judge Clarence Thomas of sexual harassment, and that sending a free viewing link for the documentary would promote "rape culture". Sarah Winslow expressed her belief, to the amazement of all present, that being associated with Justice Thomas would tarnish the image of the Federalist Society, and that despite not having seen the documentary, she was sure it was unfairly positive toward him.

70.   Sarah Winslow then announced that this was a 'women's issue', and for that reason, that as the only woman on the board she was going to veto the initiative sending of a free viewing link to members of Chapter, and threatened bad publicity and a smearing of the organization if she did not get her way.

71.   The plaintiff immediately opposed this, but as discussion continued, defendant Nelms identified an opportunity, and after initially opposing Sarah Winslow as well for being patently unreasonable, he abruptly changed course, and interrupted resolution of this issue in order to save this point of contention for later use by the Crew in their acquisition of control.

72.   In the following days, two members of the board contacted the plaintiff and were concerned about Sarah Winslow's threats, and that because she had a very "big mouth" she would cause embarrassment to the board, and threaten their careers by affecting their reputations at a critical hiring time.

73. At roughly the same time, defendants Nelms and Weinberg worked in tandem to create a confrontation serving as a pretext to stage a coup against the plaintiff to take control of the Chapter. As defendant Nelms called Sarah Winslow to assure her that the plaintiff would call her to apologize to her for not granting her veto, which she eventually revealed herself to the plaintiff during the call, defendant Weinberg called the plaintiff to suggest the need for communicating to her that she could not veto the rest of the board or threaten the reputations of other members when she did not get her way.

74. The phone call between the plaintiff and Sarah Winslow resulted in no common ground being found, as exacerbated by the setting up of different expectations by defendants, and resulted in the decision that Sarah Winslow could not be allowed to continue to hold the organization hostage and threaten the reputation of students, especially while subverting the legitimate aims and values of the Chapter.

75. The pattern of behavior of Sarah Winslow, would eventually be repeated to opposite results in 2021 when the only two women on the board decided to veto the hosting of a debate by the chapter, on whether abortion was a protected right under the U.S. Constitution. Because the racket was defending itself and its control rather than utilizing controversy to acquire control as it had in 2020, the two women members were pushed out of the board, provoking their making good on threats of publicity through an open letter, resulting in this incident being widely reported, and the National Organization and defendant Epstein provided support and cover rather than scapegoating of the chapter leadership.

76. During the days after the phone call with Sarah Winslow, the NYU Crew gathered votes to remove the plaintiff from his position so as to acquire control over the organization. Once a majority was gathered by agreement, they set out to blackmail and extort the minority to ensure a "unanimous" vote.

77.   Due to Plaintiff's approval by defendant Epstein and the national organization, they needed a "unanimous" vote, and squeezed the minority so by direct threats to paint anyone who would vote in his behalf or advocate for a moderate step short of his "unanimous" ouster and humiliation, in the same brush as him, and limit their career opportunities at a vital time, prior to hiring for second year firm positions which often become permanent positions. On information and belief, two members of the board, Patrick Griffin in Minnesota and Anderson Westerman in New York were so directly threatened via phone by defendant Nelms on or about September 25, 2020.

78.   This left supportive board members with no real choice, and they succumbed to a course of action that resulted in deep regret for some, who retreated into the Journal of Law and Liberty before it too was captured by the same group. Even their freedom to speak a word of kindness about the plaintiff was taken away by the Crew.

79.   On September 27, 2020, which was also the eve of Yom Kippur, the holiest day of the Jewish Calendar and a day of atonement, defendant Nelms commandeered a chapter Zoom call meant to plan upcoming events for the initial stated purpose of a discussion about the leadership of the chapter. The plaintiff's gracious agreement to have that discussion with him and anyone who was interested surprised defendant Nelms, and instead of actually starting a discussion, defendant Nelms changed course to a reading a speech by monologue condemning, disparaging and humiliating the plaintiff in a tone of disrespect and uncollegiality. Defendant Nelms menaced the plaintiff in this speech, and indicated severe consequences beyond merely losing a position at a "club" if he did not go quietly, referring to public humiliation and career destruction.

80.   The plaintiff patiently let defendant Nelms finish his prepared speech, and once it became the plaintiff's turn to speak, defendant Nelms rudely interrupted him again, to invite Sarah Winslow, who was not authorized to join that meeting, to engage in angry tirade. Once again the plaintiff patiently waited for Sarah Winslow to finish her tirade, and after only speaking for a few moments he was

rudely interrupted again by defendant Nelms, who instructed anyone who agreed with the plaintiff or was interested in what he had to say to speak up "NOW" with the last word being angrily and loudly emphasized. Having already blackmailed and extorted the minority, no one spoke up and defendant Nelms instructed the rest of the group to leave the meeting, which occurred within a few seconds of silence when he announced "NOW" in an intimidating fashion.

81.   Defendant Nelms suffers from chronic traumatic encephalopathy, which prevented his aspirations of playing football professionally, as he discloses on his public Linkedin page. Among other symptoms, he is prone to "flash-back" and raise on a tangent his missed football career during conversation. Unaware of the root source, the plaintiff believed this mannerism to be the humorous expression of a jockish trope, rather than a symptom of a serious condition, and teasingly compared defendant Nelms to the character of Uncle Rico from the film *Napoleon Dynamite*, who still obsesses about his missing of crucial football approximately 25 years later, similarly obsessing over his failure to have a football career.

82.   Since that faux pas early in the first year of law school, and as exacerbated by the evident enjoyment of the law by the plaintiff as his passion, which grated upon defendant Nelms who was tragically deprived of his own by reason of brain injury, he sought to get even, and inflict his suffering of lost dreams on the plaintiff, among others.

83.   Defendant Nelms had many courses of action to effectuate a change in leadership in the board together with the NYU Crew, but he chose the most malicious course, which preyed on the patience and good intentions of the plaintiff to maximize humiliation. Furthermore, he sought to create antagonism between the plaintiff and the minority of board members were blackmailed and extorted into their vote, silence and participation in defendant Nelms twisted and gratuitous ritual of humiliation. Defendant Nelms, and the other members of the Crew, particularly defendant Pallaki,

wanted the plaintiff to suffer, and feel that he had no friends by so coercing the minority of friendly board members.

84. The Plaintiff refused an opportunity by the national organization to have this dispute, and gross mistreatment adjudicated, as a personal sacrifice to prevent reputational harm to the organization.

85. Thereafter, defendant Weinberg was announced in an email sent by defendant Pallaki as the president for the remainder of the academic year, who was actually the real power in the Crew. This email also appointed Gary Dreyer, who was not formerly on the board, and whose role in these events is presently unclear, to the former position of defendant Weinberg.

86. In the next meeting of a seminar attended by the plaintiff and just one other student, defendant Weinberg, who usually carries a wooden face, was upbeat and frequently smirked at the plaintiff. This change in mood would reverse course by the next meeting of the seminar, because in the interim, defendant Epstein decided to punish defendant Weinberg, and declared to him, as he would later to the plaintiff albeit for different reasons, that he will not clerk, as a declaration of fact rather than a refusal to recommend.

87. In between both of those seminar sessions, defendant Epstein called the plaintiff and asked him who he thought was most responsible for the events which transpired in the chapter. The plaintiff honestly believed at the time that it was defendant Weinberg and not defendant Pallaki, and indicated so to defendant Epstein, without knowing how this information would be used. Thereafter defendant Epstein brought his full might down upon defendant Weinberg resulting in Weinberg never clerking. Upon information and belief, this was despite defendant Weinberg's excellent grades and distinguished service as an Officer of the United States Air Force, which together would ensure competitiveness.

88.   Defendant Epstein chose to only punish and make an example out of one person, for the simple reason that he wanted to maintain control over his racket and protect the plaintiff as an asset, without destroying too much of one of his three stocks-in-trade, which is the human capital he draws upon. This is consistent with his utilitarian values rather than any deontological idea of right or wrong, or individual justice.

89.   The plaintiff eventually took a leave of absence for the academic year of 2020/2021 due to the worsening in the illness of a family member, an uncertain hiring market and a diminished enjoyment of classes mandatorily taken over the Zoom format unsupported by the intellectual life of law school prior to the Covid-19 pandemic.

The Motives of Ringleader Pallaki

90.   Without any intention or wrong doing, the plaintiff unwittingly became a major obstacle for defendant Pallaki both in his ambitions to become defendant Epstein's favored student, particularly for a Supreme Court clerkship, and defendant Pallaki's romantic desires for Isaiah Evans, a recent graduate who was a loyal friend to the plaintiff and a supporter of his leadership of the NYU chapter, for a time.

91.   Defendant Pallaki sought the favor of defendant Epstein, and eventually served as his Research Assistant, writing a law review article together about antitrust and labor law. The plaintiff never interfered with Pallaki's relationship with Epstein, and though he did not know defendant Pallaki well, he only said favorable things about him to the professor by complimenting his intellect and principled adherence to libertarian values. Oftentimes, the plaintiff and defendant Pallaki would be the last two students remaining in defendant Epstein's Zoom classroom in the roughly 10 minutes he hosted for after class questions and discussion.

92.  Defendant Pallaki sought a romantic relationship with Isaiah Evans, who met both the plaintiff and defendant Pallaki while they were first-year students, and he was a third-year student. Isaiah Evans was Treasurer of the NYU Chapter during that year, and was a powerful force in ensuring that the plaintiff would serve as President and defendant Pallaki would serve as Treasurer, and trained defendant Pallaki as his own replacement.

93.  Early in their first and third years respectively, Isaiah Evans and the plaintiff quickly formed a friendship over a shared sense of humor and appreciation of fine food. Because of this friendship, and the fact that defendant Pallaki had already presented himself as a hostile competitor to the plaintiff, Isaiah Evans spurned defendant Pallaki's romantic advances, because he did not want to have to choose "between a friend and a lover", as Isiah Evans would later explain, and remained loyal to the plaintiff, for a time.

94.  By the next year, in early September during a period of hostility toward the Chapter on the school listserv, Isaiah Evans wrote publicly in support of the plaintiff and the Chapter, and privately told the plaintiff that his loyalty and now-open conservatism was "costing me a lot of sex". The Plaintiff appreciated his sacrifice, but did not know that he was also specifically referring to his spurning of advances by defendant Pallaki, and instead just imagined some kind of a general sexual boycott of gay conservatives.

95.  Roughly in the middle of September 2020, defendant Pallaki finally managed to seduce Isaiah Evans, and eventually turned him against the plaintiff, thus depriving the plaintiff of the information and counsel that he relied upon to manage internal politics, and this greatly facilitated the events described, masterminded by defendant Pallaki.

96.  In mid-October 2020, Isaiah Evans called the plaintiff to apologize for giving in to his "hedonism" and spoke of defendant Pallaki visiting him frequently at his apartment, and it was only

then that the plaintiff realized this interest of defendant Pallaki, and the role it had played in motivating his personal antagonism.

97.   Defendant Pallaki's visible delight at the ousting and humiliation of the plaintiff on September 27, 2020, the eve of Yom Kippur, was evidenced by a huge grin carried throughout the entire proceedings, in which he did not speak. This distinguished him from the rest of the attendees who had a neutral tone and just wanted to get over with the unpleasant business, except for Sarah Winslow, who was visibly angry.

98.   Upon information and belief, defendant Pallaki was raised in a strict Catholic environment, and attended the private Catholic school of St. Ignatius of Cincinnati, Ohio, where he successfully ran for student senate on a joint ticket with Gabriel Mielki, a subsequent prominent organizer of Students for Democratic Socialism and LGBTQ+ activist. Defendant Pallaki returned there later his adult life to instruct a "Christian Manhood" program for younger boys. Upon information and belief, he compensates for his failure to live according to the teachings of his religion by reason of his sexual proclivities, through directing hatred towards members of other faiths, particularly Jews, on online message boards and forums.

99.   Through actions with their commingled professional and personal motives, defendant Pallaki obtained control over the Chapter, and the romantic relationship he sought with Isaiah Evans, but could not succeed in destroying the relationship between the plaintiff and defendant Epstein, which came at the expense of his own Supreme Court recommendation, until the Summer of 2022, where again he puppeteered others to do his dirty work, and bury the plaintiff for good.

**2021/2022**

<u>School Year Sabotage and Defamation</u>

100. During the absence of the plaintiff leading up to this academic year, defendant members of the Crew, abusing their roles in the Chapter, lied to Peter Redpath and Kate Alcantara at the student division of the national organization by telling them that the plaintiff was transferring to Northwestern University, which was not a T6 school, and was older than 30. Both the falsely stated change of the plaintiff to a non-T6 law school, and being older than 30 would make the plaintiff ineligible for priority investment and attention from the national organization, and defendant students sought to deprive him of this by fraud. Conversly, this also deprived the organization of more beneficial association with the plaintiff while these frauds had not been uncovered.

101. Defendants Pallaki, Weinberg and Nelms changed the chapter constitution with a rule that would only affect the plaintiff, and prevent him from holding any position in the future. This action both practically and symbolically cemented the continuing bias and antagonism of the Crew against the plaintiff. This encouraged and legitimzed further unlawful injuries towards the plaintiff.

102. The plaintiff eventually clarified the truth of both of these matters, when asked by Peter Redpath about them at the National Lawyers Convention of November 2021. The plaintiff was an NYU Law student and only 25 years old at the time.

103. The defendant members of the Crew, including the newly recruited members, defendants Iyer and Garrett, were surprised to see the plaintiff attend chapter events. At the first dinner, defendant Pallaki taunted the plaintiff about the events of the previous year, and told him that it was surprising to see him. The Plaintiff played off prior history as mere politics and was friendly to all.

104. Defendant Pallaki would thereafter avoid attending any event attended by the plaintiff, which was almost every meeting, even though he was the treasurer, and the real power behind the nominal president, defendant Iyer. Instead he would only attend the few "board and former board only" events organized which the plaintiff was excluded from, despite being a former board member himself.

105. Despite being the president of the chapter, defendant Iyer was not permitted by the ringleader, defendant Pallaki, to attend the leadership conference for incoming presidents hosted by the national organization. Defendant Pallaki sent himself instead.

106. Defendant Pallaki used his presence among approximately 200 other attendees from almost every law school in the United States at the Student Leadership Conference to spread defamations about the plaintiff in attempt of creating a kind of a viral effect. As a result of these efforts at the Student Leadership Conference, among others, when attending various Federalist Society functions all over the United States, the plaintiff has encountered approximately two dozen people in the years since who attended that same conference whom he never met, yet have strong preconceived notions of him, mostly negative but some very sympathetic from those who could see through defendant Pallaki's lies.

107. Defendant Iyer told the plaintiff, early in this academic year, that defendant Pallaki would ask him if the plaintiff had signed up for an event. The plaintiff signed up for every event, and actually attended almost all of them. Defendant Iyer would also mention things, often out of context and almost as a provocation, about defendant Pallaki, such as where he was going to clerk or what article he was writing with defendant Epstein, but never received any caring or engagement from the plaintiff. The plaintiff was not interested in the past.

108. Although out of sight and out of mind, defendant Pallaki was not done with the plaintiff. During this academic year, he would spread vile defamations about the plaintiff, such as that the women the plaintiff was occasionally seen on dates with in Manhattan were prostitutes because he could not succeed with women, that the plaintiff was a hard drug user and that the plaintiff had gained weight compared to the first year of law school due to taking psychiatric medications.

109. All of these vicious defamations were false. The plaintiff has never used or taken hard drugs, recreational drugs of any kind, nor psychiatric medication of any kind. Rather than consort with

prostitutes, the plaintiff dated educated women often in the prime of their successful professional careers, who sought to and did in fact include him in their lifestyles.

110. Defendant Pallaki did not want to take the risk of spreading these defamations himself, and so he spread them by agitating a gullible student, Quentin Weinstein, as his messenger, and then feeding him with them. Defendant Pallaki agitated Quentin Weinstein by telling him that the plaintiff was saying equally terrible things about him. In fact, the plaintiff had never met Quentin Weinstein, did not know who he was other than hearing his name mentioned, and had never talked about him to anyone.

111. Eventually, towards the end of the school year, Quentin Weinstein stopped serving defendant Pallaki in this regard after he met the plaintiff for the first time, and realized that the plaintiff did not know who he was and had no opinion of him at all. Thereafter defendant Pallaki continued by a different intermediary.

Attempt to Join Board and Reconcile

112. Besides from defendant Pallaki's individual and more egregious fabrications, the Crew was generally continuing its sabotage and dirt campaign against the plaintiff, with milder falsehoods for defendant Epstein to believe. These attempts caused defendant Epstein to believe that the plaintiff had to "patch things up" email with the board, despite him doing everything possible and fault laying upon them. A common refrain against the plaintiff was that he was not socially successful or talented.

113. Nothing could be further from the truth, because outside of the law school, where he did not even attempt to socialize, the plaintiff had the best year in social terms of his life. He enjoyed the social scene of Manhattan including the private social and dining clubs, was invited to sporting events, offered a surefire recommendation to join the Harmonie Club, and was invited to serve as a formal escort at debutante balls. To cement his friendship with women he had met who were members, and to

advance the cause of women, he also joined the Women's National Republican Club as a member of the male auxiliary.

114. In an act of reconciliation, the plaintiff applied to join the board of the Chapter in a minor role, and was informed by defendant Iyer that he was not eligible for any role according to the new chapter constitution implemented by the board of 2020/2021, which prevented former presidents from having any role. Defendant Iyer did not have any explanation for why the plaintiff, who evidently was deemed a former president, was not permitted to attend events for former board members either.

115. The Plaintiff took this issue up with the national organization, which instructed defendant Iyer to interview the plaintiff. Regardless of a performative interview, he was not offered a board position, and reached the conclusion that the Crew, in control of the Chapter and having become a significant power over defendant Epstein's racket, would continue to undermine and attack him despite him giving them no reason.

The Bar Review (Social Event) Defamation And Subsequent Cover-Up

116. On or about April 7, 2022, Plaintiff attended a "bar review" party hosted by the NYU Student Bar Association, which was a rare occurrence for him, on the suggestion of some members of the NYU Chapter.

117. Late into the event, at approximately 11PM, Sarah Winslow arrived and saw the plaintiff talking outside the pub with defendant Garrett. She told the doorman, while in view of high definition security cameras that face outward from the entrance, that the plaintiff had been "creeping" on her earlier that night, despite not having spoken or seen him in about year and a half, or interacting on any matter besides the September 2020 dispute about providing free links to the Clarence Thomas documentary.

118. Initially, the doorman turned both the plaintiff and defendant Garrett away, but eventually clarified that only the plaintiff would be refused reentry, due to the above mentioned fabrication by Sarah Winslow, whom he identified by her specific clothing and physical description of being short and heavy.

119. The doorman further explained that he did not believe her, and that the plaintiff could return anytime after that night, but that they had an automatic policy for such situations, and that it only applied to male patrons subject to complaints by female patrons but not the opposite.

120. Defendant Garrett and the plaintiff, who were standing together, in front of the high definition security cameras that face outward from the entrance, turned to each other and remarked that this was the sort of primae facie discrimination they had been taught about at law school.

121. Subsequently, on or about April 8, 2022, the plaintiff filed a human rights complaint against the establishment, which was investigated by the New York State Division of Human Rights (NYSDHR), a governmental body that exercises both investigative and adjudicative powers. The Plaintiff notified defendant Garrett that he could expect a call from the New York State Division of Human Rights investigator, who had provided the plaintiff with his number.

122. In the interim, defendant Garrett, as the designated successor for the position of nominal Chapter president, under both the remote counsel of defendant Pallaki, and defendant Iyer as the on-campus leader consulted the other members of the Crew as to what should be done. He knew to consult, because he had heard about the events of September 2020 from the original members of the Crew, and the role that Sarah Winslow played as a pretext for the coup. He was instructed by defendants Pallaki and Iyer to do whatever was necessary to continue sabotaging and oppressing the plaintiff, and protect Sarah Winslow as a former asset of the Crew, including to provide perjured testimony and obstruct justice, which he did. In so instructing, defendants Iyer and Pallaki tampered with a witness.

123.    The investigation of the NYSDHR was terminated for the sole reason of defendant Garrett's perjured testimony provided in his phone interview, which also obstructed justice by interfering with an executive branch state-level investigation. Defendant Garrett denied everything he had witnessed despite these events being recorded, and he was rewarded by the Crew by being nominated the new president of the Chapter the following month, and receiving assistance in obtaining a clerkship for the same Ninth Circuit Court of Appeals judge that defendant Pallaki would clerk for prior to him.

Plaintiff's Decision to Spend Third Year Away From NYU and Defendant Epstein's Request He Stay

124.    As a result of all of this sabotage, defamation and mistreatment, and background campus antisemitism, the plaintiff decided to spend his final year of law school divided between a foreign exchange and at a different American law school, but graduate from NYU Law as is permissible. The Plaintiff informed defendant Epstein of his decision in an April 10 email, which detailed these reasons, with some humor to make light of what felt like a cowardly retreat, and making a point to remind defendant Epstein that contrary to what the members of the Crew said about his social skills, he was socially succeeding well enough outside the law school.

125.    A few days later, defendant Epstein called the plaintiff and pleaded with him to remain, and offered the him a "feeder" federal appellate clerkship from a list the plaintiff would provide to be followed by a Supreme Court clerkship as available, a top position on his journal, the Journal of Law and Liberty and to teach Property in addition to Food and Drug Law. At this time, defendant Epstein was struggling with a potentially fatal health issue that was later resolved, and the plaintiff's conscience could not let him refuse such a sincere request from someone in that situation. The Plaintiff agreed and canceled his plans for spending the third year away from NYU.

126. Because he was aware of the hostilities between the Crew and the plaintiff, defendant Epstein ordered defendant Iyer, who had initially refused to even interview the plaintiff for a board position, to

invite the plaintiff to apply. Defendant Iyer did so on the pretext that the journal was understaffed and that the plaintiff should apply for that reason, and he did not sound enthusiastic. After confirming with defendant Epstein that the position of Senior Article Editor was his plan for the plaintiff, the plaintiff accepted the position formally offered by defendant Iyer and discussed the details with Vincent Puzak, the upcoming Chief Editor.

### NYU Crew Implement "Final Solution" Against Plaintiff

127.    On or about July 15, 2022, defendant Garrett organized a last-minute get-together for members of the NYU Law Federalist Society. During a discussion about plans after summer jobs, which typically end in July, the plaintiff shared with defendants Iyer and Garrett that he would attend the James Kent Academy in early August. Approximately one third of all attendees were former Supreme Court clerks, and attendees regularly go on to become Supreme Court clerks.

128.    This revelation caused defendants Iyer and Garrett, to believe that the plaintiff was going to be one of approximately four whom defendant Epstein would recommend for a Supreme Court clerkship, and that the plaintiff would thus occupy the one slot maximum personally reserved by defendant Epstein for NYU.

129.    Defendant Iyer would then inform and consult with defendant Pallaki, who would also hope to occupy that slot after finishing his second clerkship in the interim year. The two reaffirmed mutual career support to each other, which was a basic understanding of their overlapping membership in the Crew for an entire year, regardless of which one of them got the NYU slot. It was mutually beneficial for them to set up defendant Garrett to do the dirty work facing the Federalist Society and defendant Epstein, just as defendant Pallaki had set up defendant Weinberg to take the fall in front of defendant Epstein in 2020.

130.    Because the long litany of sabotages, defamations, public humiliations, false complaints and other acts of malfeasance did not succeed to prevent the plaintiff from reaching this extremely favorable position, the NYU Crew had to do something drastic in order to maintain their power and status, as well as increase their own chances.

131.    On July 29, 2022, defendant Iyer surreptitiously photographed a guard desk at the lobby of 601 Lexington Avenue (the address of Kirkland & Ellis). He then used digital image manipulation software to erase the actual contents of a page posted at that desk and replace them with a picture of the plaintiff's face, and the text:

DO NOT ADMIT
GIDEON RAPAPORT
KIRKLAND AND ELLIS

132. The fake image thus created the false and defamatory implication that plaintiff had been barred from entry for some kind of misconduct. This false image was then posted online by defendant Iyer on two internet sites, Reddit.com and Top-Law-Schools.com.

133. The postings were accompanied by false statements posted by defendant Iyer that the plaintiff was fired for sexual harassment, was banned from the building and was accompanied by a significant amount of material about his personality, habits, mannerisms, modes of dress and pastimes.

134. The text of the posts accompanying the forgery also mentioned plaintiff's political, ideological and jurisprudential beliefs. This was in order to mask the attack as not coming from individuals with shared ideology and membership in the Federalist Society, when in fact it came from defendants Pallaki, Iyer and Garrett.

135. The anonymous publication of the forgery and defamatory claims were intended to coincide with the presence of defendant Garrett at the Federalist Society Student Leadership Conference for incoming law school chapter presidents, hosted from July 29 to 31, 2022.  Defendant Iyer posted these

materials anonymously, so that he would limit his exposure, and defendant Garrett would do the dirty work during the Student Leadership Conference facing staff of the organization in person.

136. Defendant Garrett conveyed these online defamations that were posted anonymously by defendant Iyer by showing them to Peter Redpath and Kate Alcantara.

137. Because Peter Redpath and Kate Alcantara did not believe these defamations to be true, and the first version of the forged image appeared fake, the Crew had to try again, and more thoroughly. This time, since defendant Garrett had tried his leverage through the conference and failed, defendant Iyer would have to come forward as a purported witness because he also worked at Kirkland & Ellis that summer.

138. Upon pressure from defendant Pallaki in combination with his own malice against the plaintiff, defendant Iyer went back to try again. This pressure was particularly potent, because defendant Pallaki could have exposed the conduct of defendant Iyer in taking and forging the picture. This time, he risked exposing himself by presenting himself to defendant Garrett and to defendant Epstein and the staff of the Federalist Society as the source of the image, rather than getting it from the internet, as defendant Garret wrote in his email to the Federalist Society Student Division. This second forgery was better done, because it had wrinkles on the page that transferred through the image of the plaintiff, while the first forgery was completely smooth only for the portion upon which the digital image of the plaintiff was inserted but wrinkled elsewhere.

**2022/2023**

<u>Defendant Epstein Joined With Defendant Students To Protect The Racket</u>

139. Once defendant Epstein was informed about the allegations by defendants Iyer and Garrett, he decided to pull all support of and totally destroy the career of the plaintiff. He did not care whether the

allegations were true or false, and even after he learned them to be false and supported by forgeries, he continued his boycott of the plaintiff.

140. Shortly after concluding his participation in the James Kent Academy, the plaintiff spoke with defendant Epstein over the phone on August 9, 2022.

141. After the publication of the defamatory materials and filing of false claims, and on or about August 9, 2022, in an exceptionally one sided phone call, defendant Epstein declared by monologue to the plaintiff that he had decided that as a result of the recent "shipwreck", and despite the forgery and falsity of the allegations, that the plaintiff will not have a federal clerkship, will not serve as Senior Article Editor of the Journal of Law and Liberty.

142. Defendant Epstein personally attacked the plaintiff by also saying that if he had any complaints he should hire a psychiatrist to complain to, if he does not have one already.

143. Defendant Epstein admitted to the plaintiff that he believed that it was not beneficial for the Bradley fellowship to be associated with the plaintiff, even considering the forgery and the falsity of the defamatory allegations and that the motive for the defamation. Defendant Epstein had previously communicated to the plaintiff, in April 2022 that he would receive a Bradley Fellowship for a sum of $5,000 if he returned to NYU as suggested by defendant Epstein.

144. Defendant Epstein also spoke to the plaintiff about a false complaint filed against him, and that but for the personal intervention of the Dean, he would have been subject to an unfair and dangerous proceeding. This was also intended to discourage the plaintiff from investigating.

145. Later that day, the plaintiff pressed defendant Epstein about the possible involvement of members of the NYU Chapter by email. Defendant Epstein replied "I was responsible", which was a fraudulent lie meant to shield the students whom he knew to be culpable, at least of the defamation, forgery and wire fraud at that stage.

Investigation Thwarted by Defendant Epstein

146. The Plaintiff repeatedly tried to learn the truth about what had happened throughout September 2022, and if anyone from the NYU chapter was involved, but defendant Epstein would never agree to disclose anything.

147. Tellingly, defendant Epstein showed instant anger, as he rarely does, except when he feels that something is wasting his time and his intellect, when confronted with a request of sympathy considering the source of the attack was ideologically based. Defendant Epstein showed this anger because he knew that it was just masked as being ideologically based, but had actually come from his own students, in his own Chapter.

148. At the conclusion of the 2023 Journal of Law and Liberty Gala, on or about February 3, 2023, on a walk to defendant Epstein's subway stop, the plaintiff asked defendant Epstein if there was anything he could get involved in to improve his chances of finding a job. Defendant Epstein offered the plaintiff something from the "Bradley group" if he would "stop bothering people", referring to the plaintiff's insistence on resolving what had happened in the Summer of 2022. He mentioned the sum of ten thousand dollars.

149. The Plaintiff was pleased by this revelation because he thought that having a fellowship like he had expected to have before would be beneficial for his resume and signal inclusion. Defendant Epstein told him that it was just for the money without the distinction, because of the plaintiff's reputation. The Plaintiff then asked what would stop him from claiming it on his resume if he actually got the money transferred to him and could prove it with a bank statement.

150. Defendant Epstein laughed, and explained that in the plaintiff's case it would simply be necessary to show the money as coming from somewhere else. The Plaintiff refused this, as it was not the money he was after, and did not feel that this was proper based on his education as an accountant.

151. It was also during this walk, that the plaintiff asked defendant Epstein about whether he had cut ties with his former student John Eastman as well, and why. The plaintiff provided a similar utilitarian rationale, that it was not good to remain tied for the other things he does and is affiliated with. He dismissed the suffering of that former student by saying "he got too close to power" and that "you can't do that". This illustrates defendant Epstein's contrasting, highly indirect and broad approach to political influence, as diagrammed in Appendix A.

152. After exhausting all possible investigative leads, and being deceived by defendant Epstein's deflections away from the NYU Crew, the plaintiff made one final try to get the truth from defendant Epstein.

153. On July 28, 2023, defendant Epstein and the plaintiff went to lunch. Defendant Epstein originally insisted on a date that would have been after the statute of limitations for potential defamation claims, but the plaintiff insisted for the true reason that he had to return to Ohio on July 29.

154. Over lunch, plaintiff showed him a copy of the original complaint in the matter of Rapaport v. Doe 1 et al. 23-cv-06709, which he had intended to file that day in this action, and asked him if he had any corrections or additions to it.

155. This was the original *pro se* John Doe complaint, in which plaintiff was completely ignorant of the identities of the defendants, including defendant Epstein. Thus, while he knew full well what had happened to him, he had no idea who was responsible.

156. Defendant Epstein did not offer a single correction or addition, despite knowing full well of the tortious actions, false statements, and the two fake photographs perpetrated by defendants Iyer and Garrett, as well as his own actions.

157. Defendant Epstein stated that he did not want to be involved in any way, but the plaintiff told him that it was too late, because he was a key witness and so much of the measure of the damages revolves around him.

158. Although he did not offer any correction or addition to the original complaint, defendant Epstein could not resist commenting on the overall situation, and told the plaintiff in a self-satisfied manner that because he could not serve John Does, the case would automatically be dismissed within 120 days [the rule that used to require service within 120 days has been amended to require 90]. The plaintiff then humorously told him that whoever taught him civil procedure should be fired, because it was not so simple.

159. On the way to the subway stop, the plaintiff, who was quite familiar with the academic theories and works of defendant Epstein, told him that despite careful study, he could not understand his moral theory or conduct. Specifically his contradictory utilitarian and deontological natural law positions. Defendant Epstein enthusiastically referred the plaintiff to his 1989 article *The Utilitarian Foundations of Natural Law*, which the plaintiff had already read and responded with a brief critique. Defendant Epstein then told the plaintiff that he was referring to "basic matters", and that in such matters he was taught by his parents some decades ago to "tell the truth and be kind to those are weaker than me".

160. The plaintiff then asked defendant Epstein whether he had told the truth and been kind to those weaker than him in the matter contemplated by the draft complaint. Defendant Epstein was conspicuously silent and did not speak for the length of two Manhattan short blocks after which he abruptly announced that he remembered had to go to the bank and turned into a branch.

<u>Attempts of the Plaintiff to Investigate the Racket Rebuffed by Fraud and Abuse</u>

161. The plaintiff asked defendant Epstein for information three separate times at the law school during September 2022, by appealing alternatively to his sense of justice, self-interest and

empathy. Nothing worked and defendant Epstein always had the same incredible answer, that the totally false defamation was all the plaintiff's fault because it "would not have happened to anyone else", even as defendant Epstein knew his own students had fabricated and forged the defamations.

162. Defendant Epstein was so callous and insensitive to the suffering of the plaintiff, and thus not inclined to tell the truth or take any ameliorating steps, and rather subjected the plaintiff to further reputational harm by loudly insulting him, after inviting him, in front of a large ballroom that included judges, professors and many other students at a dinner concluding a Journal of Law and Liberty symposium in February 2023.

163. The plaintiff made many attempts to discover who the perpetrators of the online defamations were, who also forwarded the materials in a targeted fashion to the Federalist Society and its affiliates. It was clear to the plaintiff that defendant Epstein knew something, and so he asked him on the August 9, 2022 phone call, followed up by pressing for an answer again by email that same day.

164. On September 19, 2022 the plaintiff wrote to defendant Epstein that the plaintiff's view from close to the front of the class of defendant Epstein's clay feet was only getting worse. This was a biblical metaphor from Daniel 2:31-35, where in a prophetic dream an otherwise magnificent statute had clay feet that cause it to eventually crumble into ruin.

165. A few days later, the plaintiff tried again to persuade defendant Epstein to do the right thing, and built on the feet of clay metaphor, with an aspect of self-awareness. On a walk to defendant Epstein's office, the plaintiff asked him if he remembered ABBA, and proceeded to recite a few verses from the groups *Happy New Year* song of 1979:

166.

"Oh yes, man is a fool
And he thinks he'll be okay
Dragging on, feet of clay

Never knowing he's astray
Keeps on going anyway…"

167. Defendant Epstein was amused but would not right his course, and would stick to his previous fraudulent cover up for the actions of his former students and current co-defendants.

168. Defendant Epstein showed a surprising outburst of impatience every time the plaintiff mentioned that the defamation originated from ideological opponents as a mitigating factor. In retrospect it is clear that this is because defendant Epstein already knew it was not so, because he knew it came from his own students, and felt that discussing that camouflage was a waste of time.

169. The plaintiff then tried to obtain information from defendant Epstein through anger, as was partially effective on August 9, 2022 resulting in the email received. The plaintiff's flagging attendance upset defendant Epstein, and while discussing attendance, the plaintiff turned the tables on defendant Epstein by accusing him of betrayal, covering up for the forgers and defamers, rewarding the guilty while punishing the innocent, and fretting over attendance while perpetrating a monumental wrong himself.

170. This was too much for defendant Epstein, and rather than provide any specific information he screamed at the plaintiff to get out of his office, although this inarticulate outburst was a kind of an admission.

171. The plaintiff hoped that defendant Epstein would report him for attendance and allow for a confrontation with the administration. Defendant Epstein did report the plaintiff for attendance, but the law school did nothing, and this inaction communicated information to the plaintiff. The law school knew that any adverse action against the plaintiff would incentivize him to bring a case and obtain discovery against defendant Epstein and the student defendants, because then he would have nothing to lose, and wanted to avoid this because there was something to conceal.

172. At the Federalist Society National Lawyers Conference and Student Leadership Conference the plaintiff tried unsuccessfully, to delicately obtain any information from Peter Redpath or Kate Alcantara, or other individuals but was unsuccessful in learning any information about the identities of the perpetrators.

173. Although the plaintiff suspected that the perpetrators were affiliated with the NYU chapter, he had no proof or identification of any particular individual. Others suspected the same generally but could not provide anything pointing to a particular individual. Some law student attendees and recent graduates from other schools speculated that the massive defamation campaign, which was infamous, was a continuation of the prior infamous struggle, which began in the academic year of 2020/2021, that they referred to as "Team Gideon vs. Team Cabal". Jokingly some of the individuals that discussed this general topic identified a team loyalty, as if it were a sport.

174. The "cabal" referred to by these students and recent graduates presumably represents the NYU Crew that ganged up on the plaintiff to oust him from the board in 2020/2021, such as the now-identified defendants Pallaki, Weinberg and Nelms, and their new recruits such as the now-identified defendants Iyer and Garrett. This commentary was the result of the events of the 2020/2021 academic year becoming infamous in the Federalist Society, with some curious people maintaining an interest in new developments. It is unknown who began referring to this group as a "cabal".

175. The September 2020 coup and subsequent mistreatment of the plaintiff by defendants, even prior to their ultimate attempt to destroy the plaintiff in the Summer of 2022, was notorious both in the social sphere of the Federalist Society, and the legal industry of New York. The plaintiff did not only face many inquiries from people in the former category, but was also asked by multiple partners and associates at the law firms he interviewed with during "On Campus Interview" week.

**2023/2024**

Subsequent Injuries After John Doe Pro Se Defamation Case Brought

176. The plaintiff suffered additional injuries, particularly from defendant Epstein, who weaponized his entire racket and sphere of influence against the plaintiff to an even greater extent.

177. Defendant Epstein, through tortious interference, threats of collateral, and double collateral boycotts, and by the operations of his racket prevented the plaintiff from working in the legal field, and got him fired from two jobs that were JD-advantaged and of an academic nature.

178. Since the transactions and occurrences which gave rise to this action, and continuously after the commencement of this action until now, defendant Epstein has tortiously interfered with the attempts of the plaintiff to obtain and retain employment relating to the law.

179. After the commencement of this action, for example, defendant Epstein would enthusiastically tell others that plaintiff was frequently absent from his classes, and described him as delinquent, unreliable and untrustworthy. The plaintiff had perfect attendance in defendant Epstein's classes, prior to being betrayed by him; only thereafter was he occasionally absent.

180. Defendant Epstein also made these remarks to small crowd of people at an exclusive Christmas party conspicuously attended by the right-of-center political, media and intellectual elites of New York. This particular private Christmas party is hosted annually by an eminent and wealthy New York family, and defendant Epstein chose to make the plaintiff a topic of disparaging discussion in both the 2022 and 2023 instances. This was witnessed by a close personal friend of the plaintiff who attended both years, and who confirmed the presence of the ultimate decision maker at the plaintiff's place of first employment that he lost as a result of defendant Epstein's interference both times. The plaintiff also heard about these comments through work prior to being terminated, but he did not discuss defendant Epstein's comments or their context due to this pending litigation.

181. Defendant Epstein denied the plaintiff the ability to earn a living once again when he demanded that the Manhattan Institute assign the project that the plaintiff was hired to work on to him as assisted by one of his research assistants from one of the organizations that supply him with them, and not take on the plaintiff despite already extending him an offer. Defendant Epstein's

demand was one made from a position of power, because he influences significant amounts of funding, recommends talent *to* the Manhattan Institute and also recommends *from* the Manhattan Institute through his various initiatives to clerkships and other positions.

182. Defendant Epstein presented the research on the topic that the plaintiff was specifically hired for instead of the plaintiff publicly and also provided more private materials to the Manhattan Institute as part of the engagement. This also included a video lecture on the subject with a question and answer period that was removed from the internet after the filing of the First Amended Complaint in the related matter of Rapaport v. Doe 1 et al 23-cv-06709.

183. On or about September 27, 2024 defendants Iyer and Garrett filed two perjured affidavits in support of their irredeemably conflicted legal representation so as to obstruct justice for an advantage in litigating the matter of Rapaport v. Doe 1 et al. 23-cv-06709. They each falsely declared under penalty of perjury  that they "vehemently deny the allegations that accuse us of any wrongdoing either jointly or separately". They cannot both do so truthfully, because defendant Iyer was identified by defendant Garrett to be the source of the second defamatory forgery when he forwarded it to the Federalist Society. This would either require for defendant Iyer to be the source of the forgery, a classic example of *malum in se* wrongdoing, or for defendant Garrett to have willfully and knowingly falsely attributed the second forgery to defendant Iyer.

184. On or about November 14, 2024 the contemporary President of NYU chapter of the Federalist Society, Keton Kakkar, spoke at the alumni lunch to provide alumni with a status of the chapter. He informed those present that the chapter had never seen a worse year for clerkship outcomes than that of the 2023/24 year, and that so far the 2024/25 year was faring no better. He stated that the chapter had "no pipeline", that it had previously been and remains exclusively reliant on defendant Epstein as the "pipeline" for clerkships. Kakkar referred to an ambition to remove defendant Epstein in his role as the faculty sponsor of the chapter, and cryptically referred to the difficulty in doing so. He also spoke of efforts in obtaining a new "pipeline" for clerkships.

185. Such abysmal outcomes were realized due to the exclusive reliance upon defendant Epstein, who in response to the federal actions initiated to bring him to justice engaged in a collective punishment through boycott of NYU students, denying them all of his slots, as a show of power and a deterrence against any testimony as to his conduct or the true nature of affairs in the organization.

186. On or about November 16, 2024, defendant Epstein spoke before a plenary session of the National Lawyers Convention of the Federalist Society. Though the session was meant to be a show of appreciation for the departing founder, defendant Epstein turned a substantial portion of his speech to himself and his own ideas, and spoke at length about the need to staff certain positions with the right young people in order to cement ideologically favorable outcomes in the future. Among the many positions defendant Epstein listed law clerks were emphasized.

187. Defendant Epstein chose to raise this as a public relations spin for his own benefit, as he incorrectly stated that the main purpose of the Federalist Society was to develop and place law clerks into judicial clerkships and eventually judgeships. In so doing he conflated the source of his own power and prestige, specifically the control over such clerkship slots, with the legitimate purpose of the organization whom his racket captures and exploits for his own aims.

Background on United States Supreme Court Clerkships

188. The process for becoming a clerk at the United States Supreme Court is quite esoteric, but it is widely known that the majority of positions are occupied by students from the top three law schools while almost all positions are occupied by students from the top fourteen law schools. There is no formal application process, and almost all clerks were required to clerk elsewhere before, usually for a federal appellate judge referred to as a "feeder". Increasingly, multiple clerkships are required.

189. There are notable deviations, relevant to this matter, in the pathways of how individual students succeed in this journey. The "standard" process, if there is such a thing, is understood to be securing a federal appellate clerkship with a "feeder" judge, and performing well enough in that role to be recommended to a slot which that judge has with a justice. However, some of the best students from the best schools, who are supported by the most influential professors such as defendant Epstein, can skip a part of this process.

190. These students can arrange their federal appellate clerkship and their United States Supreme Court clerkship at the same time, and assuming they perform adequately, they already know which justice they will clerk for before they even finish law school.

191. This was what defendant Epstein contemplated for the plaintiff, and why he waited until later in the degree, because the second clerkship was more important that the first, and the plaintiff hand indicated to him uncertainty about the idea of taking a detour for one year with an uncertain outcome. Furthermore, as a non-citizen, the plaintiff could not be paid for the first clerkship, but would also not take up a budgetary slot, thus upon securing interest from a justice, it would have been easy for defendant Epstein and the justice to persuade the appellate judge in question to just add an extra chair and desk in their chambers for the plaintiff.

192. The growing ideological divide of the Supreme Court also augments the role of defendant Epstein, especially when it is contrasted with the ideological orthodoxy of all of the top schools which is aligned with the Democratic-appointed justices, of which there are only currently three out of nine.

193. Because sending students to eventually clerk at the United States Supreme Court is immensely beneficial to the stature and alumni network of a law school, the law schools are motivated to ensure they fill those slots. However, this puts them at odds with their ideological goals, because many of the faculty and administrators of these top law schools view the Republican-appointed justices with intellectual and personal contempt, as evidenced by notorious public

statements, letters and advocacy in favor of impeaching them, stripping their jurisdiction, packing the court or some combination of these things.

194. Filled with sophisticated and intelligent people, these law schools have devised formal and informal policies to fill these detested conservative slots with their favored students. The schools manufacture these confections, which are generally apolitical or ideologically moderate, and train them through fellowship programs, mentorship from faculty members and other law school initiatives to serve as a controlled opposition. These students receive what is referred to as "institutional support", which is unofficial at NYU but official elsewhere, and have all of the connections and resources of the institution behind them. Thus serving both the ideological and institutional goals of the law school.

195. This process is so successful, and has been continuing for so long, that some of its former products have returned to the Supreme Court, where they clerked as controlled opposition tokens, as (now former) justices, who themselves hired fresh batches of confections like they once were to keep up the charade or simply turned their coats after receiving lifetime appointment.

196. At the same time, students that are identified as outspoken and enthusiastic rising members of the conservative legal movement, are subject to a *de facto* ban from any position on the flagship school law review, saddled by false disciplinary complaints, excluded from student organizations, and graded down in circumvention of so-called "anonymous grading" between one half and one grade point, which is an immense difference, and has been proven by private investigation and settled litigation.

197. It would be very naive and inaccurate to assume that a judge or a justice selecting clerks in this environment, can just pick the student with the highest GPA, a good position on the flagship law review and who sings a similar tune to them philosophically. This naive approach is no longer possible, and this is were "recommenders" like defendant Epstein come in.

198. As a result of all of these factors, defendant Epstein, as faculty advisor to the chapter and a prestigious journal that is ideologically tolerant, serves as a human bypass valve for all of the obstacles and uncertainties affecting judges and justices hiring law clerks put up by an ideologically opposed legal academy. He performs end-runs around the ideological opponents that outnumber him in, by taking raw talent and evaluating, training, certifying and eventually deliver it to where it can have the greatest impact, which is the United States Supreme Court. In this regard, he is the only game in town at NYU.

## FIRST CLAIM

**Racketeering per Racketeer Influenced Corrupt Organizations Act, 18 U. S. C. § 1962(b)**

199.     Plaintiff repeats and re-alleges the allegations of each of the foregoing allegations.

200.     It is "unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(b).

201.     The defendants captured and retained control of the Federalist Society chapter of NYU and the NYU Journal of Law and Liberty which are otherwise legitimate enterprises engaged in interstate commerce, through the commission of predicate racketeering activities per 18 USC § 1961(1). These acts included wire fraud, blackmail, extortion, witness tampering, obstruction of justice, obstruction of state law enforcement and money laundering.

202.     These racketeering activities were engaged in for the purposes of, and alongside violations of the anti-trust laws of the United States.

203.     On or about September 2020, defendant Nelms in cooperation with defendants Pallaki and Weinberg filed a false complaint utilizing the internet, against the plaintiff with the NYU School

of Law that deprived him of the proper contractual relations, and honest services, he had bargained and paid for with the school.

204.    On or about September 2020, defendant Pallaki, in cooperation with defendants Weinberg and Nelms, by phone and email, made false and defrauding statements to defendant Epstein and the Federalist Society that the plaintiff was hiring a research assistant, meant to deceive them and by their reliance on this falsehood cause a detriment to them and to the plaintiff.

205.    On or about September 2020, defendant Weinberg in cooperation with defendants Pallaki and Weinberg, transmitted by the internet, intentionally defective work product to the plaintiff, intending for him to rely on it to his detriment, which he did actually rely upon, to result in a pretext that would enable the defendants to capture the enterprise.

206.    On or about September 2020, defendant Nelms in cooperation with defendants Pallaki and Weinberg extorted, blackmailed and threatened and menaced the plaintiff that if he did not surrender his position as president of the NYU Chapter of the Federalist Society quietly he would suffer severe ramifications, including to his reputation and career. This was in violation of the laws of New Jersey.

207.    On or About September 2020, defendant Nelms in cooperation with defendants Pallaki and Weinberg extorted, blackmailed and threatened and menaced two other board members, that if they did not join the planned "unanimous" vote to remove the plaintiff from his position, or gave him any support or redemption of any kind,  that they suffer severe ramifications, including to their reputations and careers. This was in violation of the State laws where the board members resided.

208.    On or About September 2020, defendant Defendants Pallaki, Weinberg and Nelms extorted, blackmailed and threatened and the Federalist Society national organization to prevent it from preventing their capture of the enterprise. They threatened that if they were not allowed to

continue control, they would utilize their status as students to dissolve it, return its school funds and further cause massive reputational harm and embarrassment to the national organization.

209.    On or about March 2021, defendant Pallaki, by phone and email, perpetrated wire fraud against the Student Division of the Federalist Society by tricking them into believing for a time, that the plaintiff had transferred to Northwestern University and was older than 30, to deprive the plaintiff of beneficial treatment by the organization, and prevent the plaintiff from challenging the control of the Crew over the captured enterprise. This also deprived the organization of a more favorable relationship with the plaintiff.

210.    On or about April 2022, after a bar review social event where he witnessed discriminatory treatment of the plaintiff in violation of his human rights under the laws of the State of New York, defendant Garrett, as instructed by defendants Iyer and Pallaki, committed perjury when testifying about the matter by phone. In so doing, he obstructed justice and committed wire fraud by depriving the plaintiff of the honest services of the NYSDHR which included legal representation to benefit the plaintiff.

211.    By instructing defendant Garrett to do so if he wanted to become the next nominal president of the captured NYU Chapter, defendants Iyer and Pallaki tampered with a witness, and also obstructed justice.

212.    On or about late July to early August 2022, defendants Pallaki, Iyer and Garrett fabricated fake pictures depicting the security desk of Kirkland & Ellis, to support a defamation that they invented, that the plaintiff was fired from his summer associate position for sexual harassment, and was banned from the premises. They posted these defamatory allegations online, sent them by email, and discussed them by phone, thus perpetrating wire frauds against defendant Epstein, the Federalist Society, New York University and many others who detrimentally relied upon this fraud and

were injured, as well as the plaintiff who was deprived of his property and honest services to which he was entitled.

213.    On or about August 9, 2022, defendant Epstein perpetrated wire fraud against the plaintiff by email and phone, where he denied, to the detrimental reliance of the plaintiff and his legal rights, that anyone from the NYU Federalist Society was involved in the recent defamations. Defendant Epstein knew that his own students were involved, and covered up for them to protect the racket.

214.    On or about August 9, 2022, defendant Epstein extorted and threatened the plaintiff with expulsion from the law school as the result of a "kangaroo court" Title IX proceeding, that defendant Epstein volunteered to say he would not lift a finger to prevent despite his immense influence at the law school, and that any controversy relating to the plaintiff would result in his suspension and eventual expulsion. Defendant Epstein did so to cover up his fraud, disincentivize the plaintiff from further investigation and obstruct justice.

215.    On or about September 27, 2024 defendants Iyer and Garrett obstructed justice by filing two perjured affidavits in support of their irredeemably conflicted legal representation so as to obstruct justice for an advantage in litigating the matter of Rapaport v. Doe 1 et al. 23-cv-06709. They each falsely declared under penalty of perjury  that they "vehemently deny the allegations that accuse us of any wrongdoing either jointly or separately". This irredeemably conflicted concurrent representation was sought out by defendant Iyer, who has more severe culpability as the forger of the defamatory and fraudulent materials, in order to corruptly tamper with the testimony of defendant Garrett, who identified him as the source of the forgery.

216.    Throughout the 2023/2024 academic term, defendant Epstein engaged in a collective punishment of all NYU students by boycotting them from his clerkship slots in order to intimidate them from testifying as to facts relevant to this case including relating to the NYU Federalist Society

chapter and the Journal of Law and Liberty. This resulted in the worst results for that cohort of students on record and constitutes tampering with witnesses.

217. Throughout the relevant period and until now, defendant Epstein controls and maintains control of the captured enterprises through control over a significant portion of their funding, and in this context he engages in money laundering to conceal the origins of funds which are not socially or politically palatable to many. Specifically, on or about February 3, 2023, defendant Epstein offered the plaintiff money from a slush fund under his control, that he referred to as being connected to the Bradley organization, and specifically stated that although related if accepted, it would be funneled through a different source to appear as coming from somewhere else. This was in order to prevent the plaintiff from hypothetically claiming a grant as some benefit to his resume.

218. Plaintiffs' damages through injury to his business and property as have been directly and proximately caused by Defendants' violations.

219. Plaintiffs have also suffered damages by incurring legal costs associated with prosecuting Defendants' RICO violations in the instant action.

220. These racketeering activities were engaged in for the purposes of, and alongside violations of the anti-trust laws of the United States.

## SECOND CLAIM

**Racketeering per Racketeer Influenced Corrupt Organizations Act, 18 U. S. C. § 1962(c)**

221. Plaintiff repeats and re-alleges the allegations of each of the foregoing allegations.

222. Particularly, all allegations of the First Claim are re-alleged as activities that represent how the defendants illicitly conducted the affairs of the captured enterprises through racketeering.

223. It is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly

or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity" 18 U.S.C. § 1962(c).

224. The defendants, with respect to the NYU Federalist Society chapter and the NYU Journal of Law and Liberty, which was an otherwise legitimate enterprise engaged in interstate commerce, conducted its affairs for their nefarious purposes through a pattern of racketeering activities per 18 USC § 1961(1). These acts included wire fraud, blackmail, extortion, witness tampering, obstruction of justice, obstruction of state law enforcement and money laundering.

225. Plaintiffs' damages through injury to his business and property as have been directly and proximately caused by Defendants' violations.

226. Plaintiff has also suffered damages by incurring legal costs associated with prosecuting Defendants' RICO violations in the instant action.

227. These racketeering activities were engaged in for the purposes of, and alongside violations of the anti-trust laws of the United States.

### THIRD CLAIM

**Racketeering Conspiracy per Racketeer Influenced Corrupt Organizations Act, 18 U. S. C. § 1962(d) to violate 18 U. S. C. § 1962(b)**

228. Plaintiff repeats and re-alleges the allegations of each of the foregoing allegations.

229. Particularly, all allegations under the heading of the First Claim are re-alleged herein in reference to the conspiracy to capture the enterprises through a pattern of racketeering activities.

230. It is "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section" 18 U.S.C. § 1962(d).

231. 18 U.S.C. § 1962(b) provides that it is "unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or

indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

232.    The defendants conspired to capture, or alternatively to retain control of the NYU Federalist Society chapter and the NYU Journal of Law and Liberty which are otherwise legitimate enterprises engaged in interstate commerce, through the commission of predicate racketeering activities per 18 USC § 1961(1). These acts included wire fraud, blackmail, extortion, witness tampering, obstruction of justice, obstruction of state law enforcement and money laundering.

233.    Defendants perpetrated wire fraud against the NYU School of Law, the State of New York Department of Human Rights, the Federalist Society of Law and Public Policy, and the plaintiff directly in their illegal schemes to capture and retain control of the NYU chapter of the Federalist Society and the NYU Journal of Law and Liberty.

234.    Plaintiffs' damages through injury to his business and property as have been directly and proximately caused by Defendants' violations.

235.    Plaintiff has also suffered damages by incurring legal costs associated with prosecuting Defendants' RICO violations in the instant action.

236.    These racketeering activities were engaged in for the purposes of, and alongside violations of the anti-trust laws of the United States.

## FOURTH CLAIM

**Racketeering Conspiracy per Racketeer Influenced Corrupt Organizations Act, 18 U. S. C. § 1962(d) to violate 18 U. S. C. § 1962(c)**

237.    Plaintiff repeats and re-alleges the allegations of each of the foregoing allegations.

238.    Particularly, all allegations of the First Claim are re-alleged as activities that represent how the defendants conspired to conduct the affairs of the captured enterprise through racketeering.

239. It is "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section". 18 U.S.C. § 1962(d).

240. 18 U.S.C. § 1962(c) provides that it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity".

241. The defendants conspired to capture, or alternatively to retain control of the NYU Federalist Society chapter and the NYU Journal of Law and Liberty which are otherwise legitimate enterprises engaged in interstate commerce, through the commission of predicate racketeering activities per 18 USC § 1961(1). These acts included wire fraud, blackmail, extortion, witness tampering, obstruction of justice, obstruction of state law enforcement and money laundering.

242. Plaintiffs' damages through injury to his business and property as have been directly and proximately caused by Defendants' violations.

243. Plaintiff has also suffered damages by incurring legal costs associated with prosecuting Defendants' RICO violations in the instant action.

## FIFTH CLAIM

### (Monopolization of the Judicial Clerkship Market at NYU)

244. Plaintiff repeats and re-alleges the allegations of each of the foregoing allegations.

245. Defendants monopolized the judicial clerkship market as flowing through the New York University School of Law, understood as one of a handful of pipelines to such professional distinction and employment, which are a requirement for access to this market.

246. Defendant Epstein, with final say and control, was during the relevant period, and still is the only provider in this market. There are no substitutes, due to the structure of the broader market,

wherein other recommenders at other schools only recommend their own students and will refuse to deal with others.

247.    All other defendants joined in defendant Epstein's monopoly and assisted in operating it for the purposes of securing influence over it and benefit from it for themselves.

248.    This monopolization was supported by tortious activity and a pattern of racketeering.


## SIXTH CLAIM

**(Attempted Monopolization of the of the Judicial Clerkship Market at NYU)**

249.    Plaintiff repeats and re-alleges the allegations of each of the foregoing allegations.

250.    Defendants attempted to monopolize the judicial clerkship market as flowing through the New York University School of Law, understood as one of a handful of pipelines to such professional distinction and employment, which are a requirement for access to this market.

251.    Defendant Epstein, with final say and control, was during the relevant period, and still is the only provider in this market. There are no substitutes, due to the structure of the broader market, wherein other recommenders at other schools only recommend their own students and will refuse to deal with others.

252.    All other defendants joined in defendant Epstein's monopoly and assisted in operating it for the purposes of securing influence over it and benefit from it for themselves.

253.    This monopolization was supported by tortious activity and a pattern of racketeering.


## SEVENTH CLAIM

**(Unreasonable Restraints of Trade Concerning Academic Journal Work)**

254.    Plaintiff repeats and re-alleges the allegations of each of the foregoing allegations.

255. Defendant Epstein, as driven and motivated by other defendants, organized an unlawful collateral and double collateral boycott meant to prevent the plaintiff from engaging in academic journal work at the NYU Journal of Law and Liberty.

256. This unlawful restraint of trade was supported and implemented through tortious activity and a pattern of racketeering.

257. This was successful and resulted in the plaintiff not performing any academic journal work, for the NYU Journal of Law and Liberty or any other journal, in the 2022/2023 academic year. This detrimentally affected his participation in the other markets contemplated by this action, and his business.

## EIGHTH CLAIM

### (Unreasonable Restraints of Trade Concerning Think Tank Work)

258. Plaintiff repeats and re-alleges the allegations of each of the foregoing allegations.

259. Defendant Epstein, as driven and motivated by other defendants, organized an unlawful collateral and double collateral boycott meant to prevent the plaintiff from performing think tank work, either for an impromptu research project funded by the America Fund or a more organized position for the Manhattan Institute.

260. In the latter case, defendant Epstein took that work into the sphere of his own racket, and completed the project with a research assistant in order to keep the plaintiff out of the market.

261. Defendant Epstein's collateral and double collateral threat was a serious one to these organizations, due to the amount of influence he carries with a variety of organizations, donors and his control over staffing of coveted positions, including federal clerkships.

262. This was supported and implemented through tortious activity and a pattern of racketeering.

263.    This was successful and caused the plaintiff not performing any think tank work after he lost both jobs, with very poor prospects of reentering the market.

## NINTH CLAIM

### (Unreasonable Restraints of Trade Concerning Clerkships)

264.    Plaintiff repeats and re-alleges the allegations of each of the foregoing allegations.

265.    The defendants created and conspired to create unreasonable and unlawful restraints of trade against the plaintiff to prevent him from obtaining a judicial clerkship by tarnishing his reputation by creating forgeries and defamations that would make it impossible for any person to obtain such a position or even become admitted as an attorney despite fulfilling all other requirements.

266.    This was supported and implemented through tortious activity and a pattern of racketeering.

267.    This was successful and caused the plaintiff to be unable to obtain such a position.

**WHEREFORE**, Plaintiff demands judgment against defendants, jointly and severally, as follows:

1.    Award treble damages for all Claims, with the base amounts to be determined by a jury.

2.    Adjudge and decree that defendants acted unlawfully to monopolize or attempt to monopolize the markets as described in the Fifth and Sixth Claim.

3.    Adjudge and decree that defendants acted unlawfully to restrain trade in the markets described in the Seventh, Eighth and Ninth Claim

4.    Award appropriate legal costs for the bringing of this action.

5.    Grant such reasonable equitable relief by order as is necessary to restrain current and future racketeering and anti-trust violations.

**Appendix A**